UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  2:15-cr-00127-JDL |
| | ) | |
| TODD RASBERRY | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS
WITH INCORPORATED MEMORANDUM OF LAW**

The United States of America, by and through its attorneys, Thomas E. Delahanty II,
United States Attorney for the District of Maine, and Julia M. Lipez, Assistant United States
Attorney, respectfully objects to Defendant Todd Rasberry's Motion to Suppress (Docket No.
17).  The defendant has been charged by indictment (Docket No. 10) with one count of
possession with intent to distribute cocaine and one count of possession with intent to distribute
heroin, both in violation of 21 U.S.C. § 841(a)(1).

The defendant seeks to suppress drugs seized from him during an encounter with law
enforcement at a hotel room in Scarborough, Maine.  For the reasons stated below, the motion is
without merit and should be denied.

**STATEMENT OF FACTS**[1]

The government expects to prove the following facts at the hearing on the defendant's
Motion to Suppress:

On July 15, 2015, Special Agent Paul Wolf of the U.S. Drug Enforcement Administration
("DEA") spoke with a cooperating source who informed him that a woman referred to herein as
J.W. was delivering heroin for a drug trafficker with the street name "Champagne."  Agent Wolf
had previously been investigating both J.W. and Champagne, and had determined that

---

[1]    The facts set forth below are based on a review of reports and related documents, and
conversations with one or more officers who participated in the events at issue.

Champagne was a man named Todd Rasberry.  The cooperating source told Agent Wolf that J.W. would be delivering drugs in the area of the Clarion Hotel in Portland around 3:00 p.m. on July 15th, and the source provided information about J.W.'s rental car, which Agent Wolf was able to verify with Hertz.

Agent Wolf, along with DEA Special Agents Kris Sullivan and Kate Barnard and Task Force Agent Tom LaPierre, set up surveillance outside the Clarion Hotel.  At 3:45 p.m., they observed J.W. parked at the gas station across the street in the expected rental car.  They subsequently confronted her and she provided them with six knotted baggies of a brown powder, which the agents believed to be heroin.  She told the agents that she was delivering the drugs for an individual she knew as Champ or Champagne, and that he was currently inside Room 109 of America's Best Value Inn in Scarborough.  She further told the agents that Champagne had asked her to pick up a box of sandwich bags in order to package drugs for sale.  J.W. had rented Room 109 in her name and provided the agents with a keycard to the room and written consent to search it.  She told them that Champagne would be alone in the room and that he would become suspicious and flee if she did not continue to answer her phone when he or drug customers called.

Based on his prior investigation, Agent Wolf believed that the Champagne J.W. referred to was Todd Rasberry.  He had seen Rasberry's photograph and was familiar with his criminal history, which included convictions for drug offenses and violence involving weapons.  He knew that Rasberry had used aliases in the past and had recently been convicted for providing a false name to police.  He also was aware that the conviction involving the false name resulted from a police search of a hotel room occupied by the defendant and another individual, during which the police found drugs and a gun.

Agents Wolf and LaPierre, along with Scarborough Police Officer Andrew Flynn, proceeded to Room 109 of the America's Best Value Inn, while Agent Sullivan guarded a window at the rear of the hotel.  All of the officers were in plainclothes with either a police vest or a badge.  Agent Wolf first tried to open the door to Room 109 using the keycard that J.W. gave him.  When that did not work, he knocked on the door and the defendant, whom Agent Wolf recognized as Todd Rasberry, opened the door.  The officers told the defendant they were there to search the room and entered.  The defendant did not object.  Officer Flynn recalls that although he had his weapon drawn at the time he entered the hotel room, he holstered it shortly thereafter.

Once inside the room, Officer Flynn placed the defendant in handcuffs at Agent Wolf's direction, and conducted a cursory check of the back of the defendant's pants to make sure he did not have any weapons that he could access even while in handcuffs.  The officer found a bandana tucked into the back of the defendant's pants.  Because the bandana felt lumpy, Officer Flynn removed it to check for weapons, subsequently determining that the lump resulted from a fold in the bandana.  He also noticed a jingling in the defendant's pockets and removed a set of keys. He did not conduct a full pat-down of the defendant.

