# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 2:15-CR-00127-JDL** |
| | ) | |
| **TODD RASBERRY** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its counsel, Thomas E. Delahanty II, United States Attorney for the District of Maine, and Jamie R. Guerrette, Assistant United States Attorney, respectfully submits the following memorandum in aid of sentencing.

### INTRODUCTION

On July 15, 2015, the Defendant, Todd Rasberry was arrested after agents located him in a motel room in possession of 51.1 grams of a mixture or substance containing heroin, caffeine and quinine, and a separate baggie containing 24.7 grams of quinine. He was charged by complaint with possession with the intent to distribute heroin and possession with the intent to distribute cocaine (as the quinine was initially believed to be cocaine), and later indicted for those same offenses on July 21, 2015. On October 21, 2015, the Grand Jury returned a three-count superseding indictment charging Defendant with possession with the intent to distribute cocaine (Count One), possession with the intent to distribute heroin (Count Two), and conspiracy to possess with the intent to distribute, and distribute, heroin (Count Three). In support of the superseding indictment, the Grand Jury heard from the primary investigator, Special Agent Paul Wolf, and two civilian witnesses. On June 15, 2016, the Defendant entered a conditional guilty plea to

count two of the superseding indictment that charged Defendant with possession with intent to distribute heroin.[1]

The Presentence Investigation Report (PSR) concluded, based on investigative reports and summaries, and information provided my multiple sources of information, that the Defendant was, for guideline purposes, accountable for 6.67 kilograms of heroin, resulting in a base offense level of 32.  The PSR further concluded that the Defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, resulting in four-level enhancement and an adjusted offense level of 36.  The Defendant was further afforded a three-level departure for acceptance of responsibility for a total offense level of 33.[2]  Based on a criminal history category V, the PSR determined that Defendant's guideline range is 210 to 262 months, which was adjusted to 210 to 240 months, based on the statutory maximum of 20 years for the

---

1 The Defendant reserved his right to appeal the November 17, 2015 decision denying his Motion to Suppress Evidence.

2 Although Defendant entered a guilty plea to count two of the three-count superseding indictment, he has levied and maintained objections to all of the information establishing drug quantity, including paragraph 12, which contains information about the offense of conviction incorporated into the Prosecution Version, the role enhancement, and all of his criminal convictions.  Arguably, his objections undermine whether he has, in fact, accepted responsibility for his conduct.  Pursuant to United States Sentencing Guidelines, "if the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."  U.S.S.G. § 3E1.1(a).  Application of subparagraph (a) triggers the subsequent application of subparagraph (b).  According to Application Note 1(a), one of the non-exhaustive considerations in making the acceptance determination is a Defendant "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)."  Id.  The note further provides that a Defendant is not required to affirmatively admit his/her conduct, and may remain silent, however "…a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."  Id.  Furthermore, Application Note 3 also cautions that "…evidence [of a guilty plea and not frivolously contesting any additional relevant conduct] may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility."  Id.  It concludes by observing, "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right."  Id.

offense of conviction.

In support of the conclusions set forth in the PSR, the Government respectfully submits the following arguments and supporting documentation (sentencing exhibits) that are incorporated by reference. The Government will request that the sentencing exhibits be submitted under seal given the sensitive nature of the information contained therein including, but not limited to, the fact that the exhibits include grand jury testimony, information provided by sources of information cooperating with the Government (proffer interviews), the materials discuss individuals that have not been charged with a crime or who may be under investigation, and some documents may contain personally identifiable information (PII). In addition to the submissions, the Government may elicit testimony from one or more of the sources of information discussed herein.

### CONTEXT FOR SENTENCING

Rasberry is facing a maximum sentence of 20-years imprisonment on Count Two of the superseding indictment. PSR ¶ 58. The Court must impose a supervised release term of at least 3 years and up to life. PSR ¶ 61. A fine of up to $1,000,000 may be imposed, and a $100 special assessment is mandatory. PSR ¶¶ 65, 66.