While Officer Flynn was interacting with the defendant, Agent Wolf drew his weapon and performed a brief security sweep of the room.  Once he determined that there were no other individuals present, he holstered his weapon.  Agents LaPierre and Sullivan did not draw their weapons at any time.

Agent Wolf then explained to the defendant that he was not under arrest, but was instead being detained while the officers searched the room.  The defendant told them that the room was not his and that he was a guest of the woman who had rented it.

Agent Wolf left briefly to move his truck and get evidence bags and search gloves.  Upon returning to the room, he told the defendant that he was going to pat him down for weapons before removing the handcuffs.  The defendant asked Officer Flynn why he was being frisked again, and Officer Flynn explained to him that the first frisk had been cursory.  During the pat-down, Agent Wolf felt a hard object about the size of a tennis ball hanging low near the inseam of the defendant's shorts.  Agent Wolf knew immediately that the object was not part of the defendant's anatomy and believed, based on his past experience with drug trafficking investigations, that it was drugs secreted in a hidden compartment in the defendant's underwear.

Based on the information previously received from J.W., the drugs found on her, and the suspected drugs found on the defendant's person, Agent Wolf informed the defendant that he was now under arrest and was going to be searched.  Inside a pocket in the defendant's underwear, Agent Wolf found a plastic bag that contained three large bags of brown powder and one large bag of white powder.  These items later field tested positive for heroin and cocaine, respectively.  The defendant was cooperative throughout the search of his person.  The agents also found cash and a phone in the defendant's pockets, and a digital scale, a second phone, and a box of sandwich bags in the hotel room.

## **ARGUMENT**

The defendant argues that the officers unlawfully arrested him and frisked his person, leading to the discovery of drugs in his underwear that must be suppressed.  Because the officers conducted a proper investigative detention and pat-down of the defendant, his motion to suppress should be denied.

**I.      The Officers' Use of Handcuffs and Drawn Weapons Did Not Convert the
         *Terry* Stop Into an Unlawful Arrest**

Upon entering Room 109 of the America's Best Value Inn on July 15, the agents placed

the defendant in handcuffs and conducted a security sweep of the room, all in compliance with

the Fourth Amendment.[2]  As a result of *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, police

officers may conduct a brief investigatory detention of an individual based upon "a reasonable,

articulable suspicion that criminal activity is afoot."  *United States v. Romain*, 393 F.3d 63, 71

(1st Cir. 2004).  The defendant does not contest the basis for the *Terry* stop here, and indeed, the

officers had gathered information that justified detaining the defendant for questioning on

suspicion of drug trafficking.  Instead, the defendant argues that the *Terry* stop turned into a de

facto arrest when the agents handcuffed him and drew their weapons.  *See* Defendant's Motion to

Suppress (Mot.) at 4.

To determine whether a *Terry* stop has become an unconstitutional arrest, the First

Circuit "inquire[s], in light of the totality of the circumstances, whether a reasonable person in

the suspect's position would have understood her position to be tantamount to being under

arrest."  *United States v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011) (citations and quotation

marks omitted).  That court has also "repeatedly stressed that officers may take necessary steps

to protect themselves if the circumstances reasonably warrant such measures."  *Flowers v. Fiore*,

359 F.3d 24, 30 (1st Cir. 2004).  "[O]fficer safety is paramount and, when reasonably necessary

---

[2]      The defendant does not appear to challenge the agents' entry into the room, nor has he
argued that he had a reasonable expectation of privacy in the room sufficient to allow him to
make such a challenge.  *See Rakas v. Illinois*, 439 U.S. 128, 134 (1978) (holding that to sustain a
Fourth Amendment challenge, defendant must demonstrate a reasonable expectation of privacy
in the place searched).  Indeed, the defendant corroborated J.W.'s statement that she rented the
room.  In any event, the agents entered upon valid written consent provided by J.W. and the
defendant did not object to their entry.  *See Georgia v. Randolph*, 547 U.S. 103, 109, 113 (2006)
(noting that Fourth Amendment permits warrantless entry into a person's home based on valid
consent of occupant so long as present co-occupant does not object).