After *United States v. Booker*, 543 U.S. 220 (2005), the First Circuit has encouraged sentencing courts to follow a "specifically delineated roadmap" when sentencing under the advisory sentencing guidelines:

> [A] sentencing court ordinarily should begin by calculating the applicable guideline sentencing range; then determine whether or not any departures are in order; then mull the factors delineated in 18 U.S.C. § 3553(a) as well as any other relevant considerations; and, finally, determine what sentence, whether within, above, or below the guideline sentencing range,

appears appropriate.

*United States v. Davila-Gonzalez*, 595 F.3d 42, 46 (1st Cir. 2010) (quoting *United States v. Pelletier*, 469 F.3d 194, 203 (1st Cir. 2006)). The statutory factors to be considered include "the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to provide deterrence, respect for the law and just punishment, and the need 'to avoid unwarranted sentence disparities.'" *United States v. Zapata*, 589 F.3d 475, 486 (1st Cir. 2009). "The purpose of this exercise is to ensure that the sentence imposed will be the product of the district court's individualized and fact-intensive decisionmaking." *United States v. Madera-Ortiz*, 637 F.3d 26, 30 (1st Cir. 2011).

**GOVERNMENT'S POSITION**

I.  **The Drug Quantity Calculation in the Pre-Sentence Report Properly Included Other "Relevant Conduct" Attributable to Rasberry**

The PSR concludes that the total drug quantity attributable to Rasberry is 6,668 grams or 6.67 kilograms of heroin. PSR ¶ 14.  This total was arrived at by probation by relying on Rasberry's possession of $3,870 U.S. Currency (drug proceeds) in November 2014 (PSR ¶ 7); heroin seized from a co-coconspirator on April 30, 2015 (PSR ¶ 10); heroin seized from a co-conspirator and Rasberry on July 15, 2015 (PSR ¶ 12); and, historical information provided by three sources of information (PSR ¶ 13).  Based on the information provided by the sources of information, probation believed that the drug quantity calculation in the PSR was "conservative."  PSR ¶ 14.

"Under the Sentencing Guidelines, a defendant may be held responsible for drug quantities involved in his relevant conduct, even if the quantities were not involved in the offense of conviction." *United States v. MacDonald*, 804 F.3d 497, 502 (1st Cir. 2015) (internal quotations omitted).  The umbrella of "relevant conduct" in the Sentencing Guidelines is fairly expansive.[3]  U.S.S.G. § 1B1.3.  "If the sentencing court finds by a preponderance of the evidence that a defendant engaged in the 'same course of conduct or common scheme or plan' involving additional drugs, it can attribute the amount of those drugs involved to the defendant."  *MacDonald*, 804 F.3d at 502-503; *see also United States v. Eisom*, 585 F.3d 552, 557.  Determinations regarding the scope of a particular scheme, plan or course of conduct entail "a practical, real-world assessment of probabilities, based on the totality of proven circumstances."  *Eisom*, 585 F.3d at 557.  Some of the factors courts may consider in assessing whether a single course of conduct existed "include (but are not limited to) the nature of the offenses, their timing, their commonalities, and the existence or non-existence of overarching patterns." *Id*.  Moreover, a sentencing court's determination of drug quantity "is not required to be an

---

3 U.S. Sentencing Guideline § 1B1.3(a) provides, in relevant part, "unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level…shall be determined on the basis of the following:

(1)(A) all acts and omissions committed, aided, abetted…induced, procured or willfully caused by the defendant; and (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity….; [and],

(1)(B) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction…."

5

exact determination but rather only a reasoned estimate." *United States v. Rodriguez*, 525 F.3d 85, 107 (1st Cir. 2008).  And, the court is entitled to rely on reliable hearsay evidence, including grand jury testimony and information provided by cooperating witnesses. *See United States v. Ayala*, 290 F. App'x 366, 369 (1st Cir. 2008); *United States v. Williams*, 10 F.3d 910, 914 (1st Cir. 1993) (finding witness's sworn grand jury testimony was sufficiently credible despite being the only direct evidence on sentencing issue).