based on information available to law enforcement, police officers may use multiple vehicles, multiple officers, handcuffs and drawn weapons without turning a *Terry* stop into a de facto arrest." *United States v. Jones*, 700 F.3d 615, 625 (1st Cir. 2012) (finding no de facto arrest where police drew weapons and used handcuffs after receiving anonymous tip that defendant was an armed drug trafficker).

Here, the officers acted reasonably in entering the room with weapons drawn and handcuffing the defendant while they conducted a brief protective sweep of the room. When they knocked on the door to Room 109, the officers were familiar with the defendant's criminal history, which included drug and weapons charges, and had a strong basis to believe that he was engaged in drug trafficking, an activity commonly associated with violence. *See United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014) (finding frisk of suspected drug dealer justified in part because "[t]he connection between drugs and violence is, of course, legendary"). Agent Wolf was aware that several months prior, the defendant was arrested in a hotel room where police found drugs and a gun. The defendant had given police a false name at that time and had used aliases in the past, and J.W. had alerted the agents that the defendant was likely to flee if he suspected any police involvement, which presents an inherent risk of danger. Finally, at the time the officers handcuffed the defendant and drew their weapons, they were entering an unfamiliar hotel room, unsure of how many occupants might be inside. *See Maryland v. Buie*, 494 U.S. 325, 333 (1990) (noting that "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings"); *Chaney*, 647 F.3d at 410 (noting that "the close quarters of a motel room" can enhance the "need for officers to safely secure the scene"). All of this created a situation of heightened danger that reasonably caused the officers to believe that the defendant might be armed and dangerous to them. *See id*. at 409-

6

410 (finding no de facto arrest despite drawn weapons and handcuffs given presence of two

suspected drug traffickers in motel room and a third, unfamiliar man who ignored police orders).

The handcuffs and drawn weapons also were counterbalanced by several factors keeping

this interaction within the realm of an investigatory detention rather than an arrest: (1) the

defendant was informed that he was not under arrest, *see United States v. McCarthy*, 77 F.3d

522, 532 (1st Cir. 1996) (holding no de facto arrest occurred in part because defendant was told

he was not under arrest); (2) there were a total of four officers on scene, only three of whom

made the initial entry, *cf. United States v. Taylor*, 162 F.3d 12, 21-22 (1st Cir. 1998) (holding no

de facto arrest occurred when there were ten to twelve officers on scene and defendant's egress

was blocked by police cruisers); and (3) the interaction occurred in the middle of the afternoon in

surroundings familiar to the defendant, *see United States v. Campbell*, 741 F.3d 251, 267-68 (1st

Cir. 2013) (finding no de facto arrest for *Miranda* purposes where defendants questioned in a

hotel parking lot).  Considering the totality of the circumstances, as is required in the Fourth

Amendment context, *Chaney*, 647 F.3d at 409, the agents' actions were "reasonably related in

scope to the circumstances justifying the interference in the first place," *Terry*, 392 U.S. at 19-

20.

**II.     Agent Wolf Had a Reasonable Basis to Conduct a Second Pat-Down of the
Defendant**

For the same reasons the officers could use handcuffs and drawn weapons in their

investigative detention of the defendant, they were entitled to fully frisk the defendant to ensure

that he was not armed.  "A police officer may frisk a suspect—that is, search the suspect's

person for weapons—on reasonable suspicion that the person is armed and dangerous." *United

States v. Scott*, 270 F.3d 30, 41 (1st Cir. 2001).  The defendant complains that he was

7

impermissibly frisked twice, however, and because it was the second frisk that led to the

discovery of the drugs, those drugs must be suppressed.  Mot. at 4.