Although Rasberry disputes the accuracy of the PSR's calculations, his general objections do not provide a basis for the Court to reject the calculations.  When a defendant objects in only a conclusory manner to a PSR's findings, the court is entitled to rely on the PSR. *See United States v. Ayala*, 290 Fed.Appx. 366, 369 (1st Cir. 2008); *see also United States v. Baldwin*, 507 Fed.Appx. 300, 302, 2013 WL 285720, at **2 (4th Cir. 2013) ("[E]ven if a defendant objects to a finding in the presentence report, in the absence of an affirmative showing the information is inaccurate, the court is free to adopt the findings of the presentence report without more specific inquiry or explanation."); *United States v. Ibarra*, 377 F. App'x 358, 359, 2010 WL 1779057, at **1 (5th Cir. 2010) (defendant's "objection to the drug quantity calculation was alone insufficient to serve as competent rebuttal evidence"); *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007) ("When the court relies on information contained in the PSR at sentencing, it is the defendant's burden to show that the PSR is inaccurate or unreliable. When a defendant has failed to produce any evidence calling the report's accuracy into question, a district court may rely entirely on the PSR.").

Here, as noted in the Prosecution Version, Rasberry was arrested on July 15, 2015 in possession of three bags containing a substantial, distributable quantity (51.1 grams) of a mixture or substance containing heroin, caffeine and quinine, and also a fourth bag containing a substantial quantity of quinine. Govt. Sent. Ex. #1, #2. Likewise established by the Prosecution Version, agents also seized six (6) baggies of heroin (2.1 grams) from a co-conspirator (hereinafter "source of information #1" or "SOI#1") that he/she intended to distribute. Notably, the chemical composition of the heroin mixture in the six (6) baggies possessed by SOI#1 was identical to that possessed by Rasberry. Govt. Sent. Ex. #3A, #3B. To provide the Court an idea of the amount of heroin possessed by Rasberry, the Government also submitted a photograph of the three baggies of heroin ("Ex 13"), the quinine ("Ex 12") and the six baggies ("Ex 11") for the Court's consideration. Govt. Sent. Ex. #4. Extrapolating from the net weight of the six retail baggies possessed by SOI#1, the amount of heroin possessed by Rasberry could have produced approximately 150 bags of heroin for distribution (50 grams x 3 baggies from 1 gram). Moreover, the Government would submit that it's a reasonable inference that Rasberry was using quinine as an adulterant in the heroin that he conspired to distribute.

When SOI#1 was apprehended, he/she incriminated herself by admitting his/her involvement in the distribution of heroin, and disclosed to agents that Rasberry, his/her source of supply, was located in a specific motel room.[4] *See Prosecution Version*. Rasberry was, in fact, located inside the motel room and found in possession of a

---

[4] A statement against penal interest such as this is routinely credited in credibility determinations. *See e.g. United States v. Vongkaysone*, 434 F.3d 68, 74 (1st Cir. 2006).

substantial amount of heroin.  *Id.*  The hotel room also contained a digital scale and sandwich baggies. *Id.*

SOI#1 subsequently participated in several interviews, executed plea agreement(s), and testified before the Grand Jury on October 8, 2015.[5]  Govt. Sent. Ex. #5.  SOI#1 met the Defendant, Todd Rasberry, who he/she knew as "Champagne" in the Summer of 2014.  *Id.*  At the time, he/she was a daily heroin user.  *Id.*  During this early period of time, SOI#1 purchased ½ gram to 1 gram on a daily basis from two "runners" who he/she believed were working for Rasberry based on his/her knowledge of the organization and Rasberry occasionally answering the phone.  *Id*, p. 8.  In January 2015, SOI#1 became a "runner" for two of Rasberry's associates.  *Id.*, p. 9.  In February 2015, SOI#1 had a conversation with Rasberry about his/her arrangement with his associates, and Rasberry adjusted the rate he/she received from the associates (from ½ gram to 1 gram of heroin for every $300 sold).  *Id.*, pp. 11-13.  SOI#1 thereafter became entangled in the conspiracy as a "runner" and followed Rasberry and his associates to several different locations. *Id.*, pp. 13-15.  One of these locations was on Orlando Street in South Portland, and SOI#1 identified the name of the female tenant, C.T.  *Id.,* p. 15.  SOI#1 further described an incident involving the police, where Rasberry gave him/her and a female heroin when he learned that police were responding to the residence to evict the