As with all inquiries in the Fourth Amendment arena, "the reasonableness of a second or

subsequent pat-frisk conducted pursuant to *Terry* is to be determined under a standard that takes

account of the fact that context is vital."  *United States v. Osbourne*, 326 F.3d 274, 278 (1st Cir.

2003) (citations and quotation marks omitted).  In *Osbourne*, the court held that a second pat-

down of the defendant was justified where the officers reasonably believed the defendant was

armed and the first pat-down was "'quick.'"  *Id*. at 278.  Here, as in *Osbourne*, Officer Flynn's

initial pat-down of the defendant was cursory and limited only to the area that the defendant

could reach with his hands cuffed behind his back.  A short time later, Agent Wolf, who intended

to remove the defendant's handcuffs, "reasonably declined to regard the frisk conducted by

[Flynn] as conclusive on the question of whether [the defendant] was armed and dangerous," *id*.,

and so was justified in conducting a more thorough pat-down of the exterior of the defendant's

clothing to ensure the safety of the officers on scene.  Upon doing so, Agent Wolf felt the drugs,

which led to probable cause to place the defendant under arrest and seize the drugs, either as part

of a search incident to arrest or under the "plain feel" doctrine.  *See United States v. Proctor*, 148

F.3d 39, 43 (1st Cir. 1998) (The "plain-feel" corollary to the plain view doctrine "permits an

officer who lawfully pats down a suspect's outer clothing and feels an object whose contour or

mass makes its identity immediately apparent to seize the contraband." (citations and quotation

marks omitted)).  Circumstances justified a second frisk of the defendant, and the evidence

uncovered as a result of that frisk should not be suppressed.[3]

---

[3]     Even if the Court were to conclude that the officers' detention and pat-down of the
defendant were unlawful, the drugs on the defendant's person would have been inevitably
discovered because the officers could have arrested the defendant based only on evidence found

## CONCLUSION

In light of all the agents knew of the defendant's history and the particular circumstances of July 15, 2015, they acted reasonably in handcuffing the defendant, sweeping the hotel room with weapons drawn, and fully frisking the defendant to ensure that he was not armed.  As a result, no basis exists to suppress any evidence obtained during the investigation and the government respectfully requests that the Court deny the defendant's motion to suppress.

Dated:  August 27, 2015

Thomas E. Delahanty II
United States Attorney


 /s/ Julia M. Lipez
Assistant United States Attorney
U.S. Attorney's Office
100 Middle Street Plaza, East Tower
Portland, ME  04101
(207) 780-3257
julia.lipez@usdoj.gov

---

during the consent search of the hotel room.  They had previously seized heroin from J.W., who told them that the defendant had sent her to distribute the drugs, had asked her to pick up sandwich bags so that he could package more drugs, and was in Room 109 of the America's Best Value Inn.  The discovery in the hotel room of the digital scale and sandwich bags, common tools of drug traffickers, provided sufficient corroboration of J.W.'s statements to arrest the defendant for drug trafficking.  In the event of an independent arrest of the defendant based upon the evidence seized from J.W. and found in the hotel room, the drugs on the defendant's person would have been discovered either during a search incident to arrest or an inventory search at the Cumberland County Jail.  *See United States v. Hughes*, 640 F.3d 428, 440 (1st Cir. 2011) ("The Supreme Court has stated with conspicuous clarity that evidence that 'would inevitably have been discovered without reference to the police error or misconduct' may be admitted at trial." (*quoting Nix v. Williams*, 467 U.S. 431, 448 (1984))).

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**


**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2015, I electronically filed Government's Opposition to Defendant's Motion to Suppress with the Clerk of Court using the CM/ECF system, which will send notifications of such filing to the following:

Robert A. Levine, Esquire
17 South Street
Portland, ME 04101
(207) 871-0036
ralevine@maine.rr.com

Thomas E. Delahanty II
United States Attorney

/s/ Julia M. Lipez
Assistant United States Attorney
U.S. Attorney's Office
100 Middle Street Plaza, East Tower
Portland, ME  04101
(207) 780-3257
julia.lipez@usdoj.gov