---

5 SOI#1 entered a guilty plea and was subsequently sentenced on a single count of conspiracy to distribute heroin.  Based on his/her cooperation, the Government recommended and he/she received a favorable 5K1.1 departure resulting in a time-served disposition and 36 months supervised release.  SOI#1 has struggled with addiction and was using heroin during the period of time when he/she was involved with Rasberry.  SOI#1 violated conditions of release and was eventually detained before he/she was sentenced.  Additionally, he/she has violated the terms of his/her supervised release by the ongoing use of controlled substances.

occupants.  *Id*.  SOI#1 disclosed that he/she and the female slipped out with a quantity of

heroin when the police were upstairs and were later joined by Rasberry at a motel.  *Id*.,

pp. 15-16.  SOI#1 learned that Rasberry was identified by police, and he/she later

observed that Rasberry's associate ("Easy") had been detained.  *Id*.

A South Portland Police Department (SPPD) incident report documented the

incident described by SOI#1 which occurred on May 11, 2015. Govt. Sent. Ex. #5.

According to the officer narratives, SPPD responded to a residence on Orlando Street and

had contact with C.T. who appeared to be under the influence.  C.T. additionally claimed

nobody was present.  *Id.*  The purpose of the response was an eviction.  *Id*.  Officers

noted that the residence contained video-surveillance of the driveway.  *Id*.  While inside,

one of the officers observed two females leave the residence via the video surveillance

system which was "streaming a live feed" to a television in the living room.  *Id*.  Two

males were located in a locked basement room.  *Id*.  One of the males verbally identified

himself as "Todd Rasberry."  *Id*.  The second male had a warrant for his arrest for a drug-

related offense (probation).  *Id*.  According to SOI#1, he/she and others had been at this

location for "about a month" at the time the incident occurred.  Govt. Sent. Ex. #5, p. 14.

SOI#1 was one of several "runners" that Rasberry and his associates used.  *Id.*, p.

17.  Customers would communicate with Rasberry and/or his associate and SOI#1, and

others, would make the deliveries and remit payment to Rasberry and his associates.  *Id*.

At some point, SOI#1 started delivering larger quantities of heroin to two individuals,

including R.B. (hereinafter referred to as "source of information #2" or "SOI#2") and

F.F.  *Id*., pp. 18-19.  According to SOI#1, when he/she started delivering heroin to these

two individuals, the amount of each delivery was about 12 grams, and there were occasions when SOI#2, who "sold a lot," would receive a second delivery of 12 grams (in the same day). *Id*. SOI#1 estimated that this activity was fairly consistent for approximately a three-month period.[6] *Id*., p. 20. SOI#1 also admitted that he/she was distributing approximately 12 grams on a daily basis during this period of time. *Id*. SOI#1 further provided testimony about an unknown female who transported bulk quantities of heroin to Maine for Rasberry, and expressed knowledge of 7 or 8 such deliveries. *Id*., pp. 21-22. SOI#1 also testified that, shortly before Rasberry's arrest, he/she deposited proceeds into the account of "N.J." at TD Bank, and that "N.J." was the girlfriend of Rasberry's associate.[7] *Id*., p. 23. Lastly, SOI#1 was aware that Rasberry had previously been arrested at a Super 8 Motel and he no longer wanted to be referred to as "Champagne"; rather, he requested that SOI#1 refer to him as "Shawn." *Id*., p. 21.

Although the investigation of "Champagne" spanned several years, the Government is focusing on the information that unquestionably establishes Rasberry's presence in Maine and his involvement in the distribution of controlled substances. As

---

6 In an earlier interview, SOI#1 estimated that he/she participated in the distribution of 100 grams of heroin per day for at least a 60-day period. This interview was the basis for the drug quantity determination attributed to SOI#1 in Paragraph 10 of the PSR. However, even a conservative approach to SOI#1's testimony, focusing strictly on the 90-day period preceding Rasberry's arrest, produces a drug quantity well in excess of a kilogram. For example, SOI#1's receipt and distribution of 12 grams per day for a period of ninety days represents 1,080 grams. If each of the larger customers identified received 12 grams on a daily basis during this period of time, the quantity would exceed 3,000 grams. However, from his/her testimony, he/she was involved in the distribution of heroin with Rasberry, and/or his associates, for approximately six months (January 2015).

7 Although the Government has obtained TD Bank records of a "N.J.," and the records include cash deposits made in Maine, it has not yet confirmed with SOI#1 that these are in fact the deposits she made (as the amount of the deposits are inconsistent). Therefore, the Government is not submitting those documents at this time, though it may be in a position to do so before the hearing.

noted in paragraph 7 of the PSR, and referred to by SOI#1, on November 23, 2014, Rasberry was arrested at the Super 8 Motel in Westbrook, Maine, after the Westbrook Police Department (WPD) and Maine Drug Enforcement Agency (MDEA) conducted a bail check on a female.  Govt. Sent. Ex. #7.  Rasberry was found in possession of two cell phones and $3,870 U.S. currency - $3,000 in one pocket and $870 in another pocket.  *Id.*, p. 3.  Officers eventually located approximately 29.9 grams gross weight and 9.9 grams gross weight on a second male subject that was in the room. *Id.*, p. 4.  That subject only had $201 U.S. currency on his person.  *Id.*  When asked for identification, Rasberry verbally identified himself as "James Bald" and eventually signed a Uniform Summons & Complaint (USAC) and fingerprint card in the false name.  *Id.*, p. 5.  His true identity, though suspected, was only confirmed after his fingerprints were submitted to the FBI. *Id.*  Rasberry was incarcerated until December 24, 2015, when $25,000 cash was posted to secure his release (not third-party).  Govt. Sent. Ex. # 8.  The cash bail was later returned to Rasberry on February 20, 2015, after he entered a guilty plea to a single count of Aggravated Forgery, as noted in paragraph 35 of the PSR, and admitted to a criminal forfeiture count, that alleged that the $3,870 U.S. currency was drug proceeds.  Govt. Sent. Ex.'s #8 and #19.

Additional sources of information corroborate SOI#1's involvement in the distribution of heroin with Rasberry.  As noted in paragraph 10 of the PSR, on April 30, 2015, SOI#2 was arrested by the Portland Police Department (PPD) after he was found in possession of seven baggies of suspected heroin.  Govt. Sent. Ex. #9B.  That evidence was later transferred to the DEA laboratory and a chemist determined that the mixture or

substance contained heroin with a net weight of 1.9 grams.  Govt. Sent. Ex. #9A.

Notably, similar to the substances reflected in sentencing exhibits #1, 2 and 3A, seized

from Rasberry and SOI#1, the seven baggies of heroin possessed by SOI#2 also

contained quinine.

SOI#2 was subsequently interviewed on February 19, 2016 and provided

information about his/her involvement with Rasberry and SOI#1.[8]  Govt. Sent. Ex. #10.

SOI#2 positively identified a photograph of Rasberry.  *Id*., p. 3.  SOI#2 was also familiar

with SOI#1 and described SOI#1 as Rasberry's main delivery driver. *Id.*  SOI#2 also

reported that SOI#1 was associated with F.F., who SOI#1 reported was one of two

individuals receiving larger deliveries of heroin.  *Id.*, Govt. Sent. Ex. #5, p. 19.

Inconsistently, SOI#2 reported that he/she met Rasberry in 2013 through SOI#1;

however, SOI#1 recalled and testified that he/she met Rasberry in 2014.  Nevertheless,

SOI#2 maintained that when he/she returned to Maine and relapsed in April 2015, he/she

started working for Rasberry.  *Id.*  During April, May and June 2015, SOI#2 estimated

that he/she was given 12 half-gram packages of heroin by Rasberry approximately three

times per week.  SOI#2 would owe Rasberry $600 for the heroin and be permitted to

retain any extra currency that he/she generated.  *Id.*  In the several weeks before SOI#2's

arrest (July 12, 2015), the quantity increased to 24 half-gram packages on each occasion.

---

8 SOI#2 is believed to have a significant criminal history, a summary of which will be provided to
Rasberry before the sentencing hearing.  At the time he provided the information, he was incarcerated on a
felony assault charge that was allegedly committed on July 12, 2015.  He was also informed that he was a
target of this investigation but he was ultimately not charged federally.  SOI#2 was also addicted to
controlled substances and a regular heroin user during the period of time that he/she was involved with
Rasberry and SOI#1.

The report, and paragraph 10 of the PSR, conservatively determined that SOI#2 received 126 grams of heroin from Rasberry based on 6 gram transactions multiplied by seven transactions per month for a total of 3 months.  This is likely an underestimation.  SOI#2 reported that he/she received 6 grams (12 ½ gram packages) 3 times per week; therefore, that would translate to 12 times per month or 72 grams in a month.  Additionally, SOI#2 reported that he/she received 12 grams (24 ½ gram packages) for several weeks preceding his/her arrest.  This would correspond to 108 grams in the final three-week period (12 x 3 (times per week) x 3 (weeks).  Arguably, the amount properly attributable to SOI#2, according to his/her interview, is 252 grams.  And, the increase in activity before his/her arrest is consistent with SOI#1, although SOI#1 attributes a much greater quantity to SOI#2.

SOI#3 also corroborates SOI#1 and SOI#2.  SOI#3 was interviewed and subsequently testified before the Grand Jury pursuant to immunity protection.[9]  Govt. Sent. Ex.'s #11A and 11B.  SOI#3 estimated that he/she had seen "Champagne" on maybe six occasions in a two-year period.  Govt. Sent. Ex. #11A, p. 8.  SOI#3 would call a specific phone and "runners" would deliver the heroin to him/her.  Govt. Sent. Ex. #11A, pp. 9-11.  SOI#3 estimated that he/she ordered a gram per day for at least one year. *Id*., p. 12.  SOI#3 also confirmed that "Champagne's" principal runner was "SOI#1's first name" (did not know his/her last name).  *Id*.  In his/her earlier interview, SOI#3 reported that he/she met SOI#1 in about December 2014, and estimated that he/she purchased a

---

9 Similar to SOI#1 and SOI#2, SOI#3 was addicted to heroin.  SOI#3 recently passed away from a suspected heroin overdose.  SOI#3 is not believed to have a significant criminal history, but any such information will be furnished to Rasberry before the sentencing hearing.

half-gram of heroin every day from SOI#1 for a period of six months.  SOI#3 also identified SOI#2 as one of "Champagne's" runners, and estimated that he/she obtained heroin from SOI#2 on approximately ten occasions. Govt. Sent. Ex. #11A, p. 11.  SOI#3 identified photographs of SOI#1 and SOI#2, but was unable to positively identify a photograph of Rasberry. Govt. Sent. Ex. #11B, p. 2.  The information attributed to SOI#3 in paragraph 10 of the PSR includes the 90 grams purchased from SOI#1 over the six-month period, and 365 grams from "Champagne" over the course of a year.  There is very likely some double-counting between these two estimates; therefore, out of an abundance of caution, the Government would suggest that the 365 grams be converted to 180 grams (1 gram per day for 6 months, instead of 12 months).

The Government respectfully submits that the PSR properly included the foregoing information as "relevant conduct" as it involves acts committed, aided and abetted by Rasberry, was reasonably foreseeable to him, and/or was a continuing course of conduct or common scheme or plan.  U.S.S.G. § 1B1.3.  Even if the Court accounts for some of the discrepancies between the SOIs, the drug quantity reasonably exceeds 1,000 grams and may very well exceed 3,000 grams, as determined in the PSR.  The alleged conduct was part of an ongoing, concerted effort to distribute heroin, and the activity was engaged in by a core-group of individuals operating with a common purpose, including SOI#1 and SOI#2.  The period of time discussed, approximately 6-8 months, is also narrowly focused, although it should be noted that the overwhelming majority of the drug quantity is gleaned from the ninety-day period preceding Rasberry's arrest.  The accounts of the SOIs corroborate one another and persuasively depict Rasberry's involvement in a

continuing course of conduct.  The accounts of the SOIs are further corroborated by the incident reports in November 2014 and May 2015.

## II.     Rasberry Was a Leader or Organizer of Criminal Activity Involving Five or More Participants

At an absolute minimum, Rasberry was an "organizer, leader, manager, or supervisor of [of the drug-related] criminal activity…," which warrants a 2-point enhancement pursuant to § 3B1.1(c).  This would be justified if the Court determines that the activity "…involved at least two complicit participants (of whom the defendant may be counted as one), and the defendant, in committing the offense, exercised control over, organized, or was otherwise responsible for superintending the activities of at least one of those other persons." *United States v. Garcia-Morales*, 382 F.3d 12, 19 (1st. Cir. 2004). Of course, the Government bears the burden of proving that the enhancement applies; however, "[t]he evidence supporting the defendant's role in the offense may be wholly circumstantial and the government need only prove that the defendant exercised authority or control over another participant on one occasion." *Id.* at 19-20.  Unquestionably, Rasberry exercised that type of control over SOI#1, and this fact is arguably established based on the Prosecution Version alone.

That notwithstanding, the Government would submit that the PSR properly concludes that Rasberry should receive a 4-level enhancement for aggravating role under § 3B1.1(a).  Section 3B1.1(a) provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."  Here, it cannot be seriously disputed that the criminal activity

15

involved five or more persons.  At a minimum, SOI#1, SOI#2 and Rasberry were all involved, as were additional "runners."  Additionally, according to SOI#1, Rasberry managed and supervised two associates when SOI#1 first started "running" in January/February 2015, and directed his associates to alter her fee arrangement. Additionally, Rasberry utilized a number of different "stash" locations, including the South Portland location identified in sentencing exhibit #6.  Moreover, Rasberry was utilizing an unknown female to transport the drugs from New York to Maine.  Here, there is sufficient evidence in the record for the Court to find that Rasberry was a leader or organizer of a criminal activity involving five or more participants.

## III.   The PSR Properly Determined that Rasberry Has a Criminal History Category of V

In his response to the PSR, Rasberry also "objects to all of the convictions used as the basis for criminal history category V, asserting that there is insufficient proof of these convictions and the relevant details of these convictions."  This objection is meritless and frivolous, and substantially undermines Defendant's acceptance of responsibility and his posture as a contrite, remorseful Defendant.  The Government has secured documentation from several New York court and penal institutions establishing that the Defendant has, in fact, suffered the convictions noted in the PSR, and would submit that the PSR properly assigned 3 criminal history points in paragraph 31, 3 criminal history points in paragraph 32, 1 criminal history point in paragraph 33, and 3 criminal history points in paragraph 34, for a total of 10 criminal history points and a corresponding criminal

history category V.  The Government would further submit that Rasberry should receive 1 criminal history point for the aggravated forgery conviction in paragraph 35.

As noted in paragraph 31 of the PSR, Defendant was convicted of a felony offense of Criminal Possession of a Weapon – 3rd Degree in the Kings County Supreme Court on April 17, 2002, Docket #04541-2001.  The Government obtained a Certificate of Disposition, Sentence & Order of Confinement, and copy of the Indictment from the Kings County Supreme Court confirming that "Todd E. Rasberry" (same date of birth and NYSID # noted on cover page of PSR) was convicted of the offense and received a 1 to 3-year sentence of imprisonment. Govt. Sent. Ex. #14A.  The Sentence & Order of Confinement notes that the sentence was concurrent with "6864/01," which is the docket number of the conviction noted in paragraph 32 of the PSR.  With regard to the offense conduct, the Indictment alleged that the Defendant possessed "a sawed-off shotgun having a barrel of less than eighteen inches in length."  *Id.*  Additionally, according to an affidavit that was also produced by the Kings County Supreme Court, the Defendant was observed removing the shotgun from his pants and placing it underneath the front passenger seat of a livery cab.  Govt. Sent. Ex. #14B.  He was also found in possession of an unspecified amount of marijuana. *Id*.

As noted in paragraph 32 of the PSR, Defendant was convicted of a felony Assault – 2nd Degree in the New York County Supreme Court on April 4, 2002, Docket #06864-2001.  The Government obtained a Certificate of Disposition from the New York County Supreme Court confirming that "Todd Rasberry" (same date of birth) received a 42-month determinate sentence for this offense.  Govt. Sent. Ex. #15.  The Certificate

further memorializes that the sentence was concurrent with "04541-2001," which is the offense discussed in paragraph 31. *Id*.

As noted in paragraph 33 of the PSR, Defendant was convicted of Criminal Possession of a Controlled Substance – 7th Degree in the Kings County Criminal Court on July 21, 2005, Docket #2005KN046530.  A Certificate of Disposition and affidavit related to that offense establish that the Defendant pled guilty to the offense on July 21, 2005, the day after he committed it, and was resentenced to imprisonment of "TS" (time served) on April 16, 2006.  Govt. Sent. Ex. 16.  According to the affidavit, the offense involved the possession of crack-cocaine. *Id.*  The Government would further highlight the fact that the Certificate of Disposition reflects a NYSID # 8586047Z, which is the same identification number noted on the Sentence & Order of Confinement submitted to establish the conviction in paragraph 31 and the New York State Department of Corrections and Community Supervision Certificate, submitted to establish the conviction noted in paragraph 34 (discussed below).  Additionally, in his original response to the PSR, the Defendant did not dispute that he was the person charged with this offense, but rather, he claimed that the offense was "expunged."  The record obtained from the Court illustrates otherwise.

As noted in paragraph 34 of the PSR, Defendant was convicted of a felony Attempted Possession of a Controlled Substance – 4th Degree in the Kings County Supreme Court on March 25, 2008, Docket #2007KN069544.   He was convicted of this offense under the alias "James E. Bald."  Notably, when the Defendant was arrested on November 23, 2014 at a motel in Westbrook, Maine, the offense conduct noted in

paragraph 35, he identified himself as "James Bald." Govt. Sent. Ex. #7.   The

Government obtained a Certificate of Disposition and a copy of the Indictment

confirming that "James E. Bald" (same date of birth as Rasberry) received a 2 year and 6-

month sentence for the offense, which involved the attempted possession of cocaine in an

amount that exceeded 1/8 of an ounce.  Govt. Sent. Ex. #17.  The Government further

obtained records from the New York Department of Corrections which connects

Rasberry's convictions in paragraphs 31, 32 and 34 of the PSR to a single NYSID

#08586047Z.  Govt. Sent. Ex. #18.  Moreover, if there was any lingering doubt that

Rasberry is "James Bald," the records produced by the New York State Department of

Corrections included a photograph of "James Bald" that is Rasberry.  *Id*.

Lastly, as noted in paragraph 35 of the PSR, Defendant was convicted of a felony

aggravated forgery on February 20, 2015 in the Cumberland County Unified Criminal

Docket (UCD) and received a 30-day sentence.  Govt. Sent. Ex. #19.  Probation declined

to assign criminal history points to this offense because the $3,870 U.S. currency seized

from Rasberry during the incident was converted to 32 grams of heroin in paragraph 7.

Pursuant to § 4A1.1(c), this conviction should receive 1 criminal history point.  At the

moment, this additional point would not change Rasberry's criminal history category, but

Rasberry has a standing objection to all of these convictions, so it may very well become

relevant.

CONCLUSION

For the foregoing reasons, the government respectfully recommends that the Court adopt the findings and conclusions set forth in the revised pre-sentence report.  The Government will present its sentencing recommendations based on the factors enumerated in 18 U.S.C. § 3553 at the sentencing hearing on December 2, 2016.

Dated:  November 17, 2016

Respectfully submitted,

THOMAS E. DELAHANTY II
UNITED STATES ATTORNEY


 /s/ Jamie R. Guerrette
Assistant United States Attorney
United States Attorney's Office
100 Middle Street, 6th Floor
Portland, Maine 04101
(207) 780-3257

20

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 17, 2016, I filed this Government's Sentencing

Memorandum with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to the following:

William Maselli, Esq.

THOMAS E. DELAHANTY II
UNITED STATES ATTORNEY

  /s/ Jamie R. Guerrette
Assistant United States Attorney
United States Attorney's Office
100 Middle Street, 6th Floor
Portland, ME  04101
(207) 780-3257

21