UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

UNITED STATES OF AMERICA,            CRIMINAL ACTION

                Plaintiff           Docket No: 2:15-cr-127-JDL


        -versus-


TODD RASBERRY,

                Defendant
_____

Transcript of Proceedings


Pursuant to notice, the above-entitled matter came on for **Suppression Hearing** held before **THE HONORABLE JON D. LEVY,** United States District Court Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine on the 15th day of October, 2015 at 1:20 p.m. as follows:


Appearances:

For the Government:  Julia M. Lipez, Esquire
                     Assistant United States Attorney

For the Defendant:  Robert A. Levine, Esquire




Dennis R. Ford
Official Court Reporter

(Prepared from manual stenography
and computer aided transcription)

<u>I N D E X</u>

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Paul Wolf | 9 | 37 | 72 | 78 |
| Andrew Flynn | 80 | 97 | 109 | |
| Thomas LaPierre | 111 | 125 | 134 | 136 |
| Kris Sullivan | 138 | 147 | | |

<u>E X H I B I T S</u>

| Number | Description | Page/Admit |
|---|---|---|
| Govt's 1 | Dispatch Log | 94/95 |
| Deft's 1 | Affidavit Paul Wolf | 63 |

<u>SIDE BAR CONFERENCES</u>

<u>CHAMBERS CONFERENCES</u>

3

```
 1              (Chambers conference)
 2         THE COURT:  We are here in the case of United
 3  States versus Todd Rasberry, docket 15-cr-127.
 4  Counsel, please note your appearances for the record.
 5         MS. LIPEZ:  Julia Lipez for the United States,
 6  Your Honor.
 7         MR. LEVINE:  Robert Levine for Todd Rasberry.
 8         THE COURT:  And I understand that you wanted
 9  to meet with me ahead of our hearing, so tell me what's
10  on your mind.
11         MS. LIPEZ:  Yes, Your Honor.  I just wanted to
12  briefly discuss the parameters under which defense
13  counsel could use the Giglio materials that we
14  disclosed about Agent Wolf, and I'm sure Robert knows
15  Rule 608(b), but just so that more is not disclosed
16  than is needed at the hearing, I did want to ask the
17  Court again to discuss the parameters.
18      As I view 608(b), certainly specific instances of
19  conduct that go to credibility can be asked about, but
20  the rule does not permit questions about extrinsic
21  evidence, and I take that to mean it would not be
22  permissible to ask isn't it true that the U.S.
23  Attorneys Office found or isn't it true that a DEA
24  investigator found.
25         Our view is that that would not be appropriate as
```

1  it's extrinsic and both hearsay as well, but certainly

2  it might be appropriate to ask isn't it true that you

3  did X, Y or Z.

4        THE COURT:  Robert?

5        MR. LEVINE:  Yeah.  My only -- I mean as I

6  discussed with Julia over the phone, you know, the use

7  I want to make of that in cross-examining Agent Wolf is

8  just to discuss the need for his reports to reflect,

9  you know, the full parameters of the investigation.

10 That he was -- you know, he knows that, and number two,

11 from a prior investigation where he was told that his

12 report wasn't complete.

13       MS. LIPEZ:  Yeah, I would object to that

14 because I think the question about any findings from a

15 prior investigation is a reference to extrinsic

16 evidence and to hearsay as opposed to asking

17 specifically if in the past he had made incomplete

18 reports or not.  I think that's what's permissible

19 under 608(b).

20       THE COURT:  So your position is that he can't

21 be impeached by even the suggestion that questions had

22 been -- were questions raised in connection with an

23 earlier investigation?

24       MS. LIPEZ:  I think that's right, Your Honor.

25 I think the rule is clear that it can only be a

1    question to the witness about whether the witness did

2    or did not do something and then the examiner is really

3    stuck with the witness's answer about that.

4         THE COURT:  And what's the Government's

5    position as to whether he can be asked about a prior

6    incident or investigation in which he was requested to

7    submit follow-up reports because of the need to provide

8    further explanation that was provided in the report

9    that preceded it?

10        MS. LIPEZ:  I guess it would depend on how the

11   question is phrased, Your Honor, but I think again the

12   question should be focused on what Agent Wolf did or

13   did not do.

14        THE COURT:  All right.  Well, I will -- I'm

15   going to leave to the two of you as able advocates to

16   ask questions that you believe will lead to admissible

17   answers and to the extent there's an objection, I'll

18   rule when it's made.

19        It does seem to me, however, that the parameters

20   of what's admissible is a little broader than you

21   suggested.  On the other hand, I haven't heard you

22   indicate this, Robert, but I don't think it would be

23   appropriate for you to get into names certainly, and to

24   -- having reviewed his materials, it seems to me that

25   there would be a basis to ask whether conclusions were

1    made based upon -- in connection with that earlier

2    investigation.

3         That would seem to be a fair representation of

4    what that body of information indicates based on the

5    questions, but rather than rule on this in the

6    abstract, it's best that I do so on the bench as you

7    ask the question and the objection is made.

8         Are there any other concerns about this?

9              MS. LIPEZ:  No, Your Honor.  I don't believe

10   so.

11             THE COURT:  It seems to me also though that it

12   would be sensible to -- because this is sealed

13   information, to agree beforehand that neither of you

14   will make reference to the name of that earlier case.

15   I'm sure that the detective or the investigator or the

16   agent -- it's an agent?

17             MS. LIPEZ:  Agent.

18             THE COURT:  Agent Fox --

19             MR. LEVINE:  Wolf.

20             THE COURT:  Wolf.  I knew it was a mammal, a

21   furry mammal.  He will know what you're referring to,

22   so I think you'll both find a creative way to refer to

23   it without actually using names.

24             MS. LIPEZ:  And Your Honor, he has obviously

25   seen the same materials that Mr. Levine has seen, so I

1    suspect he will understand what's being referred to.

2           THE COURT:  All right.  Now, how many

3    witnesses do you have?

4           MS. LIPEZ:  I have four, Your Honor.

5           THE COURT:  Four witnesses.  How long do you

6    expect them to take?

7           MS. LIPEZ:  I would think no more than two

8    hours, depending on cross-examination.  We will start

9    with Agent Wolf, who I expect to take the longest, and

10   I do expect them to get progressively shorter.

11          THE COURT:  Anything else to discuss

12   beforehand?

13          MR. LEVINE:  No.  After her agents testify, if

14   we have time, I would like to take a brief recess to

15   talk to my client about the possibility of him

16   testifying.

17          THE COURT:  Okay.  You'll remind me of that

18   when the time comes.  Thank you both, I'll see you in

19   the courtroom.

20          (Open court.  Defendant present.)

21          THE COURT:  Good afternoon.

22          MS. LIPEZ:  Good afternoon.

23          THE COURT:  We are proceeding in the case of

24   United States versus Todd Rasberry.  This is docket

25   15-cr-127.  Counsel, please identify yourselves for the

1    record.

2         MS. LIPEZ:  Julia Lipez for the United States,

3    Your Honor.

4         MR. LEVINE:  Robert Levine for the defendant

5    Todd Rasberry, Your Honor.

6         THE COURT:  We're here for an evidentiary

7    hearing on the defendant's motion to suppress.

8    Counsel, is there anything to take up before we begin

9    the evidence?

10        MS. LIPEZ:  No, Your Honor.

11        MR. LEVINE:  No, Your Honor.

12        THE COURT:  All right.  The Government may

13   proceed.

14        MS. LIPEZ:  Your Honor, the Government calls

15   Special Agent Paul Wolf.

16        THE CLERK:  Please raise your right hand.  Do

17   you solemnly swear that the testimony you will give in

18   the cause now in hearing will be the truth, the whole

19   truth, and nothing but the truth, so help you God?

20        THE WITNESS:  I do.

21        THE CLERK:  Please be seated.  If you would

22   please pull yourself right up to the microphone and

23   state your first and last name for the record.

24        THE WITNESS:  My name is Paul Wolf.  Last name

25   spelled W-O-L-F.

Wolf-Direct/Lipez

1          THE COURT:  Please proceed.

2          MS. LIPEZ:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4    BY MS. LIPEZ:

5    Q.    Where do you work, Special Agent Wolf?

6    A.    I'm a federal agent.  I work for the United

7    States Drug Enforcement Administration.  I'm assigned

8    to the Portland, Maine, resident office.

9    Q.    And how long have you been an agent with DEA?

10   A.    About 20 years.

11   Q.    And in that time, what type of investigations

12   have you conducted?

13   A.    I investigate narcotics offenses, so it has to do

14   with drug trafficking, money laundering and

15   drug-related offenses from Title 21.

16   Q.    And have your duties remained largely the same

17   for the last 20 or so years?

18   A.    Different locations, but yes, essentially the

19   same mission.

20   Q.    And in recent years, have you been conducting an

21   investigation of an individual that you first learned

22   of as Champagne?

23   A.    Yes.

24   Q.    And how long approximately have you been

25   investigating the activities of Champagne?

Wolf-Direct/Lipez

1    A.    I'd say between 3 and 4 years.

2    Q.    And specifically, what type of activities were

3    you investigating?

4    A.    The activities included surveillance,

5    interviewing witnesses and cooperators, making

6    controlled purchases from the Champagne organization in

7    order to try to learn more about it and infiltrate the

8    organization.

9    Q.    And what did you suspect that Champagne was

10   doing?

11   A.    My understanding -- from my investigation it

12   showed that this person Champagne was from New York

13   City and was overseeing an organization of people in

14   the Portland, Maine, area distributing heroin and

15   cocaine in the community around Portland.

16   Q.    And at some point during your investigation, were

17   you able to determine the actual identity of this drug

18   trafficker known as Champagne?

19   A.    Yes.

20   Q.    And who did you finally determine Champagne to

21   be?

22   A.    His actual identity I determined to be Todd

23   Rasberry, but I also learned during the investigation

24   that he used other aliases.

25   Q.    And when approximately was it, if you can recall,

Wolf-Direct/Lipez

1    that you determined that the person known as Champagne

2    was actually named Todd Rasberry?

3    A.    I think it was around the fall of 2014.

4    Q.    And how many aliases did you determine he had

5    used?  How many aliases did you determine that Todd

6    Rasberry had used in the past?

7    A.    Based on my interviews and my investigation, but

8    also reviewing his criminal history from NCIC, I

9    observed at least five, but I was aware of him using

10   James Bald, B-A-L-D, and also Rahiim, R-A-H-I-I-M,

11   Etheridge, E-T-H-E-R-I-D-G-E.

12   Q.    All right.  And in the last year or so, were you

13   able to determine who -- strike that.

14         Were you able to determine whether there was

15   an individual in the Portland area who was delivering a

16   large portion of heroin on a regular basis for

17   Champagne or Mr. Rasberry?

18   A.    Yes.

19   Q.    And who did you determine that that individual

20   was?

21   A.    I eventually identified that person as Julie

22   Wilson.

23   Q.    And just briefly, how did you determine that Ms.

24   Wilson was running drugs for Todd Rasberry?

25   A.    I had interviewed cooperating sources.  I had

Wolf-Direct/Lipez

1    interviewed people following their arrest trying to

2    learn more about the organization.  Through them, I had

3    obtained telephone numbers for this person Julie, who I

4    only had a first name at first.

5           I did phone analysis and then eventually

6    talking to, I believe, a Westbrook police officer, who

7    was jointly involved in the investigation, we were able

8    to determine that the -- that Julie was Julie Wilson

9    and, you know, following that, I was able to obtain a

10   photograph of Julie Wilson, which was shown to some

11   witnesses who said yes, that's the person that I

12   obtained heroin from.

13   Q.    And you mentioned phone analysis.  Did any of

14   that phone analysis show links between Mr. Rasberry or

15   the drug trafficker you knew as Champagne and Julie

16   Wilson?

17   A.    It did.

18   Q.    Can you describe briefly what the phone analysis

19   showed.

20   A.    Yes.  Over the course of time, say even the last

21   year leading up to the arrest, my investigation would

22   show telephone numbers that were occasionally changed,

23   that witnesses would tell me were the phone numbers to

24   contact Champagne in order to place orders, but also

25   another number to contact Julie Wilson in order to

Wolf-Direct/Lipez

1    coordinate delivery or to simply order from her.

2            I did do phone analysis of several of those

3    numbers that were attributed to each of them and saw

4    within a 30-day period hundreds of connections between

5    the telephone numbers, whether those connections

6    represented text messages or actual telephone voice

7    calls, but there were hundreds of connections between

8    the two.

9    Q.    All right.  I'd like to direct you to July 15th

10   of 2015.  Leading up to that date, had you received any

11   information about Ms. Wilson making a delivery of drugs

12   on that date?

13   A.    I did receive information that date about her,

14   yes.

15   Q.    And what was the information you received?

16   A.    I received information that she was operating a

17   rented vehicle and I had a description of the vehicle,

18   I had the license plate of the vehicle, and that she

19   was doing drug deliveries in the Portland area.

20           I had gone to Hertz Rent a Car at the airport

21   and verified that she was still a registered driver for

22   the particular vehicle with the same license plate, and

23   finally I received information that she would be making

24   a heroin delivery in the area of the Clarion Hotel on

25   Port -- on Congress Street in Portland sometime around

Wolf-Direct/Lipez

1    3 o'clock in the afternoon on the 15th of July.

2    Q.    And this information came from a source of yours;

3    is that right?

4    A.    Yes.

5    Q.    What did you do then in response to receiving

6    this information that she was going to be making a

7    delivery on the afternoon of the 15th?

8    A.    I developed a plan to try to observe her and

9    approach her and solicit her cooperation or, you know,

10   interview her to see if she was, in fact, delivering

11   drugs.  So myself and I think three other agents, maybe

12   four, we simply established surveillance in the area of

13   the Clarion because we had a particular vehicle to look

14   for, and probably starting around 3 o'clock, we took

15   various positions around the Clarion keeping an eye out

16   for that vehicle.

17   Q.    And do you recall today the agents that were with

18   you and the names of at least some of them?

19   A.    Sure.  Special Agent Kate Barnard was there as

20   was Special Agent Kristopher Sullivan and Task Force

21   Agent Tom LaPierre.

22   Q.    All right.  What happened after you all had set

23   up surveillance in the area of the Clarion Hotel?

24   A.    Well, for a while nothing.  We were waiting and

25   were almost at the point of discontinuing the

Wolf-Direct/Lipez

1    surveillance when myself or another member of the team

2    observed the vehicle attributed to Wilson parked across

3    Congress Street from the Clarion at a gas station.

4    Q.    And what did you do at that point?

5    A.    I directed the other agents -- again we started

6    thinking about safety at that point -- I directed them

7    to take various positions around her car, moving one

8    vehicle in front, one behind so that we don't wind up

9    with a car chase, but we approached, contained the

10   vehicle and then approached Wilson who was seated in

11   the vehicle by herself.

12   Q.    What happened after you approached her?

13   A.    I directed her out of the car.  I did a quick pat

14   down of her to make sure she wasn't holding any weapons

15   and I began an interview of her by identifying myself,

16   explaining the situation and a little bit of the

17   evidence implicating her and soliciting her cooperation

18   to try to expand my investigation.

19   Q.    What did she do in response to your statements to

20   her?

21   A.    Initially, she was very frightened and asked if

22   we could speak privately.  She was concerned about

23   being out on the street and she agreed to move to my

24   vehicle.  She was not handcuffed.

25          Inside my vehicle, she began to cry, expressed

Wolf-Direct/Lipez

1    a very strong desire of being afraid of going to jail

2    and I continued to explain to her that my purpose was

3    to expand the investigation and solicited her

4    cooperation and I told her I felt that she was making a

5    drug delivery.

6           She reached into her waistband and pulled out

7    a baggie of -- I think it was six small baggie corners

8    of tan powder that to me was consistent with heroin and

9    I took custody of that.  I said you're still not under

10   arrest, you're being detained and I'd like to continue

11   to talk about the situation that you're in.

12   Q.    And did she agree to do that?

13   A.    She did.  We continued to talk and I told her

14   that I felt that she was a pawn for someone else and

15   that while what she was doing was illegal and wrong,

16   that there were other people that were taking advantage

17   of her and I told her my interest in learning who and

18   where the person that was controlling this heroin was

19   located.

20   Q.    Did she tell you anything?

21   A.    She did.

22   Q.    What did she tell you?

23   A.    She told me that she worked for a man from New

24   York that she knew as Champ or Champagne.  She told me

25   that she had rented a hotel room in Scarborough, that

Wolf-Direct/Lipez

1   Champagne was currently in the hotel room.  She told me

2   she believed that he was in possession of additional

3   drugs there and she provided me a key to the hotel room

4   that she said I could use to access.

5          I got a form in order to memorialize her

6   consent and I read it to her out loud.  She watched

7   while I filled in the information on Room 109 at

8   America's Best Value Inn in Scarborough and then she

9   expressed concern -- as we were talking, her phone was

10  ringing.  She had said those were, you know, customers

11  were calling in and she said if he calls me and I don't

12  answer, he's going to run away, so I at that point knew

13  that we had an urgency in order to get to the next

14  step.

15  Q.    And I believe you said that she indicated she was

16  working for Champ or Champagne; did she elaborate

17  further on what she was doing for him during this

18  conversation?

19  A.    Yes.  She said that she -- she said that she was

20  an addict and that she was -- spent her time delivering

21  heroin to drug customers around Portland on his behalf.

22  Q.    All right.  So you said that she gave you a key

23  to the room; did she tell you what room and what hotel

24  specifically she believed Champagne was in?

25  A.    She did.

Wolf-Direct/Lipez

1    Q.    And what did she say?

2    A.    And she said it was Room 109 of America's Best

3    Value Inn on Route 1 in Scarborough.

4    Q.    What did you do then once you had that

5    information, the key and her consent to search that

6    room?

7    A.    I then contacted Officer Andrew Flynn of the

8    Scarborough Police Department, explained the situation

9    to him, talked to the other agents and we tried to, as

10   quickly as possible, relocate somewhat closer to the

11   hotel so that we could finalize a plan to approach that

12   room.

13         So Julie Wilson and the other agents that were

14   with me, we all next went over to the Scarborough

15   Police Department, only an 8 or 10-minute ride away,

16   and met in the parking lot there.

17   Q.    When you were in the parking lot, did you have a

18   discussion about what you would do next at the hotel?

19   A.    Yes.  I, you know, de facto was making the

20   decisions here as it was my case.  I asked Agent

21   Barnard if she would remain at the Scarborough police

22   station with Julie Wilson.

23         I know that part of valid consent is the

24   ability for someone to withdraw their consent if they

25   change their mind, so I explained to Julie Wilson that

Wolf-Direct/Lipez

1   she's going to stay there with Agent Barnard.  If she

2   changed her mind and didn't want to -- or if she wanted

3   to withdraw her consent, all she had to do was tell the

4   agent and the agent would call us and we would stop.

5        I wanted them -- then take the other agents so

6   we then had four of us because Officer Flynn had joined

7   us and then we developed a very brief plan to go to the

8   hotel and approach Room 109 with the written consent

9   with the intent of entering that room and conducting a

10  consent search.

11  Q.    And did you then go to America's Best Value Inn

12  to effectuate that search?

13  A.    Yes.

14        THE COURT:  Attorney Lipez, pardon me, do you

15  intend to mark and introduce the written consent?

16        MS. LIPEZ:  I did not intend to do that, Your

17  Honor.  I did not believe it was material.

18        THE COURT:  Thank you.  Go ahead.

19  BY MS. LIPEZ:

20  Q.    At the time you went to the hotel -- I'd like to

21  ask you a little bit about what you knew of Mr.

22  Rasberry's background.  Had you seen a photograph of

23  him at that point?

24  A.    Yes, many times.

25  Q.    So you were familiar with his appearance?

Wolf-Direct/Lipez

1  A.    Absolutely.

2  Q.    And you mentioned that you had run his criminal

3  history; what had you learned from that?

4  A.    I had observed numerous arrests in the New York

5  area that included narcotics violations, what --

6  assault that involved what appeared to be firearms from

7  my interpretation of the record.

8        I was also aware that in December of 2014,

9  about six months earlier, that Mr. Rasberry had been

10 arrested in a hotel room in Westbrook.  In that hotel

11 room were a quantity of cocaine and heroin and I was

12 also aware in that hotel room was a backpack that had

13 contained a handgun.

14 Q.    And during that incident where officers found

15 drugs and a gun in the hotel room where Mr. Rasberry

16 was located, do you know what Mr. Rasberry himself was

17 arrested for at that time?

18 A.    On that night he was charged with aggravated

19 forgery.  I was not present for that.  It was related

20 to use of aliases over his real name during the booking

21 process.

22 Q.    And when you enter a hotel room like you planned

23 to do in this case, are there particular safety

24 concerns that you have that are unique to a hotel room

25 as opposed to encountering someone in a public place,

Wolf-Direct/Lipez

1    on the street or something like that?

2    A.    Yes.  The overarching priority for all of our

3    operations is safety and the safety extends to members

4    of our team, the safety extends to whoever the

5    defendant might be, in this case Mr. Rasberry, and it

6    extends to nearby innocent bystanders.

7              So in a hotel room, having done many entries

8    and searches of hotel rooms, it's a very confined space

9    and almost always there are adjacent rooms with just

10   drywall in-between them, meaning that in the event that

11   there's any discharge of a firearm, the risk to

12   innocent people who are by design at the hotel like

13   that in close proximity goes up.

14             So when entering a hotel room or any space,

15   the first priority is safety and that safety is

16   obtained by establishing the security, neutralizing any

17   threats that might be inside of that space.

18   Q.    And did you view Mr. Rasberry to be a potential

19   threat?

20   A.    I did.

21   Q.    And what was the basis for that?

22   A.    I was aware of his firearm's history, some of

23   which was recent.  I was aware of his conviction as

24   being a felon involving violence, and my investigation

25   showed me that he was the head of a significant drug

Wolf-Direct/Lipez

1    trafficking organization in the Portland area and I

2    know that drug trafficking and violence often go

3    hand-in-hand.

4    Q.    When you arrived at the hotel, approximately what

5    time in the afternoon was it; if you recall?

6    A.    I think it was probably around 4:30 in the

7    afternoon.

8    Q.    And who was with you?

9    A.    At the hotel, myself, Agent Sullivan, Agent

10   LaPierre and Officer Flynn.

11   Q.    What was the plan in terms of entry into the

12   room?

13   A.    I had directed Agent Sullivan -- we knew the

14   layout of the hotel, especially with a Scarborough

15   officer with us.  We knew that all of the doors faced

16   the parking lot; in other words, there was no internal

17   hallway.  All of the room doors led directly outside.

18   We knew that there was on the back side of the building

19   a window through which a person could fit.

20         So the plan was I put Agent Sullivan on the

21   window on the back of the building.  The other --

22   myself and the other two approached Room 109 and we saw

23   that there was a window that faced the parking lot,

24   which was to the right of the door.  We stood to the

25   left of the door.  Our training never has us standing

Wolf-Direct/Lipez

1   in front of the door and we approached there with the

2   purpose of knocking and entering.

3   Q.    And why don't you stand either in front of the

4   window or in front of the door to the room; why did you

5   stand to the side?

6   A.    Again, it's -- we want to show as little as

7   possible of whatever tactics we might have, so standing

8   in front of a window gives whoever is in the room to

9   have the opportunity to see you, to see that the police

10  are there, to destroy evidence, to arm themselves and

11  you essentially lose the element of surprise.

12          Standing in front of a door, in this case the

13  door had no window in it, but just practice is that in

14  the unlikely event that someone is -- has armed

15  themselves and is going to do harm with a firearm,

16  standing in front of the door puts you in the field of

17  fire.

18  Q.    And what were you wearing at the time you had

19  lined up sort of to the side of this door and were

20  preparing to enter?

21  A.    No one was in any kind of a police uniform.  We

22  had either ballistic vests that were -- that had police

23  printed on the front of them and/or normal practice is

24  to wear a badge on a lanyard around the neck.  Which of

25  those I had that day, I believe I was in a ballistic

Wolf-Direct/Lipez

1    vest, but I'm not sure.  I either had that or a badge

2    showing.

3    Q.    And did you have your weapon out as you

4    approached the door?

5    A.    No.

6    Q.    So what did you do then when you got to the door?

7    A.    I had the keycard that Julie Wilson had provided.

8    It was not the type that you would slip into a slot in

9    order to activate the lock.  It was more like a

10   proximity card.  You hold it near the lock, it would

11   pick up the signal and would unlock.

12           So we quietly approached the door.  I placed

13   it -- the card key and I saw, I think, a red light

14   light up, but it did not activate the lock so I wasn't

15   sure why, but the keycard that I had didn't work.  I

16   told the other officers that and I then knocked on the

17   door.

18   Q.    And at the time you knocked, where was Officer

19   Flynn and Agent LaPierre?

20   A.    They were both to my left.  Again, I'm just to

21   the left of the door and they are both to my left,

22   further down the exterior, out-of-sight of anybody that

23   would look through the peephole if there was one or

24   look straight out the window, we would be out of their

25   sight.

Wolf-Direct/Lipez

1   Q.    So you were the first in line to that hotel door?

2   A.    Yes.

3   Q.    And what happened when you knocked on the door?

4   A.    Within five seconds or so the door opened and I

5   observed the person I knew as Todd Rasberry standing

6   there.

7   Q.    And at that time, did you have your weapon drawn?

8   A.    No.

9   Q.    What happened then after Mr. Rasberry opened the

10  door?

11  A.    We -- our intent was to enter that room, so we

12  began to step in.  A statement was made either by me or

13  one of the other officers or more than one of us

14  essentially saying we're here to search this room and

15  we stepped into the threshold.  I think Mr. Rasberry

16  was somewhat surprised.  He didn't say anything in

17  response and at that point, my most important priority

18  is the safety that I talked about.

19        I don't know who else is in that room.  I

20  don't know if there's weapons in that room, and now

21  that we've shown ourselves, the priority is to do a

22  security sweep, neutralize any threats that might be in

23  the room, so --

24  Q.    So how did you go about doing that?

25  A.    I was first in line.  I know my priority is to

Wolf-Direct/Lipez

1  get as much penetration into whatever space that we're

2  getting.  If I encounter anyone along the way, the way

3  we train is the people behind me are trained to engage

4  them and neutralize them while the lead person or the

5  lead people in our entry team penetrate the space as

6  much as possible.  So I observed him.  I knew that my

7  teammates behind me were going to engage him.  I drew

8  my weapon at that point as we were coming by and as I'm

9  coming by Mr. Rasberry.

10 Q.    Did you point your weapon at him?

11 A.    No.

12 Q.    So what was the purpose of drawing your weapon at

13 that point?

14 A.    I'm going further into a space and I don't know

15 what's in there.  So it's the protection of myself and

16 the rest of my team from any threats that might be

17 inside.

18         It's a hotel room.  It's not a very big hotel

19 room.  It's essentially a rectangle where we are.

20 Ahead to the right was a bathroom, small bathroom,

21 which is at the rear, and it was an open area with a

22 sink and I don't think there was a closet or anything.

23 And so from not knowing what's in the room, to being

24 able to say clearly that no other people were in the

25 room, no other threats were in the room, was a five

Wolf-Direct/Lipez

1    second penetration in order to say okay, we're --

2    immediate danger has subsided.

3    Q.    And once you determined there were no other

4    threats in the room, what did you do with your weapon?

5    A.    I holstered it.

6    Q.    And while you were doing that protective sweep of

7    the room, you mentioned that you expected that Officer

8    Flynn or Agent LaPierre would engage Mr. Rasberry; did

9    you know what they were doing with him specifically?

10   A.    I know from when I turned around and I know,

11   based on our plan when we went in given the level of

12   our apprehension going to encounter this person, that

13   he would be detained and he would be handcuffed.

14   Q.    And so after you cleared the room and turned

15   around, what did you observe?

16   A.    I saw that he had been handcuffed.

17   Q.    And who was standing closest to him; if you can

18   recall?

19   A.    Flynn and LaPierre were there in his vicinity,

20   but again, none of us is more than ten feet apart.

21   It's a relatively small room.

22   Q.    Did you see either of them frisk him or search

23   him in any way?

24   A.    No.

25   Q.    And once you had holstered your weapon, were

Wolf-Direct/Lipez

1    either of the other two officers in the room -- did

2    they have weapons drawn?

3    A.    Not that I recall at that point.  Normal -- once

4    again, once we get to that level, everybody's in a

5    position to holster up and I know that by our practice,

6    you know, if you're engaging someone, if you're putting

7    your hands on someone, your weapon is always holstered

8    so that you have both hands free, so I don't know if

9    they ever drew a weapon or not.

10   Q.    Did you speak to Mr. Rasberry at that point once

11   you determined there was no one else in the room that

12   was a threat?

13   A.    Yes.  So at that point adrenaline is running

14   high, Mr. Rasberry's been surprised by us, there's a

15   lot of apprehension on our part, so at that point,

16   based on my practice, it's time to -- for everybody to

17   take a deep breath, let's calm the situation and let's

18   get to the point of explaining what's happening here,

19   which is what I began to do.

20         I asked Mr. Rasberry who he was and he gave me

21   his name as Todd Rasberry and then I began to explain

22   to say -- well, first I wanted to establish his

23   standing; in other words, what's the circumstances of

24   the room and how it related to him so I asked him is

25   this your hotel room?  Have you rented it?  Do you live

Wolf-Direct/Lipez

1    here?  Are you staying here?  He stated no to all of

2    them and he stated that the hotel room was rented by a

3    girl and that he was a guest of the person that rented

4    the room.

5            So at that point, having established his

6    standing in the room, I explained I have a written

7    consent to conduct a search of this room, which is what

8    we intend to do and right now, Mr. Rasberry, you're not

9    under arrest.  You are being detained and I let him

10   know that.

11           At that point I left the room because we had

12   left our cars on a side street near the hotel.  I

13   wanted to get my vehicle, which had a search kit,

14   basically evidence bags, the things we would need,

15   inventory, things we would need in order to conduct a

16   search.  Go ahead.

17   Q.    Did Mr. Rasberry say anything when you told him

18   he was not under arrest that you can recall?

19   A.    No.  He was very quiet throughout the encounter.

20   Q.    So you left the room and you left Officer Flynn

21   and Agent LaPierre in the room with Mr. Rasberry; is

22   that right?

23   A.    Yes.

24   Q.    And what did you do then after you left; you went

25   to your vehicle?

Wolf-Direct/Lipez

1    A.    I first went behind the hotel to let Agent

2    Sullivan know that everything was okay and that he

3    didn't need to guard the rear window anymore.  I had

4    him come around to join us in the room.

5          I went and got my vehicle, which was maybe

6    50 yards away, drove it over to a parking spot in front

7    of the hotel.  At that general time, whether I went

8    into the room again or not, right around that general

9    time a taxi had arrived in the parking lot out in front

10   of the hotel.

11         The parking lot was almost empty, maybe three

12   cars in it.  It's a small hotel, it was the middle of

13   the afternoon, but I did go back into the room and I

14   did interact with Mr. Rasberry who made some reference

15   to -- I think he looked out the window and he said my

16   cab's here.

17   Q.    So what did you do in response to hearing that?

18   A.    So I did leave the room for maybe 3 or 4 minutes

19   because I wanted to go out and interview the taxi

20   driver to get their identity, find out more information

21   about them.  I did a brief interview with the cab

22   driver and returned into the room.

23   Q.    And while you were doing that, did any of the

24   other agents on the scene start searching the room?

25   A.    Yes.  They had done a cursory search.  Around

Wolf-Direct/Lipez

1    this time, I don't know in which order, but I learned

2    that a digital scale had been located in the bathroom.

3    I learned that a telephone had been located on top of

4    the microwave and they were just in the process of

5    looking through the drawers and the dresser and under

6    the mattresses.   That process had begun.

7    Q.    And a digital scale in an investigation like

8    this, did that have any significance to you?

9    A.    Yes.   Scales -- and I think there was a box of

10   baggies that were in the room, they to me indicate in

11   the drug world breaking down the large amount of drugs

12   into retail size packages that are then sold.

13   Q.    Once you went back into the room then after

14   speaking with the cab driver, did you engage any

15   further with Mr. Rasberry?

16   A.    Yes.

17   Q.    Was he still handcuffed at that point?

18   A.    Yes.

19   Q.    And what was the nature of your interaction with

20   him?

21   A.    I continued to explain the situation and as time

22   was going by, maybe not immediately then, but I knew he

23   was not under arrest.   I'm sensitive to leaving someone

24   handcuffed longer than is necessary when they're simply

25   detained and I explained to him that in my mind,

Wolf-Direct/Lipez

1    eventually I'm going to remove handcuffs unless drugs

2    are located and he's arrested, so I said I'm going to

3    pat you down for weapons now.

4    Q.    And in your training, what constitutes a thorough

5    pat down for weapons; what does that involve?

6    A.    My training tells me that a frisk, a *Terry* stop,

7    a pat down is a safety tool.  It's an examination of

8    someone's clothing in order to determine whether or not

9    they have anything that can do harm to me or to the

10   other people in the room.

11          It's a search for a gun or a knife and it's

12   not a strip search or anything near that.  It's -- it

13   is a pat down of the exterior clothing of the

14   individual.

15   Q.    Does that include all of the clothing, including

16   shoes, socks, things like that?

17   A.    Yes.  It's -- in my training, it's not taking

18   shoes off and looking inside them, but it's feeling the

19   exterior of socks to feel if there might be a razor or

20   something contained in them, but it's not taking the

21   soles out of shoes that, in my training, would be a

22   search.  A pat down is a quest for weapons.

23   Q.    And so your intention at that time was to do a

24   frisk of Mr. Rasberry and if there are no weapons to

25   take the handcuffs off; is that correct?

Wolf-Direct/Lipez

1   A.    Yes.   Whether I took the handcuffs off

2   immediately or not, I know that that box has been

3   checked.   And again, the room has been frisked, if you

4   will, for weapons and I want to do the same for him,

5   knowing that the potential is that he could be -- have

6   a weapon in the cargo shorts that he was wearing.

7   Q.    And at the time that you planned to frisk him,

8   what was your understanding of whether he had been

9   fully frisked already?

10  A.    My understanding was that he had not.

11  Q.    So what did you then do?

12  A.    I explained to him that I was going to pat him

13  down for weapons.   I saw that he was wearing cargo

14  shorts, a close fitting tank top, athletic shoes.   I

15  don't recall if he had socks or not.   So my -- I could

16  see the whole tank top and I could see the ankles, so I

17  knew if there was any threats, it would be within his

18  cargo shorts.

19        So I began a patting down of his pockets, his

20  buttocks, and I checked up into his crotch area to see

21  if I could feel any object there.   In my career, I have

22  located small handguns in just that location.

23        As I did that, I felt a probably tennis ball

24  size object right down where his two in-seams would

25  meet of his cargo shorts and I felt that and said I

Wolf-Direct/Lipez

1   feel something here, what is this?  And he claimed oh,

2   it's part of my anatomy, which I knew that it wasn't.

3   Q.    What did you believe it to be upon feeling it?

4   A.    Based on my training and experience, it's

5   consistent with an amount of cocaine or heroin,

6   something that's in a relatively powdered form that you

7   can feel a little bit of the consistency through

8   clothing, but I know that drug traffickers will

9   frequently hide illegal drugs in that area in order to

10  avoid detection.

11  Q.    Then based on your belief that you had felt drugs

12  in there, what did you do at that point?

13  A.    I then looked at Mr. Rasberry and said I feel

14  what I think is drugs here and I -- now you're under

15  arrest, I'm arresting you now and I'm going to search

16  you incident to your arrest.

17  Q.    Is it your standard practice to search

18  individuals incident to arrest?

19  A.    Yes.

20  Q.    And did you do that in this case?

21  A.    I did.

22  Q.    And what occurred when you did that?

23  A.    Initially, it was a little bit awkward.  I was --

24  I could feel the object down -- it felt like it was in

25  the underwear that he was wearing.  I have seen many

Wolf-Direct/Lipez

1    times custom made underwear that allows for a pocket in

2    order to hide things in.

3         For 60 seconds or so, I was trying to access

4    it from the rear unsuccessfully and Mr. Rasberry

5    eventually said to me you have to take it out from the

6    front.  We switched around.  I reached inside from the

7    front and withdrew a sandwich bag that had several

8    smaller sandwich bags inside it.

9    Q.    What did you believe at the time was in those

10   smaller sandwich bags?

11   A.    Just on first glance, it appeared to me that it

12   was three smaller sandwich bags that contained heroin,

13   one that contained cocaine.

14   Q.    And did you subsequently do any field-test of the

15   items you had retrieved from Mr. Rasberry?

16   A.    I did.

17   Q.    What did those field-tests show?

18   A.    All three of the sandwich bags that contained tan

19   powder showed a positive indication for the presence of

20   heroin, and the one that contained the white powder did

21   a positive indication for the presence of cocaine.

22   Q.    And what sort of weight did you discover in what

23   you had found?

24   A.    Including the baggies that they were in, the

25   heroin totaled at about 57 grams and the cocaine

Wolf-Direct/Lipez

1   totaled out at about 27 grams.

2   Q.    Did you find anything else on Mr. Rasberry in the

3   course of your search incident to arrest?

4   A.    Yes.   Whether it was search incident to arrest or

5   during the pat down, he had a set of keys that was in

6   one of his pockets.   He had a small amount of U.S.

7   currency, paper bills, and there was a flip phone or

8   telephone identical to the one that had been on the

9   microwave that was removed.

10  Q.    And did you seize both phones that were found in

11  the room; the one on the microwave and the one on Mr.

12  Rasberry?

13  A.    Yes.

14  Q.    And what happened then after you had completed

15  your search incident to arrest of Mr. Rasberry?

16  A.    We completed the search of the hotel room and

17  then he was transported to the Cumberland County Jail.

18  Q.    And did you find anything else in the hotel room

19  other than the scale, the baggies, the phones that

20  we've heard about?   Did you find any drugs in the hotel

21  room?

22  A.    No.

23  Q.    And are you familiar with how the Cumberland

24  County Jail treats incoming inmates in terms of whether

25  they're searched or not?

Wolf-Cross/Levine

1    A.   Yes.  Particularly in drug offenses, all inmates

2    are searched and depending on the circumstances, there

3    will be a strip search of them as well.

4            MS. LIPEZ:  I have no further questions of

5    this witness, Your Honor.  I would, in response to Your

6    Honor's request about the written consent, my read of

7    defense counsel's motion was that they're not actually

8    challenging the entry into the room.

9        If that changes, I would like the ability to

10   retrieve that exhibit after this hearing and provide it

11   to the Court.

12           THE COURT:  Thank you.  Attorney Levine.

13           MR. LEVINE:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15   BY MR. LEVINE:

16   Q.   Agent Wolf, you've been investigating Todd

17   Rasberry for, I think you said, 3 or 4 years?

18   A.   Yes.

19   Q.   And in 3 or 4 years, you hadn't gotten an arrest

20   warrant for him?

21   A.   No.

22   Q.   Why is that?

23   A.   Well, I learned that Mr. Rasberry is very

24   accomplished at his job and he uses layers of people

25   between him and us, so I had made several controlled

Wolf-Cross/Levine

1    purchases from what I believed was his organization or

2    from him, but at least one layer removed from that.

3    Q.    So you didn't have probable cause to arrest him

4    even after 3 or 4 years of investigation?

5    A.    On the day we were at the hotel; is that what

6    you're asking?

7    Q.    No, before that day.

8    A.    If I -- no, I don't think I did.

9    Q.    Because you didn't have an arrest warrant?

10   A.    The day we met him, we did not have an arrest

11   warrant.

12   Q.    And when you went to the door to conduct the

13   search of the room, you didn't have probable cause to

14   arrest him?

15   A.    When we opened the door, you're correct, I did

16   not.

17   Q.    And you described the concerns that you had about

18   the security of the room, correct?

19   A.    I don't understand.  Security of the room, I

20   don't understand.

21   Q.    So you went to the door with several other

22   officers, correct?

23   A.    Yes.

24   Q.    And you said you were familiar with his history?

25   A.    Yes.

Wolf-Cross/Levine

1    Q.    And you were familiar with the fact that he had

2    been found in a hotel room with a weapon, I think you

3    said, in December of 2014; is that right?

4    A.    Yes.  November or December, yes.

5    Q.    And so you actually called on a Scarborough

6    police officer, I think his name was Andrew Flynn, to

7    join the force, correct?

8    A.    Yes.

9    Q.    And was Flynn in full uniform?

10   A.    No.

11   Q.    Was he wearing one of those ballistic vests like

12   you were wearing?

13   A.    I'm not sure.  I know our normal practice would

14   either -- a ballistic vest would show -- it's important

15   that we demonstrate our office to the person's eye, so

16   either a badge showing or a vest or both.

17   Q.    And was Flynn armed?

18   A.    Yes.

19   Q.    And were you armed?

20   A.    Yes.

21   Q.    Was Sullivan armed?

22   A.    Yes.

23   Q.    Was LaPierre armed?

24   A.    Yes.

25   Q.    And you had a discussion before going in about

Wolf-Cross/Levine

1    the fact that you viewed Todd Rasberry as a security

2    threat, correct?

3    A.    I don't know that I had a discussion with others.

4    I knew that myself, yes.

5    Q.    Okay.  And you were wearing a ballistic vest, you

6    think?

7    A.    Either one of those or both, yes.

8    Q.    And were the others wearing ballistic vests?

9    A.    Again, either a badge showing or a vest or both.

10    I can't sit here and specifically say it was exactly

11    this.  I don't recall that detail.

12    Q.    Okay.  And the reason for wearing the ballistic

13    vest wouldn't just be for identification, correct?

14    A.    That's correct.

15    Q.    It would also be for protection?

16    A.    Yes.

17    Q.    And yet you can't tell us whether all of you or

18    one of you were wearing ballistic vests?

19    A.    Conclusively, no.

20    Q.    And you say that you tried the key to the door,

21    correct?

22    A.    Yes.

23    Q.    And it's not one of those keys you slide into the

24    slot, it's a key that you pass by the door?

25    A.    You hold it near the lock and when it functions,

Wolf-Cross/Levine

1    you hear the lock activate and you enter.

2    Q.    And the reason you know it's functioning is the

3    red light goes to green, correct?

4    A.    If there were lights.  All I know is I held it

5    and the lock didn't activate.

6    Q.    I see.  And did it ever occur to you at that

7    point in time that maybe this Julie Wilson, who was

8    telling you that Champagne had a room at 109 Best Value

9    Inn, was not telling you the truth?

10   A.    There was a small part of me that was concerned

11   that I had bad information, which is why I knocked,

12   yes.

13   Q.    When you knocked on the door, did you identify

14   yourself as a police officer?

15   A.    Not when -- not before the door opened, no.

16   Q.    Okay.  And when the door opened, did you identify

17   yourself as a police officer?

18   A.    Yes.

19   Q.    Were guns drawn at that point in time?

20   A.    No.

21   Q.    Are you sure about that?

22   A.    Yes.

23   Q.    How are you sure about that?

24   A.    I just know -- I wouldn't stand there with a gun

25   out because who knows who might open that door.  I

Wolf-Cross/Levine

1    could possibly have incorrect information and a
2    completely innocent person would open the door and be
3    looking at my gun.   I --
4    Q.    But I thought that you said that your job was --
5    as the lead guy is to go in and neutralize the room and
6    the job of the other guys is to trail you and
7    neutralize anybody that might attack you, correct?
8    A.    Yes.
9    Q.    Neutralize, that means shoot them, correct?
10   A.    No.
11   Q.    It doesn't?
12   A.    No, not to me.
13   Q.    If somebody's attacking you from directly in
14   front of you, how are those agents trailing behind
15   going to neutralize this person?
16   A.    As I enter a room -- just to clarify,
17   neutralizing the threat to me does not mean shooting
18   someone.   It means restraining them, placing them in
19   handcuffs, ceasing any threatening moves that they
20   might have toward myself or others.   That's what
21   neutralizing means to me.
22   Q.    Okay, but I'm just trying to get an idea of what
23   you meant when you said you're the lead guy, you go in.
24   I think you said after you got in, you did draw your
25   weapon, correct?

1    A.    Yes.

2    Q.    And that's because you don't know who's in that

3    room, right?

4    A.    Well, I do know who's in that room.  I know at

5    least Mr. Rasberry is in that room.  I don't know who

6    else is in that room.

7    Q.    You don't know who else is in that room,

8    particularly in the bathroom, correct?

9    A.    Anywhere in the room.  Hiding behind the bed,

10   hiding under the bed, hiding just around the corner by

11   the sink where there's a small wall, anywhere.

12   Q.    And I think your testimony was that the agents

13   behind you, their job is to protect you as you try to

14   take on whoever you might find?

15   A.    You can look at it that way.  Their job's to

16   engage whoever I encounter and I don't have to worry

17   about something dangerous behind me.

18   Q.    Okay.  And is it typical that they too would draw

19   weapons at that point in time?

20   A.    Depending on the situation.  As soon as -- by

21   practice, as soon as they might be putting their hands

22   on someone, they would holster up.  In that case,

23   whether someone covered him and the other handcuffed

24   him, whether they both had hands on him, I don't know,

25   but we have -- our training does not have us trying to

Wolf-Cross/Levine

1    pull somebody's arm with a gun in the other hand.

2    That's a dangerous situation.

3    Q.    Sure.  And he's right at the door, right?

4    A.    Yes.

5    Q.    And when he opens the door, he's at the door,

6    correct?

7    A.    He opens the door, steps back maybe 1 or 2 feet.

8    Q.    And so if somebody had a gun out and then

9    holstered it up when they handcuffed him, they would

10   have had the gun out as they entered the room, correct?

11   A.    No.  I probably drew my gun as soon as I saw him

12   and started to cross the threshold.  I said to myself,

13   okay, we're here, this is the right room.  I know that

14   guy, I know his background.  I know that this is a

15   high-risk situation.

16          I would have drawn my gun probably as I

17   stepped over the threshold.  They may have done that

18   behind me as well.  One of them may have drawn and

19   covered him while the other placed him in handcuffs.  I

20   don't know, but there's a number of ways it could have

21   happened.

22   Q.    But it sounds like 2 or 3 officers are stepping

23   over the threshold with guns drawn as my client is

24   taking a step, 1 or 2 steps back into the room.

25   A.    I can tell you that when the door opened, I know

Wolf-Cross/Levine

1    I entered the room and when I crossed that threshold

2    and saw him, I knew that the -- you know, I was in a

3    high-risk situation.  I would draw my weapon at that

4    point.

5              I don't know whether they drew weapons outside

6    and stepped in, whether they did it as they crossed the

7    threshold.  I can't see behind me.

8    Q.    Did he offer you any resistance to your entering

9    the room?

10   A.    No.

11   Q.    Did he try to flee from the room?

12   A.    No.

13   Q.    Did he just take a step back and stand there?

14   A.    Momentarily until other people had contact with

15   him, yes.

16   Q.    Did you ask his permission to enter the room?

17   A.    No.

18   Q.    And that's because you viewed that you already

19   had consent to enter the room?

20   A.    Yes.

21   Q.    And who was it that handcuffed Mr. Rasberry?

22   A.    I don't know.  It was either Agent Sullivan --

23   not Agent Sullivan, it was either Agent LaPierre or

24   Officer Flynn.  I don't know exactly.  I was facing the

25   other way at the time.  I know -- whether they did it

Wolf-Cross/Levine

1    together or one of them did it, I don't know.

2    Q.    You were focused on other things at that point.

3    A.    At that point, yes.

4    Q.    But had you discussed that you would be the lead

5    guy and that somebody else would detain Mr. Rasberry?

6    A.    No.  We just know in that situation what normal

7    practice is for an entry into a space.

8    Q.    So it did not come as a surprise to you that

9    somebody had put Mr. Rasberry in handcuffs as you

10   entered the room with guns drawn?

11   A.    No, not at all.

12   Q.    And you said it only took a few seconds for you

13   to clear the room to make sure no one was hiding under

14   the bed or in the bathroom, correct?

15   A.    Right.  Time expands, but certainly within 5 to

16   10 seconds, we knew that Mr. Rasberry was the only one

17   in there.  There was nobody under a bed, there was

18   nobody hiding behind a bed or in the shower stall or

19   anywhere.

20   Q.    And then you holster your weapon at that point in

21   time?

22   A.    As soon as I know there's no threat, yes.

23   Q.    And are the other officers' weapons holstered at

24   that point in time?

25   A.    They would be normally, yes, if not earlier.

Wolf-Cross/Levine

1    Again, if we're having physical contact with someone,

2    if people are in line with our training, they wouldn't

3    have a weapon drawn and have physical contact with

4    someone.  If you're cuffing someone up, your weapon is

5    holstered.

6    Q.    Do you know as you sit here who it was that

7    handcuffed Mr. Rasberry?

8    A.    I don't.  I think it was Officer Flynn, but I'm

9    not sure.

10   Q.    And is it typical under those circumstances where

11   there's a security threat and someone's in handcuffs to

12   perform a pat down simultaneously?

13   A.    Not necessarily.

14   Q.    It's not?  Do you know whether Officer Flynn did,

15   in fact, perform a pat down on him?

16   A.    My understanding is he did not.

17   Q.    He did not?  Have you read the Government's

18   response?

19   A.    I don't know that I have.

20   Q.    Had you met with Ms. Lipez before this hearing?

21   A.    Yes.

22   Q.    And did you know in her response she said that

23   there was a, quote-unquote, cursory pat down?

24            MS. LIPEZ:  Objection, Your Honor.  I don't

25   think that's an appropriate question for this witness.

1          THE COURT:   Overruled.  You can answer the

2     question.

3     BY MR. LEVINE:

4     Q.    She said that there was a cursory pat down.

5     A.    I heard that there was a very brief examination

6     of his lumbar area to -- with his handcuffs behind his

7     back, but there was nothing immediately reachable

8     there, yes.

9     Q.    All right.  So you said that you heard that;

10    where did you hear that?

11    A.    Whether it was in discussions with the prosecutor

12    or with the other officers.

13    Q.    Did you have any discussion with my client about

14    the fact that he had already been patted down before

15    you patted him down?

16    A.    No.

17    Q.    You did not?

18    A.    I had discussion with him to say I'm going to pat

19    you down for weapons now.

20    Q.    Did you know that Officer Flynn had emptied out

21    his pockets and looked at a bandanna that was folded in

22    the pocket?

23    A.    I remember a bandanna being on the bed, yes.  I

24    don't know if it came from his pocket or where.  I

25    remember seeing a bandanna because there was some

Wolf-Cross/Levine

1   residue in it, but I don't know where it came from.

2   Q.    Is it typical to remove items from a pocket that

3   aren't weapons during the pat down search?

4   A.    Sometimes.

5   Q.    Does that include a bandanna?

6   A.    I don't know where it came from, so I don't know

7   if it came from --

8   Q.    You don't know that it didn't come from his

9   pocket, right?

10  A.    You are correct.

11  Q.    And, in fact, you do understand that there was

12  some sort of search of his pocket or his crotch area or

13  his body prior to your pat down search?

14  A.    I don't know of any examination of his crotch

15  area prior to my pat down search.  I know after the

16  fact that, if anything, a very brief examination of his

17  lumbar area where his hands were eliminated the

18  possibility that he had a gun or some other weapon

19  tucked into his waistband where his hands could reach.

20  Q.    Would he --

21        THE COURT:  Pardon me, just so that the record

22  will be clear and my understanding of the evidence

23  would be clear, are you asking him what he -- what he

24  -- when you said understand, what he understood at the

25  time he decided to perform his search, his frisk or are

Wolf-Cross/Levine

1    you asking what he understood or understands as of

2    today?

3              MR. LEVINE:  Um, well, I'm asking both, I

4    guess.

5              THE COURT:  I'm going to ask you if you would

6    make it specific as to which or both of those

7    situation -- time frames you're inquiring about.

8    BY MR. LEVINE:

9    Q.    When did you first become aware that there was

10   another search of his lumbar region?

11   A.    After the fact.  At the time that I planned to

12   pat him down, I was unaware that anybody had done any

13   pat down search.

14   Q.    You deny that my client said to you I've already

15   been searched?

16   A.    I don't know whether he did or not and his

17   opinion on it would not factor into my decision whether

18   or not to protect myself.

19   Q.    All right, and you don't remember saying to him

20   who searched you?

21   A.    No.

22   Q.    And you don't remember him saying that guy?

23   A.    No.

24   Q.    And you don't remember telling him that you were

25   going to do it again?

Wolf-Cross/Levine

1   A.    I told him that I was going to pat him down for

2   weapons and I wasn't looking to debate the issue with

3   him.

4   Q.    Now, you're saying that that conversation didn't

5   happen or that you just don't remember that

6   conversation?

7   A.    I have no flawless way to determine.  I know that

8   I told him that I was going to pat him down for

9   weapons.  I know that at that point, I was unaware of

10  him being patted down for weapons previously.

11  Q.    You had cleared the room as far as security,

12  right, I think you said in 15 seconds.  You had

13  holstered your weapon and at that point, the focus

14  turned to a search of the hotel room; is that correct?

15  A.    For some of the members, yes.  Like I said, I

16  went and got my vehicle, brought it over, encountered

17  the cabbie outside, got the agent that was out back.

18  Q.    And so the other agents were tossing the room; is

19  that right?

20  A.    Some.

21  Q.    Looking in drawers, right?

22  A.    Yes.

23  Q.    Under mattresses, in closets, right?

24  A.    I don't think there was a closet in the room, but

25  if there was, yes.

Wolf-Cross/Levine

1   Q.    Looking in the bathroom, right?

2   A.    Yes.

3   Q.    In the toilet, correct?

4   A.    Um-hmm.

5   Q.    And that takes a little while, correct?

6   A.    Depending on what a little while means, but yes.

7   Q.    And you leave the room during that period of

8   time, correct?

9   A.    Yes.

10  Q.    And you go outside and you talk to the cab

11  driver?

12  A.    Yes.

13  Q.    And Mr. Rasberry had mentioned that he had

14  ordered a cab; is that right?

15  A.    I remember him saying something along those

16  lines, yes.

17  Q.    And you told him he wasn't under arrest, correct?

18  A.    I told him he was not under arrest.  He was being

19  detained, yes.

20  Q.    But he wasn't free to leave at that point?

21  A.    Correct.

22  Q.    He wasn't free to get out and go to the cab if he

23  wanted?

24  A.    That is correct.

25  Q.    And your purpose in going outside wasn't just to

Wolf-Cross/Levine

1    tell the cab driver to leave, correct?

2    A.    That's also correct.

3    Q.    You wanted to interview the cab driver?

4    A.    Yes.

5    Q.    Find out who he was picking up?

6    A.    Yes.

7    Q.    Find out if he picked up this person before?

8    A.    Yes.

9    Q.    Do further investigation?

10   A.    Um-hmm, yes.

11   Q.    Try to build probable cause?

12   A.    I don't know why I'd build probable cause toward,

13   but just to learn information, yes.

14   Q.    Well, it's been 3 or 4 years and you still didn't

15   have an arrest warrant, right?

16   A.    Yes.

17   Q.    So you were still working on probable cause,

18   correct?

19   A.    Yes.

20   Q.    And then you went back to your car?

21   A.    I went and got my car before I encountered the

22   cabbie, but yes.

23   Q.    What did you do in your car?

24   A.    I drove it over and parked it in one of the

25   vacant spots out in front of the room that we were in.

Wolf-Cross/Levine

1    Q.    And so you just moved it?

2    A.    Moved it, got some of the materials that we would

3    need for the search of the room, inventory sheets,

4    evidence bags, rubber gloves.

5    Q.    How long were you gone?

6    A.    Two minutes.  It was about a -- I went and got

7    Agent Sullivan, said we're clear, hopped in my car

8    which was 50 yards away on a small side street and

9    drove it over to the space, so I was gone 2 or

10   3 minutes.

11   Q.    2 or 3 minutes, but then you interviewed the

12   cabbie, correct?

13   A.    I believe I went back to the room because I think

14   the cabbie came back just after I returned to the room

15   where somebody said hey, there's a cab out front.

16   Knowing the lot was almost empty and based on Mr.

17   Rasberry's statement, I said okay, that cab is related

18   to this investigation.  So I went back outside and

19   probably spent 3 or 4 minutes with the cabbie, looking

20   at his license, getting the information on his cab,

21   asking him a few questions.

22   Q.    Taking any notes?

23   A.    I think I had some, yes, from the interview of

24   the cabbie.

25   Q.    And did you record that conversation?

Wolf-Cross/Levine

1    A.    No.

2    Q.    Did you learn anything useful from the cab

3    driver?

4    A.    Yes.

5    Q.    Anything that led to probable cause to arrest my

6    client?

7    A.    On that day?

8    Q.    Yes.

9    A.    No.

10   Q.    And then you went back to the room, correct?

11   A.    Yes.

12   Q.    So now you'd been gone 2 or 3 minutes to move the

13   car, 3 or 4 minutes to talk to the cab driver, so 5 to

14   7 minutes total, something like that?

15   A.    Sure.

16   Q.    And Mr. Rasberry's remained in handcuffs all that

17   time?

18   A.    My recollection, still standing in the

19   approximate area where he had been encountered just to

20   the right of the door as one enters the room.

21   Q.    Would it be customary to leave somebody 5 to

22   7 minutes in handcuffs before conducting a pat down

23   search?

24   A.    It would not be all unusual.  It could be 20 or

25   30 minutes, sometimes depending on what else is going

Wolf-Cross/Levine

1    on.

2    Q.    Isn't a pat down search for the purpose of

3    weapons?

4    A.    It is.

5    Q.    And isn't that the immediate threat?

6    A.    Well, there are priorities and this is a

7    situation where Mr. Rasberry's detained.  He is

8    fundamental to the center of this many year

9    investigation and I certainly had reason to believe

10   that there is criminal activity taking place.

11           So it's not in my mind oh, I'll pat him down

12   and we'll get him out the door.  He's detained while

13   our search continues because I didn't know at that

14   point if we would find a large amount of drugs in the

15   closet, in the bathroom, in the toilet tank and he

16   would become arrestable.  So as the search was

17   unfolding, as we were continuing to move forward with

18   our limited resources, he remained detained and because

19   he was handcuffed, was not seen as a threat, but was

20   simply under detention.

21   Q.    So -- so your purpose in detaining him at that

22   point was not so much to protect yourself from him, but

23   to conduct a search that might lead to drugs that might

24   lead to his arrest?

25   A.    My purpose in detaining him is that he was key to

Wolf-Cross/Levine

1   this investigation.  I had volumes of information of

2   him being the head of a significant drug trafficking

3   organization.  I had fresh information from who I

4   believed to be a credible eyewitness to say that he was

5   in possession of more drugs in the room, and while the

6   situation unfolded, yes, I'm balancing the safety of

7   the team, which we've addressed pretty well, so in my

8   mind he's simply being detained in a safe way at that

9   point.

10  Q.    Well, yeah, but what you said was I didn't want

11  to search him and find he didn't have a weapon and then

12  have to let him go; isn't that what you just said?

13  A.    What I said was I wouldn't have to let him go.

14  My implication is that was maybe what you were

15  implying, that we were one quick pat down away from him

16  being released.  At that point he wasn't being

17  released, but he was not yet under arrest.

18  Q.    But the point is -- because there's a distinction

19  between a *Terry* type stop and an arrest, right?

20  A.    Certainly.

21  Q.    The point is you've detained him for safety

22  purposes, right?

23  A.    I've detained him for -- no, not just for safety

24  purposes, because he's, by my investigation, the head

25  of this enormous drug trafficking organization and I

Wolf-Cross/Levine

1   wouldn't simply encounter him and send him on his way.

2   I would -- he'd be detained because he's suspected of

3   committing a crime.

4   Q.   So what is what you did with him with guns drawn,

5   with handcuffs behind his back, with him in handcuffs

6   for 5 to 7 minutes or more before you even bothered to

7   conduct your own pat down, how does that differ from an

8   actual arrest?

9          MS. LIPEZ:   Objection, Your Honor.   That's

10  asking for a legal conclusion.

11         THE COURT:   Overruled.   You can answer the

12  question.

13  A.   Could you say it again, sir.

14  BY MR. LEVINE:

15  Q.   How does what you did to him, while he's being

16  detained in handcuffs, after entering at gunpoint,

17  before you even bother 5 to 7 minutes later to conduct

18  your own pat down, differ from the actual arrest?

19  A.   Well, based on my training, and I have not

20  attended one day of law school, but frequently people

21  who are suspected of committing crimes are detained.

22  Depending on the situation, they are detained in

23  handcuffs and long before they're ever arrested and

24  charged with a crime.

25         That happens very, very frequently, and in

Wolf-Cross/Levine

1    this case I knew that I had what my investigation

2    showed as a head of a large organization who had a

3    history of violence, and I had encountered him in a

4    place where an eyewitness told me there were additional

5    drugs.

6         So in my mind, it was very clear, which is why

7    I communicated to him more than once you're not under

8    arrest right now, you're being detained.  If someone

9    looked at it in a non-legal way and just saw someone in

10   cuffs they might say oh, they're arrested now, but in

11   my mind, he certainly was not.  I might have had to let

12   him go.

13   Q.    Right.  And you said it yourself, you said I

14   didn't have to let him go even if I stopped and frisked

15   him, I could have further detained him.

16   A.    Correct.

17   Q.    Even if the frisk came up clean.

18   A.    Correct.

19   Q.    And yet you didn't bother doing that for at least

20   5 to 7 minutes?

21   A.    You have to do things in whatever order we can.

22   The urgency to do that, his condition, either being in

23   the condition of having a weapon that was a threat to

24   us or not having a weapon, that condition wasn't going

25   to change.

Wolf-Cross/Levine

1   Q.    The fact is you weren't merely searching for
2   weapons at the time you patted him down, you were
3   searching for drugs?
4   A.    That's not correct.
5   Q.    Okay.  Because prior to that you had tossed the
6   room or your agents had tossed the room, correct?
7   A.    Had begun searching the room.
8   Q.    And they hadn't found any drugs, correct?
9   A.    So far during the search, although they had found
10  drug-related articles.
11  Q.    Okay and it's a small room?
12  A.    Yes.
13  Q.    And you had believed that there would be drugs in
14  that room?
15  A.    My information said that, yes.
16  Q.    Right.  And your 3 or 4-year investigation
17  suggested that?
18  A.    Possibly.
19  Q.    So your focus at that point was where are the
20  drugs?
21  A.    My focus was carrying out the consent search that
22  I had authorization for.  My focus was trying to move
23  the investigation forward.  My focus was using whatever
24  legal means I had to investigate Mr. Rasberry and see
25  if he was committing crimes.

Wolf-Cross/Levine

1   Q.    Right.  And your focus though was not searching

2   him for weapons.  He's in handcuffs, right?

3   A.    Yes, but not -- go ahead.

4   Q.    And he's been in handcuffs for 5 to 7 minutes?

5   A.    Correct.

6   Q.    And you've been out of the room during that

7   period of time?

8   A.    Yes.

9   Q.    And there are other agents who are armed with

10  weapons in the room, correct?

11  A.    Yes.

12  Q.    They're all trained just like you are?

13  A.    Yes.

14  Q.    They're all trained to perform a frisk of a

15  suspect?

16  A.    Yes.

17  Q.    They all know that this is a potentially

18  dangerous suspect?

19  A.    Yes.

20  Q.    And yet it comes as a surprise to you that

21  somebody actually did pat him down before you patted

22  him down?

23  A.    That day, my information was in my mind it hadn't

24  been done yet and I was going to do it because yes,

25  you're right, he's in handcuffs, but if he's not going

Wolf-Cross/Levine

1    to be arrested -- I'm sensitive to the amount of time,

2    as you say, that I can keep someone handcuffed without

3    arresting them because it becomes a de facto arrest.  I

4    know that if he's not arrested, those handcuffs are

5    going to come off.

6    Q.    Right.  And you're so sensitive to that that you

7    go out and move your car, you go back and you interview

8    the cabbie and you take some notes and you come back in

9    and now a matter of minutes has passed and he's still

10   standing there in handcuffs, correct?

11   A.    Yes.

12   Q.    And all that had to be done to remove the

13   handcuffs was to give him a simple pat down, correct?

14   A.    Yes, which is why I did it.

15   Q.    Which took a matter of seconds, right?

16   A.    It does.

17   Q.    Now, you wrote an affidavit, correct?

18   A.    I did.

19   Q.    And you described for the Court what you did in

20   support of your arrest of Mr. Rasberry, correct?

21   A.    Yes.

22   Q.    And you didn't describe entering the room at

23   gunpoint, correct?

24   A.    No, I don't believe so, but I would -- if we're

25   going to talk about my affidavit, I would ask to --

Wolf-Cross/Levine

1    Q.    Do you want to look at it?

2    A.    Could I look at it?

3          MS. LIPEZ:  Your Honor, can I ask which

4    affidavit?  There have been several ones.

5          MR. LEVINE:  It's the affidavit that was

6    attached to the complaint -- okay, and it's entitled

7    affidavit of Paul Wolf and it's dated July 16, 2015.

8          Judge, may I approach?

9          THE COURT:  You may.

10   BY MR. LEVINE:

11   Q.    So I'll show you what I'll have marked as

12   Defendant's Exhibit 1 entitled affidavit of Paul Wolf;

13   do you recognize that to be your affidavit?

14   A.    I do.

15   Q.    And is it signed by you?

16   A.    Yes.

17   Q.    And that was prepared in connection with a

18   complaint for the arrest of Todd Rasberry on charges of

19   possession with intent to distribute cocaine and

20   heroin, correct?

21   A.    Yes.

22   Q.    And you wrote that affidavit, correct?

23   A.    Um, yes.  It's my affidavit.

24   Q.    And you signed that affidavit?

25   A.    I did.

Wolf-Cross/Levine

 1    Q.    And you signed it under oath?

 2    A.    Yes.

 3    Q.    In front of Judge Rich, correct?

 4    A.    Yes.

 5    Q.    And you described the operative events of the day

 6    of his arrest, correct?

 7    A.    Yes.

 8    Q.    And prior to swearing to this under oath in front

 9    of a judge, it's important that you include all of the

10    details, correct?

11    A.    No.

12    Q.    It's not?

13    A.    No.

14    Q.    You did mention the term de facto arrest,

15    correct?

16    A.    Yes.

17    Q.    And you mentioned that in your testimony just

18    now, correct?

19    A.    Yes.

20    Q.    And you mentioned that you were sensitive to the

21    amount of time that a person remains in handcuffs prior

22    to their actual arrest, correct?

23    A.    Yes.

24    Q.    And you mentioned that because your sensitive to

25    that because the longer somebody remains in handcuffs,

Wolf-Cross/Levine

1    the more likely it becomes what's called a de facto

2    arrest, correct?

3    A.    Yes.

4    Q.    And so in connection with this affidavit, you did

5    discuss your pat down, correct?

6              THE COURT:  Your what?

7    BY MR. LEVINE:

8    Q.    Your pat down.

9    A.    Yes.  If we're going to talk about it, I would

10   like to review it.

11   Q.    Okay.  Go ahead and review it.

12   A.    Yes.

13   Q.    And does that refresh your recollection?

14   A.    Yes.

15   Q.    And you described you performed the pat down,

16   correct?

17   A.    Yes.

18   Q.    You don't describe any other pat down that

19   occurred before the arrest, correct?

20   A.    Correct.

21   Q.    You don't describe leaving the room for two

22   minutes to move your car, correct?

23   A.    No.

24   Q.    You don't describe coming back to the room and

25   then leaving the room again for 3 to 4 minutes to talk

Wolf-Cross/Levine

1  to the cabbie?

2  A.     No.

3  Q.     You don't discuss the passage of time that Mr.

4  Rasberry was in handcuffs?

5  A.     No.

6  Q.     And in fact, you say a short time later with

7  regard to how soon you perform the pat down, correct?

8  A.     That is accurate.

9  Q.     Is it fair to say that the way you've written

10  that, it sounds like you never left the room, you never

11  went outside, you never came back in, you never went

12  outside again, you never came back in again.  Instead,

13  it all happened within that short period of time where

14  you're all in the room having entered with guns drawn?

15  A.     I don't get that impression.  I think it's

16  completely accurate, and without putting every detail

17  of who came and went and where people were standing,

18  every detail is not in my affidavit.  I think it's

19  completely accurate where it says, a short time later,

20  I did a pat down frisk.  I would say in this case, a

21  short time later probably means within 15 minutes,

22  which is fairly soon.

23  Q.     But you didn't say within 15 minutes?

24  A.     I did not.

25  Q.     You said a short time later, correct?

Wolf-Cross/Levine

1    A.    Yes.

2    Q.    Thank you.  I asked you whether it's important to

3    put all the relevant details in your affidavit,

4    correct?

5    A.    Yes.

6    Q.    And you said no?

7    A.    Actually you asked me if I put all details into

8    my affidavit and I don't.  I mean I think in the early

9    paragraphs, it will spell out that these are not all of

10   the facts that are known to me, simply enough to

11   establish probable cause, et cetera.

12   Q.    You know that before this hearing, there was an

13   ex parte motion before Judge Levy about another

14   incident involving you in 2005 where your report was

15   not complete, correct?

16   A.    Is that your opinion, that my report was not

17   complete?

18   Q.    All right, so let's break this down.  You know

19   that there was a discussion in front of Judge Levy

20   about a prior report that you had written, correct?

21   A.    Yes.

22   Q.    And that prior report took place in 2005?

23   A.    Yes.

24   Q.    And in 2005, that report was about a similar

25   entry into a house without a warrant, correct?

Wolf-Cross/Levine

1    A.    Yes.

2    Q.    And that report was about the way in which you

3    entered and whether or not there was actual consent to

4    enter?

5    A.    Those were things that were debated, yes.

6    Q.    Okay.  And it was debated by the U.S. Attorney

7    and the Boston office of DEA, correct?

8            MS. LIPEZ:  Objection, Your Honor.

9            THE COURT:  Basis of the objection?

10           MS. LIPEZ:  I believe this calls for Agent

11   Wolf to answer about -- information that's not within

12   his personal knowledge and asking for him to comment on

13   hearsay of others, which I do not believe is

14   appropriate under 608(b).

15           THE COURT:  All right.  Well, I'll sustain the

16   objection.  Attorney Levine, you can inquire though as

17   to the extent of his personal knowledge.

18   BY MR. LEVINE:

19   Q.    Was this an investigation of your conduct?

20   A.    Mine and others, yes.

21   Q.    And was your conduct called into question?

22   A.    It was.

23   Q.    And was your conduct called into question by our

24   own U.S. Attorney's Office?

25           MS. LIPEZ:  Objection, Your Honor.  Again, I

Wolf-Cross/Levine

1    don't believe this is appropriate cross-examination

2    under 608(b).  I believe appropriate questions should

3    go to the defendant's -- excuse me, the witness's own

4    conduct.

5              THE COURT:  The objection's sustained.

6    BY MR. LEVINE:

7    Q.    You know by your training that it's important to

8    include all relevant details?

9    A.    I disagree.

10   Q.    And you disagree that it's your job to notify the

11   prosecutor what you did and how you did it?

12   A.    You need to be more specific.

13   Q.    Okay.  Well, why do you disagree that you

14   shouldn't put all relevant details in your report?

15   A.    Well, again we're talking about an affidavit, but

16   even in a report, not all details that are known to me

17   are placed into it or other agents.  Sometimes that's

18   to protect confidential sources, sometimes it's to

19   protect a wiretap.  You never put anything that isn't

20   true, but it doesn't mean that you put in every single

21   fact that you know is true.

22   Q.    Well, why didn't you put in the fact that you

23   went out to the car and came back in and went out to

24   the car -- the cab and came back in and, in fact, it

25   wasn't just a short time later, there was intervening

Wolf-Cross/Levine

1    events; why didn't you put that in?

2            MS. LIPEZ:  Your Honor, may I have a

3    clarification, are we still talking about the affidavit

4    here or are we talking about the report?

5            MR. LEVINE:  I'm talking about the affidavit.

6            MS. LIPEZ:  Thank you.

7    A.    Because in my mind, it was just that, a short

8    time later and if I went outside to get an evidence bag

9    or I went to get more rubber gloves or if I stepped

10   outside to make a telephone call, it did not have any

11   bearing on Mr. Rasberry's detention or his status and,

12   in fact, I knew that I was well within my rule of

13   thumb, or the rule of thumb that I'm trained, which is

14   investigative detentions have about a 45-minute shelf

15   life and when you get beyond that, you're starting to

16   get into troubling areas, unless your investigation is

17   moving forward.

18            I encounter this very frequently with motor

19   vehicle stops, with detentions of persons on the

20   street.  There's a line that you start to get close to

21   where you have to be careful unless your investigation

22   is moving forward.  If the drug dog is coming from

23   45 minutes away, okay, your detention can continue.

24            The detention of Mr. Rasberry, based on my

25   history, training, et cetera, was relatively brief

Wolf-Cross/Levine

1    before he got to the point where he was arrested.

2    BY MR. LEVINE:

3    Q.    Is it relevant that he had been patted down by

4    somebody else before he was patted down by you?

5    A.    If that had taken place, it would be relevant,

6    yes.

7    Q.    And you acknowledge that something had taken

8    place?

9    A.    I know now after talking to the prosecutor that

10   some minor examination of his lumbar area, far short of

11   a full pat down search, which would have located other

12   items that I found in his cargo shorts, something like

13   that had taken place, but certainly there had been no

14   pat down of Mr. Rasberry until I did it.

15   Q.    Had you read Sergeant Flynn's report?

16   A.    I don't know.

17   Q.    And are you aware that, in fact, that bandanna

18   was taken out of his pockets?

19   A.    As I sit here now, no.  I remember seeing a

20   bandanna on the bed, but I don't know if it came from

21   his pocket or the table or what.

22   Q.    And are you aware that other items were taken out

23   of his pockets?

24   A.    No.

25   Q.    Um --

Wolf-Redirect/Lipez

1    A.    I recall that I took keys out of his pockets.  I

2    think I took a flip phone out of his pocket, some

3    amount of currency.

4    Q.    The prosecutor made reference to your written

5    report.  You also wrote a written report, correct?

6    A.    I did.

7    Q.    And in that written report, did you include any

8    details about the back and forth to the car and to the

9    cab?

10    A.    No because I normally wouldn't talk about every

11    coming and going or every trip I made to go and make a

12    phone call or -- to me there's an endless amount of

13    details that can go into a report.  You take the ones

14    that are -- have an impact on the case and you try to

15    include as many of those as possible.

16              MR. LEVINE:  That's all I have.

17              THE COURT:  Thank you.

18              MR. LEVINE:  Judge, I would like to move for

19    -- actually, I won't move the admission.  Thank you.

20              THE COURT:  All right.  Thank you, Attorney

21    Levine.  Attorney Lipez, any redirect?

22              MS. LIPEZ:  Yes, Your Honor.  Briefly.

23                        REDIRECT EXAMINATION

24    BY MS. LIPEZ:

25    Q.    Agent Wolf, in your 20 years of experience as a

Wolf-Redirect/Lipez

1   DEA agent, is it typical that you might investigate a

2   drug trafficker for 3 or 4 years without being able to

3   make an arrest?

4   A.    Yes.

5   Q.    And why is that?

6   A.    An arrest of that person.

7   Q.    Yes.

8   A.    Because there are varying levels of skill in that

9   industry and some are relatively easy to catch in that

10  they do their own work, but the nature of the

11  organizations that I encounter around here is that they

12  prey upon others to do their work for them.

13          They place layers between themselves and the

14  police so that they may even be sitting in a different

15  state taking drug orders, picking up another phone and

16  sending a runner to go and make deliveries of drugs.

17  It's not unusual.  It may take years in order to

18  apprehend a target that uses layers like that.

19  Q.    And so in this particular case, did you feel

20  frustrated that it had taken so long or was that just

21  typical in your line of work?

22  A.    Um, this, I would say, was longer than some other

23  cases, but I think it is an indication of the -- of the

24  organization itself and their methods.  It may also be

25  an indication of my methods, but it did take a long

Wolf-Redirect/Lipez

1  time in order to get here.

2  Q.    Now, there was some questions about the keycard

3  not working.  Had you used hotel keycards in your

4  personal experience, either personally or in your line

5  of work before?

6  A.    Yes.

7  Q.    And had you ever had the experience of a keycard

8  to a room that you're staying in, for example, not work

9  for whatever reason?

10  A.    Yes.

11  Q.    So that -- strike that.  What is your estimate of

12  time between when you entered the room and when you

13  ultimately place Mr. Rasberry under arrest, if you're

14  able to estimate?

15  A.    I think it's actually a little higher than Mr.

16  Levine described.  I think it's probably somewhere

17  between 15 and 20 minutes.

18  Q.    And obviously going through the chronology

19  described, the pat down happened before the arrest; is

20  that right?

21  A.    Yes.

22  Q.    And so how much time are we talking between the

23  entry into the room and the pat down in your

24  estimation?

25  A.    Well, the pat down and the arrest were

1    simultaneous, so again, 15 to 20 minutes.

2    Q.    All right.  So the pat down happened and the

3    arrest was within --

4    A.    As soon as I felt the object, talked to him about

5    it, I said you're under arrest right now and I'm going

6    to search you.

7    Q.    And there was some questions about detention

8    versus handcuffs.  Would you agree that handcuffs in

9    this case were in order to protect you and the other

10   agents; is that fair?

11   A.    A variety of things.  There's a possibility that

12   myself or the other agents could be involved in a

13   fight, a physical struggle.  There's a possibility that

14   seated three feet from the door a defendant might, not

15   handcuffed, make a leap for the door and try to out run

16   us to try to escape.  Much harder to do if your

17   handcuffed.

18        Again, at that point we don't know what's in

19   the room.  Is there a gun under one of the pillows that

20   we haven't found yet?  We don't know.  So it's to

21   immobilize someone who's a suspect who's being detained

22   and prevent them from a variety of things that would

23   not be good.

24   Q.    Would you agree that detention is not the same

25   thing as being handcuffed in terms of a *Terry* stop?  In

Wolf-Redirect/Lipez

1    other words, someone can be detained and not be in

2    handcuffs; is that --

3              MR. LEVINE:  Objection, leading.

4              THE COURT:  I'm not sure I understand the

5    question.  Please restate it.

6    BY MS. LIPEZ:

7    Q.    Have you ever detained someone in a *Terry* stop

8    without handcuffing them?

9    A.    Yes, frequently.

10   Q.    So when you use the word detain, you don't

11   necessarily mean handcuffed; is that fair?

12   A.    That's right.  I try to communicate with people

13   that I'm interacting with.  I like -- if I was them, I

14   would like to know what my status is, so I try to

15   communicate with them and update them.

16              You're being detained, you're not free to go,

17   you need to sit right there.  You aren't being

18   detained, you can leave now, you can get in your car

19   and you can go.  You're under arrest.  You know, I try

20   to take away the mystery for people that I interact

21   with so that they can know what their status is.

22   Q.    And detention can happen either with or without

23   handcuffs depending on the scenario?

24   A.    It's very situational, yes.

25   Q.    In this case though, is it fair that you would

Wolf-Redirect/Lipez

1    not have felt comfortable removing Mr. Rasberry's

2    handcuffs --

3              MR. LEVINE:  Objection.  Leading, Judge.

4              THE COURT:  Sustained.

5    BY MS. LIPEZ:

6    Q.    Would you have felt comfortable removing Mr.

7    Rasberry's handcuffs if he had not been thoroughly

8    searched?

9    A.    I would be very uncomfortable doing that.

10   Q.    Now, what in your understanding and experience is

11   the purpose of an affidavit in support of a complaint?

12   A.    It's to establish probable cause that a crime has

13   taken place and reach that threshold of probable cause

14   with the facts that support it.

15   Q.    And you mentioned that in this particular

16   affidavit, there's a paragraph where you indicated that

17   you might not put every detail known to you in the

18   affidavit; is that correct?

19   A.    Yes.  That's my standard language in an affidavit

20   to say this is not everything I know about this

21   situation.  The purpose of it is to reach that

22   threshold of probable cause that a crime has been

23   committed.

24             MS. LIPEZ:  I have no further questions, Your

25   Honor.

1          THE COURT:  Thank you.  Attorney Levine.

2                    RECROSS EXAMINATION

3     BY MR. LEVINE:

4     Q.    I want to read to you from Paragraph 14 from your

5     affidavit to the Court.

6          It says, Rasberry was placed in hand

7     restraints and I conducted a security sweep of the room

8     and bathroom; do you remember writing that?

9     A.    Yes.

10    Q.    There were no other people in the room; do you

11    remember writing that?

12    A.    Yes.

13    Q.    I then explained our reasons for being in the

14    room and I asked Rasberry if the room was his; did you

15    write that?

16    A.    I did.

17    Q.    He said, it was not his room and he was a guest

18    of the woman who had rented the room; did you write

19    that?

20    A.    I did.

21    Q.    The next sentence is, a short time later I

22    conducted a pat down frisk of Rasberry; is that the

23    next sentence?

24    A.    I'll assume it is if you're reading it, yes.

25    Q.    Who was wearing a tank top, cargo short and gym

1    shoes, correct?

2    A.    Yes.

3    Q.    You now say it was 15 to 20 minutes after you

4    went to the room that this pat down search and arrest

5    took place?

6    A.    Yes.

7    Q.    And while it's not necessary to include every

8    single detail in the report, you can't mislead the

9    Court.

10   A.    I would not do that, which is why I didn't say I

11   then patted down Mr. Rasberry, which is why I added the

12   words a short time later I conducted a pat down search.

13   Q.    You didn't say 15 to 20 minutes later?

14   A.    I do not specifically put the number of minutes,

15   no.

16            MR. LEVINE:  Thank you.

17            THE COURT:  Anything else?  Attorney Levine,

18   anything else?

19            MR. LEVINE:  I'm sorry.  No, Your Honor.

20            THE COURT:  And Attorney Lipez, any further

21   questions?

22            MS. LIPEZ:  No, Your Honor.  May the witness

23   be finally excused and free to leave?

24            THE COURT:  Yes, he may.  Thank you, agent.

25   You can step down.

Flynn-Direct/Lipez

1          MS. LIPEZ:  The Government calls Officer

2     Andrew Flynn, Your Honor.

3          THE CLERK:  Please raise your right hand.  Do

4     you solemnly swear that the testimony you will give in

5     the cause now in hearing will be the truth, the whole

6     truth, and nothing but the truth, so help you God?

7          THE WITNESS:  I do.

8          THE CLERK:  Please be seated.  And if you

9     could please pull yourself right up to the microphone

10    and state your first and last name for the Court.

11         THE WITNESS:  Andrew Flynn.

12         THE CLERK:  Spell your last name.

13         THE WITNESS:  F-L-Y-N-N.

14         THE CLERK:  Thank you.

15         THE COURT:  Please proceed.

16         MS. LIPEZ:  Thank you, Your Honor.

17                    DIRECT EXAMINATION

18    BY MS. LIPEZ:

19    Q.    Where do you work, Officer Flynn?

20    A.    I work for the Scarborough Police Department.

21    Q.    How long have you been with the Scarborough

22    Police Department?

23    A.    Just over eight years.

24    Q.    What is your particular role there?

25    A.    I'm a police officer assigned to the Special

Flynn-Direct/Lipez

1    Enforcement Unit.

2    Q.    What is the Special Enforcement Unit?

3    A.    It's a unit comprised of three other officers and

4    we do a lot of plainclothes work as well as uniformed

5    patrol.

6    Q.    When you say you do plainclothes work, what does

7    that mean?

8    A.    We work closely with the DEA, MDEA and other

9    agencies investigating drug offenses, prostitution

10   cases, anything that is outside the normal scope of

11   patrol work.

12   Q.    How long have you been with the Special

13   Enforcement Unit?

14   A.    This would be my -- just over three years.

15   Q.    I would like to direct your attention to

16   July 15th of 2015; did you receive a call that

17   afternoon from Special Agent Paul Wolf with DEA?

18   A.    I did.

19   Q.    And what did he state to you in that call?

20   A.    He informed me that him and several other agents

21   were en route to Scarborough and requested my

22   assistance in potentially apprehending someone at a

23   hotel in Scarborough.

24   Q.    And did he say -- did he give you any more

25   details during that phone call?

Flynn-Direct/Lipez

1    A.    Not too much.  He said it was time sensitive and

2    requested that I meet him at the police department.

3    Q.    Did you do that?

4    A.    I did.

5    Q.    And what happened then at the Scarborough Police

6    Department?

7    A.    Once at the police department, he informed me

8    that he was attempting to locate someone at America's

9    Best Value Inn in Scarborough.  I was familiar with the

10   location, I had been there on previous calls before and

11   he requested my assistance in securing the room.

12   Q.    And did he tell you what his plan was at the room

13   at the hotel?

14   A.    He advised me that he had obtained consent to

15   search the room and indicated that we were going to go

16   down there and attempt to make entry into the room and

17   search the room based on the consent.

18   Q.    And you mentioned that you'd been to America's

19   Best Value Inn; could you describe briefly what the

20   building looks like.

21   A.    The building is a two floor unit.  The entry

22   doors to the motel rooms are exterior doors.  There is

23   not an interior hotel like a normal hotel would be,

24   it's more of a motel where you entered the rooms

25   directly from the parking lot.

Flynn-Direct/Lipez

1    Q.    And the rooms, could you describe their size.

2    A.    They're relatively small in comparison to other

3    hotel rooms or suites.

4    Q.    And did Agent Wolf give you any information about

5    who, if anyone, was expected to be in the room that he

6    wanted to search?

7    A.    He advised me that they were going to be looking

8    for a black male that was alleged to be in the room and

9    supposedly involved in some type of drug trafficking.

10   Q.    In your meeting at the Scarborough Police

11   Department, did you discuss with Agent Wolf or any

12   other officers a safety or operational plan?

13   A.    We did.  We determined that we'd have one of the

14   agents stay at the back of the hotel -- of the motel

15   rather in case anyone in the room tried to exit out the

16   back and then the rest of us were going to make entry

17   at the front door.

18   Q.    Were there any details discussed beyond that?

19   A.    No.

20   Q.    And what happened then after you had this

21   discussion at the police department?

22   A.    We all went down to the motel.  We staged in the

23   area.  One of the agents walked up to the back window

24   and stood by there while the rest of us went up to the

25   front door and at that point, Agent Wolf tried the

Flynn-Direct/Lipez

1   keycard that he had for the room.  That did not work,

2   so we knocked on the door and made contact with the

3   male inside.

4   Q.    Let me ask you, stepping back, do you have

5   experience entering motel rooms with unknown occupants

6   inside?

7   A.    I do.

8   Q.    And are there particular concerns that you have

9   in situations like that?

10  A.    There are.  While entering into an unknown area,

11  we're on the outside coming in essentially and we're

12  not aware of who's in the room, how many people are in

13  the room, whether there are weapons inside of the room.

14  We have -- there's a serious potential for some safety

15  issues there.

16  Q.    And who -- you mentioned that Agent Wolf tried

17  the key to the room.  Was anyone else with you at the

18  front door to that motel room?

19  A.    I believe there were two other agents with me as

20  well, DEA agents.

21  Q.    Do you recall who they were?

22  A.    I believe it was Agent LaPierre and Agent

23  Sullivan.

24  Q.    Was Agent Sullivan at the door or was he at the

25  back of the hotel?

Flynn-Direct/Lipez

1    A.    I can't remember exactly where he was.  He may

2    have been the agent that was at the back door.  I

3    believe it was me -- back window, rather.  I believe it

4    was me, Agent Wolf and Agent LaPierre at the door.

5    Q.    And who was closest to the door at the time that

6    Agent Wolf tried the key?

7    A.    He was closest at the door and then I was

8    directly behind him.

9    Q.    All right.  And what were you wearing at the

10   time?

11   A.    I was in plainclothes.  I can't remember what I

12   had on for pants, but I had a shirt on with an external

13   vest carrier, black vest carrier over my shirt that

14   said police as well as a Scarborough Police Department

15   patch on it.  I had a badge on my waist as well as

16   police written across my back.

17   Q.    And did you have a weapon?

18   A.    I did, yes.

19   Q.    Where was your weapon at the time Agent Wolf

20   knocked on the door?

21   A.    I had it out in the low ready position, pointed

22   down to the ground.

23   Q.    So unholstered, but not pointed straight forward;

24   is that right?

25   A.    Correct.

Flynn-Direct/Lipez

1  Q.    And what happened then once Agent Wolf knocked on

2  the door?

3  A.    A black male answered the door and we made entry.

4  I immediately made contact with the male, placed him in

5  handcuffs and stood by for further instructions from

6  Agent Wolf.

7  Q.    So between the time that Agent Wolf knocked on

8  the door and you had your weapon in the low ready

9  position at the time the door opened, you handcuffed

10 the individual inside, what did you do with your

11 weapon?

12 A.    I holstered it.

13 Q.    Did you ever point it directly at the individual

14 who opened the door?

15 A.    No.  If anything, I would have had it in a low

16 ready position should I had to use it, I wanted it

17 readily accessible.  I wouldn't have pointed it at him

18 unless there was a threat presented to me.

19 Q.    And when that individual opened the door, how did

20 he react?

21 A.    He was relatively calm.  We announced ourselves.

22 I believe I said police and I believe the other agents

23 may have announced DEA and we made entry into the room.

24 He was not uncooperative with us and I advised him that

25 he was being detained and I placed him in handcuffs.

Flynn-Direct/Lipez

1    Q.    And what were the other agents doing at the time

2    that you placed -- well, let me ask you, did the

3    individual who you placed in handcuffs, did you learn

4    his name at some point?

5    A.    I did.  I eventually determined that he was Todd

6    Rasberry.

7    Q.    And what were the other agents doing at the time

8    that you were placing Mr. Rasberry in handcuffs?

9    A.    The other agents performed a security sweep to

10   make sure there weren't any other occupants in the

11   room.

12   Q.    And was anyone else in the room?

13   A.    There was not.

14   Q.    At the time that you handcuffed Mr. Rasberry, did

15   you discuss the handcuffs with any of the other agents?

16   A.    After handcuffing him, I do recall looking over

17   at Agent Wolf and just indicating that he was placed in

18   handcuffs and just making sure that he was okay with

19   that and he said he was.

20   Q.    Agent Wolf said it was okay for him to be

21   handcuffed?

22   A.    Correct.

23   Q.    And why did you check with Agent Wolf to see if

24   he was all right with that?

25   A.    Like I said, I had very limited information.

Flynn-Direct/Lipez

1    My -- as far as what we -- what they had for

2    information and what their reason was for entering the

3    room and what their prior investigation was.  I felt

4    that my position there was strictly as a security

5    officer to make sure that everyone was safe and based

6    on my training, education and experience, I felt it was

7    appropriate to place him in handcuffs.

8    Q.    And at the time you placed him in handcuffs, did

9    you do any sort of frisk of his person?

10   A.    I did.  I frisked the center of his back where

11   his handcuffs were and the intent of my frisk was to

12   check areas that were readily accessible to him while

13   he was still in handcuffs with his hands behind his

14   back.

15   Q.    In your training and experience, what would you

16   consider to be a full or a thorough frisk of someone

17   for weapons; what would that involve?

18   A.    That would involve patting them down to include

19   their legs, pants if they have pants on, checking

20   their -- maybe feeling their shoes to see if there was

21   anything secreted in their shoes, patting down their

22   chest, shoulders, basically the entire body.

23   Q.    And did you do that in this case?

24   A.    I did not.

25   Q.    So you mentioned that you just frisked the back

Flynn-Direct/Lipez

1    of Mr. Rasberry's pant's area; is that right?

2    A.    Correct, where his hands would have access to.

3    Q.    Even while cuffed?

4    A.    Correct.

5    Q.    And did you locate anything during the course of

6    that frisk?

7    A.    The only thing that I located when I patted was

8    his rear pant's pocket, I can't remember if it was the

9    right or left, but there was a rag folded up in his

10   pants.  When I felt the rag, it felt like there was a

11   bulge in it.  I removed the rag from his back pants and

12   as I started to unfold it, I realized that the bulge

13   that I felt was actually the way the rag was folded.

14   It folded over upon itself to create a bulge inside of

15   the rag.

16   Q.    And after finding that bandanna, did you do any

17   further frisk of any other part of Mr. Rasberry?

18   A.    I did not.

19   Q.    Why did you not perform a full frisk for weapons

20   at that point?

21   A.    Like I said, I felt that my position there was

22   simply as a safety and security officer.  I didn't have

23   a whole lot of information on whether or not Agent Wolf

24   had probable cause for search or what specifically he

25   had for in-depth intelligence into the case, so at that

Flynn-Direct/Lipez

1    point I didn't want to overstep my bounds and I just

2    made sure that I was safe and the other agents there

3    were safe.

4    Q.    And what was Mr. Rasberry's demeanor like at that

5    point?

6    A.    He was very calm the entire time.

7    Q.    So what happened then after you had initial

8    interaction with Mr. Rasberry and the other agents had

9    made sure there was no one else in the room, what

10   happened next?

11   A.    I basically stood by with Mr. Rasberry while the

12   other agents conducted their investigation.  I believe

13   some of them started searching the room.  One of the

14   other agents stepped outside to speak to someone.

15   Q.    And at some point did you make any call to anyone

16   at your department at that time?

17   A.    I did.  For a short time I stepped outside of the

18   room and one of the other agents, I believe it was

19   Agent LaPierre, stood by with Mr. Rasberry while I

20   stepped outside to call dispatch on the phone to try to

21   locate a K9.

22   Q.    And what was the purpose of doing that?

23   A.    Agent Wolf had asked if we had a K9 working and

24   we did not, but I advised him that I could contact

25   dispatch and try to either locate one of ours or check

Flynn-Direct/Lipez

1  with mutual agencies to see if someone else had one

2  that is working.

3  Q.    This is a drug sniffing dog?

4  A.    Correct.

5  Q.    And about how long after the entry would you

6  estimate you made this call for a K9?

7  A.    Approximately 7 or 8 minutes.

8  Q.    Now, at some point did you see Agent Wolf have

9  any interaction with Mr. Rasberry?

10  A.    He did.

11  Q.    And what did you observe?

12  A.    He began to speak with Mr. Rasberry.  I really

13  didn't pay much attention to their specific

14  conversation.  I believe that Mr. Rasberry asked if we

15  could remove his handcuffs and I stood by and Agent

16  Wolf said before he removed his handcuffs he was going

17  to pat him down.

18  Q.    Did Mr. Rasberry say anything to you about the

19  fact that he was going to be patted down?

20  A.    He -- I don't know if he said it directly to me,

21  but he did announce that he had already been patted

22  down once and I explained to him that I only patted

23  down his immediate hands area.

24  Q.    And then what did Agent Wolf do at that point?

25  A.    Agent Wolf conducted a thorough pat down of him.

Flynn-Direct/Lipez

1    He located a mass inside his groin area.

2    Q.    And did Agent Wolf say anything out loud about

3    what he had located?

4    A.    He did advise us that he had found something in

5    his pants and at that time we worked on extracting the

6    mass that he had in his pants.

7    Q.    Before he extracted it, did he say anything to

8    the defendant about whether his status had changed or

9    he --

10   A.    He may have said he was under arrest.  I'm not

11   100-percent sure on that.  I don't know if that

12   occurred prior to him removing the item in his pants or

13   after.

14   Q.    So you don't remember?

15   A.    I don't recall, no.

16   Q.    Was the defendant cooperative while his pants

17   were being searched?

18   A.    He was somewhat argumentative, not violent by any

19   means.  He indicated that he had already been patted

20   down once and seemed to contest the fact that we were

21   removing what was in his pants.

22   Q.    And what did you see was removed from his pants?

23   A.    There was some plastic baggies with some powder

24   inside of them.  I didn't really handle them or have

25   much interaction with that portion.

Flynn-Direct/Lipez

1    Q.    But you do recall that at some point, Mr.
2    Rasberry was placed under arrest?
3    A.    Correct.
4    Q.    Were you involved in a search of the room at all?
5    A.    No, not at all.  Like I said, my primary focus
6    was as a security officer and I allowed the agents to
7    do their investigation.
8    Q.    You mentioned earlier that you had called for a
9    drug sniffing dog.  Did the dog ever arrive; did that
10   ever happen?
11   A.    It did not.  I had dispatch -- after making a
12   call, they were in the process of trying to locate a
13   dog and during that time, we actually located the mass
14   that was on Mr. Rasberry and Agent Wolf advised me that
15   we didn't need the dog anymore.
16   Q.    And after Mr. Rasberry was arrested, what ended
17   up happening to him?
18   A.    He was transported up to the police department.
19   I went to the police department myself and obtained a
20   cruiser with a cage in it and then I transported Mr.
21   Rasberry to the Cumberland County Jail.
22   Q.    And are you familiar with the Cumberland County
23   Jail's policies when a new inmate is brought into the
24   jail?
25   A.    I am.

Flynn-Direct/Lipez

1    Q.    And in your experience, do they typically search

2    people who are brought into the jail under arrest?

3    A.    Yes.

4            MS. LIPEZ:  Your Honor, may I approach?

5            THE COURT:  You may.

6    BY MS. LIPEZ:

7    Q.    I've shown you what I've marked as Government's

8    Exhibit 1 for identification; do you recognize that

9    document?

10   A.    I do.

11   Q.    What is it?

12   A.    It is a call for service slip that our dispatch

13   initiated on this call.

14   Q.    And how did that work?

15   A.    When we -- any type of activity that we have,

16   dispatch generally will generate a call slip for us

17   documenting our response times and brief notes as to

18   what we tell them over the radio or what we enter into

19   the call slip ourselves.

20   Q.    And again, that particular slip, Government's

21   Exhibit 1, relates to the activities you've just

22   discussed occurring on July 15, 2015?

23   A.    Correct.

24           MS. LIPEZ:  Your Honor, I move the admission

25   of Government's Exhibit 1.

Flynn-Direct/Lipez

1        THE COURT:  Is there any objection?

2        MR. LEVINE:  No, Your Honor.

3        THE COURT:  Government's 1 is admitted.

4   BY MS. LIPEZ:

5   Q.    Officer Flynn, what is the first timestamp entry

6   on that dispatch log?

7   A.    First timestamp entry is the creation of the call

8   at 1629 hours.

9   Q.    So that would be 4:29 p.m.?

10  A.    Correct.

11  Q.    And what does creation of the call mean?

12  A.    That's when dispatch created the -- entered the

13  call into the computer.

14  Q.    And what is the next entry on that.

15  A.    The next entry is a note entered by dispatcher

16  Thornton at 1630 hours, which says assisting DEA.

17  Q.    So that's 4:30?

18  A.    Correct.

19  Q.    And what's next on the log?

20  A.    After that is another entry at 4:30 p.m. by

21  dispatcher Thornton indicating -- requesting a K9.

22  Q.    And that would have been your call for a K9?

23  A.    Correct.

24  Q.    So you testified previously that you think you

25  made the call for the K9 maybe 7 or 8 minutes after the

Flynn-Direct/Lipez

1    entry; is that right?

2    A.    Correct.

3    Q.    So it looks like the dispatch log is not entirely

4    contemporaneous with the entry, but actually starts

5    when you make your K9 call; is that fair?

6    A.    Correct.  It appears that the call slip wasn't

7    generated at the time of our entry.  Instead, it was

8    generated when I called them and advised them that we

9    were at that location and were requesting a K9.

10   Q.    Does the call slip indicate at what time the

11   interaction in the hotel room ended?

12   A.    It doesn't show the time that it ended.  The only

13   time it shows is when I transported Mr. Rasberry to the

14   jail.

15   Q.    And would that have been from the hotel or from

16   the police station?

17   A.    From the police station.

18   Q.    And what time was that?

19   A.    That was at 1704 or 5:04 p.m.

20   Q.    So presumably you would have had to leave the

21   hotel at some point before 5:04 p.m. to get to the

22   police station, change cruisers and then meet?

23   A.    Correct.  The hotel is a very short distance from

24   the police station, so probably less than a mile.

25   Q.    All right.  So how many minutes would you say --

Flynn-Cross/Levine

1    how many minutes prior to leaving the police station

2    would you estimate you left the hotel room with Mr.

3    Rasberry?

4    A.     Probably 5 to 6 minutes.

5    Q.     All right.  So sometime slightly before 5:00 p.m.

6    he was removed from the hotel room?

7    A.     Correct.

8              MS. LIPEZ:  I have no further questions, Your

9    Honor.

10             THE COURT:  Thank you.  Attorney Levine.

11                       CROSS-EXAMINATION

12   BY MR. LEVINE:

13   Q.     Good afternoon.

14   A.     Good afternoon.

15   Q.     So you work for Scarborough PD?

16   A.     I do.

17   Q.     And not the MDEA?

18   A.     Correct.

19   Q.     And you were called as a security person on this

20   detail?

21   A.     Correct.

22   Q.     And you were familiar with the area?

23   A.     I was.

24   Q.     And it's a hotel motel?

25   A.     Yes, sir.

Flynn-Cross/Levine

1    Q.    Two stories?

2    A.    Yes, sir.

3    Q.    Small rooms?

4    A.    Yes, sir.

5    Q.    Open to the parking lot?

6    A.    Correct.

7    Q.    And you were not in uniform, you were in

8    plainclothes?

9    A.    I did have a uniform on.  Not the consistent

10   patrol uniform, but I did have markings indicating I

11   was a police officer.

12   Q.    Were you wearing what's called a ballistic vest?

13   A.    I was.

14   Q.    And carrying a weapon?

15   A.    I was.

16   Q.    And were you briefed by Agent Wolf before you

17   engaged in this operation?

18   A.    I was.

19   Q.    How long did that take?

20   A.    He advised me it was a time sensitive issue, so

21   the briefing was probably a minute or two.

22   Q.    And what did he tell you?

23   A.    He advised me that he or one of the agents had

24   obtained consent to search a room at the Millbrook

25   (sic).  He provided me with a room number and requested

Flynn-Cross/Levine

1    my assistance in securing the room while we made entry.

2    Q.    Did he tell you who would be inside?

3    A.    He did not.

4    Q.    You said before you entered you had your gun at

5    the ready position; is that right?

6    A.    I did.

7    Q.    Why is that?

8    A.    We were entering an unknown area, unknown

9    threats.  Because I had my gun out doesn't mean that I

10   planned to use it, but if I did need to use it, I

11   wanted to have it readily accessible.

12   Q.    Did he give you any idea of the threat that you

13   faced?

14   A.    He didn't.  He did advise me it was a drug

15   trafficker, but as I said, I wasn't familiar with his

16   investigation or his case so I had limited information.

17   Q.    Did he tell you anything about the drug

18   trafficker?

19   A.    No.

20   Q.    Did he tell you whether he was an armed drug

21   trafficker?

22   A.    No.

23   Q.    Did he tell you if he was from out-of-state?

24   A.    No.

25   Q.    Did he tell you the color of the drug trafficker?

Flynn-Cross/Levine

1    A.    He said it was a black male that was believed to

2    be in the room.

3    Q.    And who else was at the room when you entered?

4    A.    Just Mr. Rasberry.

5    Q.    No, no, no, I'm sorry, who else on the -- from

6    the police side was at the room.

7    A.    For Scarborough police, there was no one else.

8    It was just drug agents.

9    Q.    So you and two other drug agents?

10   A.    There was a third drug agent as well that was on

11   the back side of the motel.

12   Q.    Okay.  Do you remember the names of the other two

13   that were with -- I'm sorry, Wolf was with you and then

14   who else was with you at the door?

15   A.    I believe Agent LaPierre was behind me at the

16   door and Agent Sullivan was on the back side of the

17   motel.

18   Q.    Okay.  And did either Wolf or LaPierre have their

19   guns drawn?

20   A.    I don't recall.

21   Q.    But you did have your gun drawn?

22   A.    Yes.

23   Q.    And that was because of what Wolf had told you?

24   A.    That was because I was entering an unknown area.

25   I didn't know what the drugs were in there.

Flynn-Cross/Levine

1    Q.    And that would have been standard operating

2    procedure?

3    A.    Yes, sir.

4    Q.    And that would have been standard operating

5    procedure for members of DEA just like members of

6    Scarborough Police Department?

7    A.    I don't know what their standard operating

8    procedures are.  I know based on what I've been

9    trained.

10   Q.    And did you see their guns drawn at any point in

11   time?

12   A.    I don't recall if they had their guns out or not.

13   Q.    Was it discussed who was going to handcuff the

14   suspect?

15   A.    It was not.

16   Q.    How was it that you were the one that did that?

17   A.    I was directly behind Agent Wolf when he made

18   entry into the room.  He immediately continued into the

19   room.  I was the next one through the door.  I observed

20   Mr. Rasberry and I went over to him and placed him in

21   handcuffs.

22   Q.    And he did not give you any resistance?

23   A.    He did not.

24   Q.    He didn't try to charge you?

25   A.    No.

Flynn-Cross/Levine

1   Q.   He didn't try to flee out the window?

2   A.   No.

3   Q.   He was handcuffed without incident?

4   A.   Correct.

5   Q.   And you said that you were taking your direction

6   from Agent Wolf at that time?

7   A.   He wasn't really giving me direction at that

8   time, but he was the person in charge of the

9   investigation, I'd say.

10  Q.   And when you handcuffed Mr. Rasberry, wouldn't

11  standard operating procedure be to pat him down?

12  A.   Correct.

13  Q.   And that would be a full pat down, not a cursory

14  pat down?

15  A.   It depends on the situation.  As I said, I wasn't

16  familiar with Agent Wolf's investigation and I felt

17  that I was there to ensure safety and I did what I

18  needed to do to make sure everything was safe.

19  Q.   And so you mentioned reaching into his pockets?

20  A.   Correct.  I patted down his rear pant's pocket

21  and I don't recall if it was the right or the left, but

22  I did locate something in one of those pockets.

23  Q.   Okay and you pulled it out of the pocket?

24  A.   I did.  I felt that it had a -- what felt like a

25  lump inside of it, so I removed it.

Flynn-Cross/Levine

1  Q.     And did you think the lump might be a weapon?

2  A.     I wasn't sure what it was.  I wasn't sure if it

3  was something hidden inside the pants or inside of the

4  cloth or what it was, if it was a weapon or contraband.

5  Q.     And what about his front pockets?

6  A.     I didn't have the need to pat those down.  His

7  handcuffs were behind his back.  He wouldn't have

8  access to his front pockets.

9  Q.     You didn't take out anything else out from his

10 pockets?

11 A.     There may have been a set of keys.  I don't

12 recall if I took those out or if those were taken -- I

13 know he had a set of keys on him, but I don't know if

14 they were removed by me or one of the other agents

15 later in the evening.

16 Q.     Do you know if those were in his front pocket or

17 back pocket?

18 A.     I don't recall.

19 Q.     It's possible that you did take them out?

20 A.     It's possible.

21 Q.     And it's possible you took them out from his

22 front pocket?

23 A.     I wouldn't know.  I don't know where I took them

24 from if I did take them.

25 Q.     If you did take them out of his front pocket,

Flynn-Cross/Levine

```
 1   that must have meant that you did pat his front pocket,
 2   correct?
 3   A.    It's possible.
 4   Q.    And so you don't recall whether you did or didn't
 5   pat the front pocket?
 6   A.    Correct.
 7   Q.    But your concern at that point was weapons?
 8   A.    Correct.
 9   Q.    Not drugs?
10   A.    Correct.
11   Q.    And you weren't the one searching the room?
12   A.    Correct.
13   Q.    Did you see Wolf enter first?
14   A.    Wolf was directly in front of me, yes.
15   Q.    And did you see a gun in his hand as he searched
16   the room?
17   A.    Like I said, I don't recall if he had his gun out
18   or not.
19   Q.    And did -- who conducted this -- once Wolf had
20   cleared the room, in other words established that there
21   was no one else in hiding, who conducted the search of
22   the room?
23   A.    I'm not sure.  Like I said, my focus was on Mr.
24   Rasberry, making sure he didn't do anything that he
25   shouldn't.
```

Flynn-Cross/Levine

1   Q.    Okay.  So you were there with him for some period
2   of time?
3   A.    I was.
4   Q.    Standing by his side?
5   A.    Yes.
6   Q.    Did officers -- Agent Sullivan come in at some
7   point in time?
8   A.    He did at some point, yes.
9   Q.    And was he and LaPierre, were they the ones
10  searching the room for drugs?
11  A.    I'm not sure if they were searching or if they
12  were standing by and waiting for further instructions
13  from Agent Wolf.
14  Q.    You don't know if they were looking under
15  mattresses and drawers, up and down, high and low
16  trying to see if there were any drugs in the room?
17  A.    I don't know.
18  Q.    You said that you called for a K9; is that right?
19  A.    That's correct.
20  Q.    And you said that this dispatch log doesn't
21  accurately reflect the amount of time that you were
22  actually in the room, correct?
23  A.    I'm confused by your question.
24  Q.    Okay.  It says here that you were -- 1629, in
25  other words 4:29, that you were -- received the call

Flynn-Cross/Levine

1   and then a minute later, assisting DEA and then that

2   same minute requesting K9; would that all happen in the

3   course of one minute?

4   A.    Correct.   There was, like I said before, I

5   believe that the call slip was generated when I called

6   dispatch, advised them I was at the motel and

7   requested -- to see if they could locate a K9 that was

8   able to respond there.

9   Q.    So how many minutes passed before you called for

10  the K9?

11  A.    I would guess approximately 7 or 8 minutes.

12  Q.    And was he in handcuffs those 7 or 8 minutes?

13  A.    He was.

14  Q.    And was Wolf in the room those 7 or 8 minutes?

15  A.    Wolf was in and out of the room.   I know for a

16  brief moment he stepped out to speak with someone

17  outside.

18  Q.    And how many minutes before Wolf came back and

19  patted down my client?

20  A.    I don't know how many minutes that was.

21  Q.    All right.   Was it 30 minutes?

22  A.    If I had to estimate, I would guess maybe

23  20 minutes.

24  Q.    And any reason my client wasn't patted down any

25  sooner than 20 minutes in handcuffs?

Flynn-Cross/Levine

1   A.    I don't know what -- I guess I don't know what

2   you're asking.

3   Q.    Why keep him in handcuffs waiting for 20 minutes

4   if all you had to do was a pat down?

5   A.    As I said, that's a question for Agent Wolf.

6   Like I said, my job was to be a safety officer there.

7   Mr. Rasberry expressed interest in having his handcuffs

8   removed and Agent Wolf, I believe, advised him that if

9   he was going to remove his handcuffs, he was going to

10  pat him down and check the area where he was going to

11  be sitting first.

12  Q.    So it wasn't until Mr. Rasberry complained that

13  he had been in handcuffs for 20 minutes that somebody

14  decided to do a pat down?

15  A.    Well, I did an initial pat down when I first

16  placed him in handcuffs.

17  Q.    And was Agent Wolf aware that you had done the

18  initial pat down?

19  A.    I'm not sure if he was or not.

20  Q.    You described a discussion that took place

21  because my client said I've already been patted down,

22  right?

23  A.    Correct.

24  Q.    Repeat to had me what that discussion was.

25  A.    He made mention when -- when Agent Wolf began

Flynn-Cross/Levine

1   patting him down, he expressed to Agent Wolf that he

2   had already been patted down once and I told him that

3   he hadn't been thoroughly patted down.  I had just

4   checked the area where his hands were.

5   Q.    Okay.  So you're standing right next to him at

6   that time?

7   A.    Correct.

8   Q.    And Agent Wolf is standing right next to you?

9   A.    Correct.

10  Q.    Because he's patting down my client?

11  A.    Correct.

12  Q.    And your job is to secure my client?

13  A.    Correct.

14  Q.    And so Agent Wolf hears what you say to my

15  client, right?

16  A.    I believe so, yes.

17  Q.    And he hears, in fact, that there had been a pat

18  down?

19  A.    I explained to your client that he had hadn't

20  been thoroughly patted down and I just checked the

21  areas around his hands where he was handcuffed.

22  Q.    Did you explain that to Agent Wolf?

23  A.    I would assume he overheard me say it to your

24  client.

25  Q.    Did he ask you the extent of your pat down?

Flynn-Redirect/Lipez

1    A.    He did not.

2          MR. LEVINE:  That's all I have.

3          THE COURT:  Attorney Lipez.

4                    REDIRECT EXAMINATION

5    BY MS. LIPEZ:

6    Q.    Officer Flynn, you've mentioned that you've

7    conducted drug investigations before.  It's one of the

8    things you do; is that right?

9    A.    That's correct.

10   Q.    And you described the drugs being found in the

11   crotch area of Mr. Rasberry's shorts.  Have you ever

12   seen drug traffickers hide drugs in that location

13   before?

14   A.    I have.

15   Q.    So that's something that's familiar to you?

16   A.    It is.

17   Q.    Did you search the crotch area or -- excuse me,

18   strike that.  Did you pat down the crotch area of Mr.

19   Rasberry's shorts in your initial frisk of him?

20   A.    I did not.

21   Q.    Did you search his ankle or shoe area or any

22   other part of him?

23   A.    I did not.

24   Q.    And again, what did you tell Mr. Rasberry when

25   Agent Wolf started to frisk him and he said he had

Flynn-Redirect/Lipez

1   already been frisked; what did you say to him?

2   A.    I explained to him -- I don't know my exact

3   wording, but I explained to him that I had just checked

4   the area where his hands were and what would be

5   accessible to him while he was in handcuffs.

6          MS. LIPEZ:  No further questions, Your Honor.

7          THE COURT:  Thank you.  Attorney Levine, any

8   further questions?

9          MR. LEVINE:  No, Your Honor.

10          THE COURT:  All right.  Thank you, officer.

11   You can step down.

12          THE WITNESS:  Thank you.

13          MS. LIPEZ:  Government calls Agent Tom

14   LaPierre, Your Honor.

15          THE COURT:  All right.  I think we'll use this

16   as an opportunity to take a short break.

17      What's your estimate of how long Agent LaPierre's

18   testimony will require?

19          MS. LIPEZ:  I would estimate 15 minutes.

20          THE COURT:  All right.  And then you have a

21   fourth witness?

22          MS. LIPEZ:  I have Agent Sullivan, who I

23   expect will be shorter.

24          THE COURT:  All right, thank you.  We will

25   take a 5 to 10-minute recess.

LaPierre-Direct/Lipez

 1          (Time noted: 3:30 p.m.)

 2          (Recess called).

 3          (Time noted: 3:46 p.m.)

 4          THE COURT:  All right.  We're back on the

 5   record and we have a new witness on the stand, so you

 6   will need to be sworn.

 7          THE CLERK:  Please raise your right hand.  Do

 8   you solemnly swear that the testimony you will give in

 9   the cause now in hearing will be the truth, the whole

10   truth, and nothing but the truth, so help you God?

11          THE WITNESS:  Yes, I do.

12          THE CLERK:  Please be seated.  If you can pull

13   yourself right up to the microphone and state your

14   first and last name for the Court.

15          THE WITNESS:  Thomas LaPierre,

16   L-A-P-I-E-R-R-E.

17          THE COURT:  Please proceed.

18          MS. LIPEZ:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20   BY MS. LIPEZ:

21   Q.    Agent LaPierre, where do you currently work?

22   A.    I currently work for Biddeford Police Department,

23   but assigned to the federal Drug Enforcement as a task

24   force officer.

25   Q.    How long have you been, first, with the Biddeford

LaPierre-Direct/Lipez

1    Police Department?

2    A.    A little over 13 years.

3    Q.    And how long have you been a task force officer

4    with DEA?

5    A.    A little over eight years.

6    Q.    And what are your duties as a task force officer?

7    A.    I generally just investigate -- investigating

8    drug offenses.

9    Q.    And what does it mean to be -- how does that work

10   that you work for Biddeford police, but are a federal

11   task force officer; what does that mean in terms of

12   your capability and what you're allowed to do?

13   A.    Well, I have all rights and authorities as a

14   Biddeford police officer.  I also am assigned all

15   rights and authorities as a federal drug agent.

16   Q.    And so you could swear out affidavits in federal

17   court and things like that?

18   A.    Yes.

19   Q.    And again, you've been a task force officer with

20   DEA for eight years you said?

21   A.    Yes.

22   Q.    I'd like to direct you to July 15th of 2015.

23   Were you assisting Special Agent Paul Wolf with an

24   investigation on that date?

25   A.    Yes, I was.

LaPierre-Direct/Lipez

1  Q.    And how did your assistance on that day begin?

2  A.    It began by a surveillance, just out in the

3  parking lot watching traffic.

4  Q.    And who were you surveilling for?

5  A.    Watching for a female that was supposed to arrive

6  and provide for one of our informants.

7  Q.    And where did this occur?

8  A.    The Clarion parking lot in Portland, Maine.

9  Q.    And did you all eventually see the woman you were

10  looking for?

11  A.    Yes, we did.

12  Q.    And briefly, what happened after she arrived?

13  A.    I was advised that the informant got a call

14  saying she was close by.  I believe Agent Wolf was the

15  one that located her across the street in a gas station

16  parking lot.  We moved over to that parking lot and

17  approached her there.

18  Q.    And did she eventually give Agent Wolf -- did you

19  see her give him drugs?

20  A.    I knew she pulled off to the side and spoke with

21  Agent Wolf for a short time and I was notified that she

22  provided drugs to him.

23  Q.    And did you hear about what, if any, information

24  she had given -- excuse me, that she had given to Agent

25  Wolf?

LaPierre-Direct/Lipez

1    A.    After he spoke to her for a short time, he came

2    out of the vehicle and talked to the rest of us telling

3    us that she said that her source of supply was in

4    Scarborough, Maine, and had some more drugs, was

5    waiting for her arrival.

6    Q.    And did you hear whether she had said who the

7    source of supply was?

8    A.    She did.  She told us or to him that it was

9    Champagne.

10   Q.    And were you aware at that point that Agent Wolf

11   had been leading an investigation into an individual

12   known as Champagne?

13   A.    Yes.  I had been part of surveillance in previous

14   times going back as far as a year for undercover buys

15   and such.

16   Q.    And what did you know about Champagne at this

17   point on July 15th?

18   A.    I knew he was from out-of-state, knew he was very

19   elusive, very hard to find, often had some violence

20   history, had a vast network of people he used to help

21   cover himself.

22   Q.    Now, after learning from this woman that

23   Champagne was in Scarborough, did you learn

24   specifically where he was believed to be?

25   A.    Yes.  A hotel complex, a motel, it was -- I

LaPierre-Direct/Lipez

1    forget the room number, but it was the American Hotel,

2    I think, Suites, something like that.

3    Q.    And what did you all decide to do after learning

4    that information?

5    A.    Made a very quick plan to move to that location

6    and I was told that -- from Agent Wolf that he had been

7    given consent to go search that apartment and look for

8    any more drugs that may be inside.

9    Q.    When you say apartment, do you mean --

10   A.    I'm sorry, the motel room, yes.

11   Q.    Did you then proceed to the hotel eventually?

12   A.    Yes, we did.

13   Q.    And who arrived at the hotel first; if you can

14   recall?

15   A.    I did.  After a short plan, my vehicle was best

16   to go -- provide surveillance inside the lot, you could

17   hide better.  I went inside very close to the room and

18   maybe 5 to 10 minutes before everybody else arrived.

19   Q.    And what did you do then once you had pulled into

20   the parking lot at the hotel?

21   A.    I just shut my vehicle down and watched the front

22   door, front window to make sure no one -- take note of

23   anyone entering, leaving.

24   Q.    And was this the door to the specific room you

25   had been told about?

LaPierre-Direct/Lipez

1  A.    Yes.

2  Q.    And did you see anyone going in and out of that

3  room?

4  A.    I did not.

5  Q.    You said that you arrived about 5 to 10 minutes

6  before any other officers?

7  A.    Yes.

8  Q.    Who arrived after you arrived?

9  A.    I saw Special Agent Kris Sullivan arrive and go

10  around to the back and then Agent Wolf arrived along

11  with Patrol Officer Flynn from Scarborough.

12  Q.    And did you all have any discussion of safety

13  planning or an operational plan before going to this

14  room?

15  A.    Just a very quick one.  The potential for

16  violence, that he potentially carried a firearm.

17  Q.    And that was a conversation you had with Agent

18  Wolf?

19  A.    Yes.

20  Q.    What happened then after the other agents

21  arrived?

22  A.    As I say, Agent Sullivan went to the rear, I

23  didn't speak to him, but Agent Wolf and Officer Flynn

24  walked along the edge of the building.  Once they got

25  to me, I joined with them and went to the door.

LaPierre-Direct/Lipez

1   Q.    And this is a door that entered -- excuse me,

2   came out to the -- strike that.  It was a door straight

3   to the outside; is that right?

4   A.    Yes.  No hallway.  Just one door in and out.

5   Q.    And the room was on the first floor?

6   A.    Yes.

7   Q.    So what happened then after you and Agent Wolf

8   and Officer Flynn get to the door of the room you're

9   looking for?

10  A.    Agent Wolf stood in the front.  He had a magnetic

11  key that could gain access to the room.  He tried it

12  probably 3 or 4 times.  It didn't work.  He tried

13  knocking on the door.  Maybe the second or third knock,

14  as he did that the door opened by itself.

15  Q.    And so Agent Wolf was closest to the door; is

16  that right?

17  A.    Yes.

18  Q.    Where were you?

19  A.    I believe I was number two with Officer Flynn

20  behind me.

21  Q.    And were you all standing directly in front of

22  the door or off to the side?

23  A.    We were off to the left.  There was a window that

24  appeared to be access to that room to the right of the

25  door that was partially covered by a blind, so we stood

LaPierre-Direct/Lipez

1   to the left of that door.

2   Q.    And what were you wearing at the time?

3   A.    Regular street clothes, but I have a common entry

4   vest.  It's fully marked police all over it, as well as

5   my badge clipped to the chest.

6   Q.    And were you armed on that day?

7   A.    Yes, I was.

8   Q.    And where was your weapon at the time Agent Wolf

9   was knocking on the motel room door?

10  A.    Holstered.

11  Q.    So what happened then after he knocked on the

12  door?

13  A.    It was opened by a black male inside, not a

14  person I recognized.  Agent Wolf said we're here for

15  consent search.  As he did so, he took a step in,

16  opening the door more.  He immediately addressed the

17  man inside as, I believe, Champagne or Mr. Rasberry or

18  something to that effect.

19  Q.    And did you follow him into the room?

20  A.    Yes, I did.  Agent Wolf stepped to the side and I

21  stepped to the front of the man sitting in the door.

22  Q.    And did Officer Flynn also come into the room?

23  A.    Yes, he did.

24  Q.    What did you do once you entered the room?

25  A.    I kind of stood to the front of Mr. Rasberry.

LaPierre-Direct/Lipez

1   Agent Wolf moved to the left to provide cover down the

2   length of the room.  Officer Flynn came from my right,

3   immediately starting putting Mr. Rasberry in handcuffs.

4   Q.    Did you pull your weapon at any time after you

5   entered the room?

6   A.    After maybe 3 or 4 seconds, put handcuffs on him,

7   I stepped to the left, saw Agent Wolf had deployed his

8   weapon and was moving towards a closed or partially

9   closed door in the bathroom.  I withdrew my weapon and

10  post the door to the bathroom and moved left inside.

11  Q.    So you and Agent Wolf both approached the

12  bathroom with weapons drawn?

13  A.    Yes.

14  Q.    And did you find anyone in the bathroom?

15  A.    No.

16  Q.    What did you do after that?

17  A.    We holstered while we were inside there.

18  Q.    You and Agent Wolf both?

19  A.    I believe Agent Wolf did.  I know I did before I

20  stepped out.

21  Q.    Did you point your weapon at Mr. Rasberry at any

22  time?

23  A.    No.

24  Q.    And did you see anyone else point the weapon at

25  Mr. Rasberry?

LaPierre-Direct/Lipez

1    A.    No.

2    Q.    And so you said Officer Flynn had handcuffed Mr.

3    Rasberry; is that right?

4    A.    Yes.

5    Q.    So what happened after he had been handcuffed and

6    you determined that there was nobody else in the room.

7    A.    We start to settle down and just come up with a

8    plan on how we're going to search, what our next steps

9    are, addressing Mr. Rasberry as well as stripping down,

10   take off some of our outer body armor.

11   Q.    Who -- you said someone had addressed Mr.

12   Rasberry?

13   A.    Yes.

14   Q.    Who was that?

15   A.    I believe between Officer Flynn and Agent Wolf,

16   they had talked to him, confirmed his identity.  Asking

17   him why he was there, things like that.

18   Q.    Do you recall him saying anything else specific

19   to him?

20   A.    There was a conversation about whether or not it

21   was his room, why he was there, what his purpose was

22   there.  He said it wasn't his room, he was visiting a

23   friend.  Didn't have any property in the room.

24   Q.    Do you recall whether anyone talked to him about

25   whether he was under arrest or not?

LaPierre-Direct/Lipez

1    A.    He was told he was just being detained at the

2    moment.

3    Q.    What happened then as that conversation is going

4    on?

5    A.    As that began, there was movement in and out.  I

6    went outside to go grab some evidence bags, take my

7    vest off.  I was out maybe 2 or 3 times.  Agent Wolf

8    was in and out talking on the phone with someone 2 or 3

9    times.

10   Q.    And Officer Flynn for the most part then stayed

11   with Mr. Rasberry; is that right?

12   A.    Yes.

13   Q.    What about Agent Sullivan?

14   A.    By that time, Agent Sullivan had come around the

15   building -- took a minute or two, he had come around

16   the building and entered into that room.

17   Q.    At some point did you start searching the room?

18   A.    Yes.  Probably within 15 minutes, 10 or

19   15 minutes.

20   Q.    Did you see whether Agent Wolf spoke to anybody

21   outside the motel?

22   A.    Yes.  At one point I walked outside to put my

23   vest away.  There was a young couple in a car that got

24   very nervous when they saw me, recognized me as police,

25   made a very bad U-turn on to the grass to get out of

LaPierre-Direct/Lipez

1   the area.  Within 30 seconds of that, a cab pulled into

2   the lot and pulled in immediately in front of the door

3   that we were searching.

4   Q.   And did you see whether Agent Wolf spoke to that

5   cab driver?

6   A.   I actually approached him first, asked him what

7   he was there for.  He said he was there for a fare at

8   the same room that we were in.  I told him hang on for

9   a minute.  He was on the phone.  I went inside, I could

10  hear a phone ringing inside.  I told Agent Wolf about

11  the cab outside and he went outside and spoke with him.

12  Q.   At some point did you start searching the room?

13  A.   About that time when I came in.

14  Q.   And what, if anything, did you find during your

15  search of the room?

16  A.   Immediately to the left, there's a very small

17  bureau or vanity.  There was some needles and

18  paraphernalia underneath that.  There was a cellphone,

19  a cable nearby and that was about it for myself.

20  Q.   And was anyone else searching the room at the

21  same time?

22  A.   Yes.  Agent Sullivan was in the bathroom.  I

23  think that was it.  He came out eventually and helped

24  me in the room.

25  Q.   And while you two were searching, did you notice

LaPierre-Direct/Lipez

 1  whether Agent Wolf had any further interaction with Mr.

 2  Rasberry?

 3  A.    As I was almost done the search, I noticed that

 4  Agent Wolf started talking to him.  He asked me a few

 5  times if I found anything.  I said nothing in violation

 6  and at that point, Agent Wolf started talking with Mr.

 7  Rasberry.

 8  Q.    Were you able to overhear any of that

 9  conversation?

10  A.    A little bit.

11  Q.    What did you hear?

12  A.    I heard him asking if there was anything

13  dangerous on him.  He kind of -- Agent Wolf asked the

14  rest of us had he been searched yet.  He told us he was

15  going to release him from handcuffs.  I spoke up and

16  said I never searched him.

17        I heard Agent -- or Officer Flynn say that he

18  had checked the general area of his back where his

19  hands were.  That was it.

20  Q.    Did Agent Wolf then proceed to pat down Mr.

21  Rasberry?

22  A.    Yes.  He told him there was no violations here,

23  there's no reason to arrest him, but before we took the

24  handcuffs off, we want to check for any dangerous

25  weapons.

LaPierre-Direct/Lipez

1    Q.    Did you see him do that?

2    A.    Yes, I did.

3    Q.    And what did you observe?

4    A.    I noticed from the front Agent Wolf start

5    searching his waistband and moving down his legs,

6    in-between his legs in the crotch area.  As he got to

7    the crotch, I could not immediately see it, but I heard

8    him start asking what is this, what's in your pants and

9    that's when I looked over, stopped and looked over.

10   Q.    And what did you observe at that point?

11   A.    Agent Wolf asking Mr. Rasberry what's in your

12   pants, what is that?

13   Q.    And again, this was the exterior of the pants

14   he's feeling?

15   A.    Yes.  He's still on the outside.

16   Q.    And then what happened after Agent Wolf asked him

17   those questions?

18   A.    Mr. Rasberry said it was himself.  Agent Wolf

19   said no, it's too big, it's too hard.  There's

20   something other than your body here.

21   Q.    And what did Agent Wolf do at that point?

22   A.    He advised him you're no longer detained, you're

23   now under arrest and I'll be searching your further.

24   Q.    Did he search him further?

25   A.    Yes, he did.

LaPierre-Direct/Lipez

1   Q.    And what did you see?

2   A.    Entered from the front of his pants.  I don't

3   know if he had to pull them down or just open up his

4   pants, I don't recall, but then reached up inside

5   between the pants and his underwear, started removing

6   something out of there.

7   Q.    And what did you see that was removed?

8   A.    A plastic packed ball, maybe about the size of a

9   softball.

10  Q.    And what did it appear to be?

11  A.    It appeared to be concealed drugs wrapped in a

12  plastic.

13  Q.    And Mr. Rasberry at some point was transported to

14  the jail after that?

15  A.    Yes.

16  Q.    What are -- are you able to estimate the time

17  from the initial entry to the time Mr. Rasberry was

18  taken to jail?

19  A.    Estimate 20 to 25 minutes.  We weren't there

20  long.

21  Q.    For the entire interaction?

22  A.    Entire, yes.

23        MS. LIPEZ:  I have no further questions.

24        THE COURT:  Thank you.  Attorney Levine.

25        (Continued on the following page)

                        CROSS-EXAMINATION

BY MR. LEVINE:

Q.    So it sounds to me -- first of all, good
afternoon.

A.    Hi.

Q.    It sounds to me like three of you at the door all
had weapons; is that right?

A.    Holstered, but the general part of my duties.

Q.    And at some point in time, all of you had
unholstered your weapons?

A.    I don't believe Officer Flynn ever unholstered.

Q.    You're not aware that he, in fact, did unholster
his weapon?

A.    He may have, but as I said, he was in the stack
behind me.  I didn't see it.

Q.    And you did see Agent Wolf unholster his weapon?

A.    Yes.

Q.    And he unholstered his weapon as soon as he got
inside the room?

A.    Maybe within 2 or 3 steps as he cleared Mr.
Rasberry.

Q.    Okay.  And same with you?

A.    After I approached Mr. Rasberry and moved him 2
or 3 steps into the room, once I saw he was in
handcuffs and then I walked away, yes.

LaPierre-Cross/Levine

1   Q.   So who put him in handcuffs?

2   A.   Officer Flynn.

3   Q.   How long did that take?

4   A.   Maybe 2 or 3 seconds.

5   Q.   And are they the plastic sort of handcuffs or are

6   they --

7   A.   No.  General police, metal, reusable handcuffs.

8   Q.   That only takes 2 or 3 seconds to put somebody in

9   handcuff?

10  A.   He was vest compliant.  He didn't fight.  He

11  turned around.  He offered up his hands.  They were put

12  on very quickly.

13  Q.   And as soon as you clear him, you see Wolf with

14  his weapon drawn?

15  A.   Yes.

16  Q.   And you draw your weapon?

17  A.   Yes.

18  Q.   And that's to protect you and Wolf and anyone

19  else in the room?

20  A.   From potential unknown threats behind the

21  bathroom door, yes.

22  Q.   And then you and Wolf determine that there is

23  nobody else in the room that you need to worry about,

24  correct?

25  A.   Once we cleared the bathroom, yes.

LaPierre-Cross/Levine

1   Q.   And once you cleared the bathroom, you holstered

2   your weapons?

3   A.   Yes.

4   Q.   And at that point in time, what do you do?

5   A.   I then walked outside, take my vest off and

6   start -- begin searching.

7   Q.   Who's with Rasberry at that point?

8   A.   Officer Flynn.

9   Q.   And what are they doing?

10  A.   I don't know.

11  Q.   Did you see Officer Flynn pat down Mr. Rasberry?

12  A.   No.

13  Q.   Where is Agent Wolf at this point?

14  A.   When I'm outside or inside?

15  Q.   When you're outside taking off your body armor.

16  A.   I believe he's inside with Officer Flynn.

17  Q.   And do you know what he's doing inside at that

18  time?

19  A.   I do not.

20  Q.   And when you get off your body armor, where do

21  you leave it?

22  A.   In my vehicle, secured.

23  Q.   So is this the first floor -- are you on the

24  first floor, Room 109?

25  A.   Yes.

LaPierre-Cross/Levine

1    Q.    So you don't have to go downstairs?

2    A.    No.

3    Q.    Your vehicle is nearby?

4    A.    It's within ten feet of the front door.

5    Q.    Unmarked?

6    A.    Yes.

7    Q.    So you throw your vest in there?

8    A.    Yes.

9    Q.    And then you come back to the room?

10    A.    Yes.

11    Q.    And what did you do then?

12    A.    I began searching.

13    Q.    What are you searching for?

14    A.    Drugs, contraband, anything illegal.

15    Q.    Okay.  And why are you searching for drugs?

16    A.    They are illegal.  It's part of my duties.

17    Q.    Okay.  And you believed, based on what the

18    confidential informant said, that there would be drugs

19    in there, right?

20    A.    Correct.

21    Q.    So where do you search for drugs?

22    A.    Anywhere concealable.

23    Q.    How do you do it?  Explain to me.

24    A.    Look under things, open drawers, move the bed

25    apart, between the sheets, cracks, crevices, anywhere

LaPierre-Cross/Levine

1   drugs can be hidden.

2   Q.    Toilet tank?

3   A.    Yes.

4   Q.    Do you find anything?

5   A.    No.  Just paraphernalia.

6   Q.    How long does that process take?

7   A.    Agent Sullivan is in the bathroom.  I'm doing

8   just the main bedroom area.  That's maybe 10,

9   15 minutes.  There's no bags, there's no personal

10  property.  It's very quick.

11  Q.    Where is Agent Wolf at this time?

12  A.    He's in and out of the -- in and out of the room

13  making phone calls.

14  Q.    And where is Mr. Rasberry at this point in time?

15  A.    He's standing towards the front of the room to

16  the right of the door.  He's like a little -- what

17  normally would be a table area is gone.  It was just a

18  couple of chairs in front of the window.

19  Q.    And who was with him?

20  A.    Officer Flynn.

21  Q.    Do you see Officer Flynn pat him down at any

22  point in time?

23  A.    No.  I'm not really focused on him, but no.

24  Q.    And do you decide to pat him down at any point in

25  time?

LaPierre-Cross/Levine

1   A.    I never had contact beyond the front door.

2   Q.    Why not?

3   A.    My duties were to search the room.

4   Q.    And who decided that?

5   A.    Maybe Agent Wolf or we just divided up duties

6   real quick.  Not a lot of conversation.

7   Q.    Okay.  And are you at all concerned how long Mr.

8   Rasberry's remained in handcuffs?

9   A.    No.

10   Q.    You said he was -- was he instructed that he was

11   being detained?

12   A.    He was.

13   Q.    Was he instructed that he was not under arrest?

14   A.    I believe so, yes.

15   Q.    What's the difference?

16   A.    I don't think we explained it to him.  He was

17   told he was being detained, yes.

18   Q.    Okay.  You didn't explain he wasn't under arrest?

19   A.    We explained he was being detained while we

20   searched the area until we did -- finished our

21   investigation.

22   Q.    So did you or anyone else say to him you are not

23   under arrest?

24   A.    By those words?  I don't recall.  Not myself.

25   Q.    Do you recall anyone else saying that to him?

LaPierre-Cross/Levine

1    A.    No.

2    Q.    You do recall someone saying to him he was being

3    detained?

4    A.    Yes.

5    Q.    Who said to him he was being detained?

6    A.    I don't recall.  Potentially myself, but I don't

7    recall.

8    Q.    So he was being detained, but he was not under

9    arrest; is that the way you viewed it?

10    A.    Yes.

11    Q.    And what's the difference between being arrested

12    and being detained for 20 minutes in handcuffs?

13    A.    He had not -- we had no crimes against him.  No

14    reason to hold him.

15    Q.    But you did hold him?

16    A.    Nothing beyond his detention, yes.

17    Q.    And what was the purpose of the 20-minute

18    detention in handcuffs?

19    A.    So we can complete our investigation.

20    Q.    Well, that investigation was a search of the

21    room, right?

22    A.    Yes.

23    Q.    And he wasn't interfering with a search of the

24    room?

25    A.    Correct.

LaPierre-Cross/Levine

1    Q.    Wasn't trying to flee?

2    A.    Correct.

3    Q.    Anyone at any time could have patted him down?

4    A.    Correct.

5    Q.    That doesn't take 20 minutes, right?

6    A.    Correct.

7    Q.    How long does it take to do a pat down?

8    A.    A minute or less.

9         MR. LEVINE:  That's all I have.

10        THE COURT:  Thank you.  Attorney Lipez?

11        MS. LIPEZ:  I have no redirect, Your Honor.

12        THE COURT:  All right.  One moment, officer.

13   Officer LaPierre, I have a question.  I believe you

14   testified that you were there for a total of 20 to

15   25-minutes; is that correct?

16   A.    Yes, sir.

17        THE COURT:  And the hotel room, I think you

18   said there were no bags; is that right?

19   A.    As I recall, there were no personal property in

20   there.

21        THE COURT:  All right.  Explain to me why it

22   took 20 to 25 minutes to complete a search of that

23   room.

24   A.    Just checking the actual furniture itself, the

25   beds.

LaPierre-Redirect/Lipez

1          THE COURT:  Was there much down-time during

2     that period?

3     A.    Oh, definitely.  There was a moment of time when

4     I was outside talking to the cabbie as well as

5     collecting evidence bags and things needed for the

6     search.

7          THE COURT:  Thank you.  Attorney Lipez, do you

8     have any additional questions based on my questions?

9          MS. LIPEZ:  I do, Your Honor.

10                  REDIRECT EXAMINATION

11    BY MS. LIPEZ:

12    Q.    Agent LaPierre, when -- what do you understand

13    down-time to mean?  Was it -- strike that.

14          Was there any time when you weren't doing

15    anything in furtherance of a search of the room?

16    A.    Definitely, yes.

17    Q.    And what was that?

18    A.    There would have been trying to come up with a

19    plan, what we're going to do, who's going to search

20    which area.

21    Q.    Okay.  So not actually searching, but talking

22    about how you're going to conduct the search?

23    A.    Correct.

24    Q.    And do you typically try to do those searches

25    carefully?

LaPierre-Redirect/Lipez

1    A.    Yes.

2    Q.    Methodically?

3    A.    Yes.

4    Q.    And you try to document where things are found?

5    A.    Yes, we do.

6    Q.    You have rules for handling evidence?

7    A.    Yes, we do.

8    Q.    Is that why you would get an evidence bag

9    beforehand, for example?

10   A.    Yes.

11         MR. LEVINE:  Objection.  Leading, Judge.

12         THE COURT:  Overruled.

13   BY MS. LIPEZ:

14   Q.    Was there any time when you were there that you

15   weren't doing something in furtherance of the

16   investigation?

17   A.    I don't believe so.

18   Q.    Was there any time when you and the agents were

19   just laughing and joking?

20   A.    No.

21   Q.    And when you were going in and out again, what

22   was the purpose of doing that?

23   A.    Either put something away or take something out

24   of my vehicle.

25   Q.    For purposes of continuing in the search?

LaPierre-Recross/Levine

1    A.    Yes.

2    Q.    And again, you spoke to the cab driver why?

3    A.    He stated -- it was suspicious that he showed up

4    right in front of our door.  When I spoke to him, he

5    said that's the person he's coming to get, be sure he

6    wasn't somehow involved in it.

7    Q.    And with the exception of Officer Flynn who was

8    standing near Mr. Rasberry, did you observe Agent Wolf

9    and Agent Sullivan doing anything that wasn't in

10   furtherance of the investigation?

11   A.    No.

12        MS. LIPEZ:  I have no further questions, Your

13   Honor.

14        THE COURT:  Thank you.  Attorney Levine?

15                  RECROSS EXAMINATION

16   BY MR. LEVINE:

17   Q.    Do you know who called for the K9?

18   A.    I do not know.

19   Q.    Do you know that somebody called for a K9?

20   A.    I do not.  It's standard practice though that we

21   try to get one.

22   Q.    How long does it typically take for a K9 to

23   arrive?

24   A.    It can be anywhere from ten minutes if one's on

25   duty close by, to a couple of hours if it's state

1    police.

2    Q.    So if it takes a couple of hours and you haven't

3    found any drugs anywhere in the room, are you going to

4    keep him in handcuffs for two hours?

5    A.    By our practice?  If the K9 is two hours away,

6    we're going to start searching before the K9 arrives.

7    Q.    Okay.  And you did start searching before the K9

8    arrived?

9    A.    Yes.

10   Q.    Why?

11   A.    I was told to.

12   Q.    But that wasn't because the K9 was two hours

13   away.

14   A.    I have no idea.

15   Q.    And you don't even know -- you weren't even aware

16   that a K9 was called?

17   A.    I was not.

18   Q.    The purpose of searching the room was to find

19   drugs?

20   A.    Yes.

21             THE COURT:  Attorney Lipez, anything further?

22             MS. LIPEZ:  No, Your Honor.

23             THE COURT:  All right.  Officer, thank you

24   very much.  You can step down.  Please call your next

25   witness.

Sullivan-Direct/Lipez

1          MS. LIPEZ:  Government calls Kris Sullivan,

2     Your Honor.

3          THE CLERK:  Please raise your right hand.  Do

4     you solemnly swear that the testimony you will give in

5     the cause now in hearing will be the truth, the whole

6     truth, and nothing but the truth, so help you God?

7          THE WITNESS:  I do.

8          THE CLERK:  Please be seated.  Please pull

9     yourself right up to the microphone and state your

10    first and last name for the Court.

11         THE WITNESS:  Kris Sullivan.

12         THE CLERK:  Spell your last name.

13         THE WITNESS:  S-U-L-L-I-V-A-N.  First name is

14    K-R-I-S.

15         THE CLERK:  Thank you.

16         THE COURT:  Please proceed.

17         MS. LIPEZ:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19    BY MS. LIPEZ:

20    Q.    Agent Sullivan, where do you work?

21    A.    Drug Enforcement Administration.

22    Q.    What is your position there?

23    A.    Special agent.

24    Q.    And do you have a particular office you're

25    stationed with?

Sullivan-Direct/Lipez

1    A.    Portland, Maine, resident office.

2    Q.    How long have you been with the Portland, Maine,

3    office of the DEA?

4    A.    A year.  I transferred about a year ago from San

5    Francisco field division office.

6    Q.    And how long in total have you been with DEA?

7    A.    Three years.

8    Q.    I'd like to direct your attention to July 15th of

9    2015; were you assisting Agent Wolf with one of his

10   investigations on that date?

11   A.    Yes.

12   Q.    And did your assistance begin with conducting

13   surveillance of someone who was suspected to be making

14   a drug delivery?

15   A.    Yes.

16   Q.    Where was that?

17   A.    I was actually stationed at the Mobil on Congress

18   Street and the target you're talking about actually

19   came to the Gulf across the street, the gas station.

20   Q.    Are you aware that at least Agent Wolf had

21   contact with her after she arrived?

22   A.    Yes.

23   Q.    Did you have any contact with her yourself?

24   A.    No.

25   Q.    What did Agent Wolf tell you after he had contact

Sullivan-Direct/Lipez

1   with this person?

2   A.    That she had a hotel room -- a motel room at the

3   American -- American Best Inn in Scarborough and she

4   eventually had given consent for us to go in that room

5   and there was an individual in there by the name of

6   Champ or Champagne and she gave us consent to go and

7   search that room.

8   Q.    And did you hear whether she had provided any

9   information about whether there were believed to be

10  other drugs in that room?

11  A.    Yes.  She said that there was drugs in the room

12  or on his person, I believe.  I don't know if she said

13  in the room or on his person, but there were drugs

14  there.

15  Q.    So what did you all agree to do after that?

16  A.    Go set up on the motel and make entry into the

17  motel room.

18  Q.    For what purpose?

19  A.    To find narcotics.

20  Q.    To search it?

21  A.    Search it.

22  Q.    Did you all discuss a safety plan?

23  A.    Safety plan as far as like a brief or --

24  Q.    Yeah.  What was the discussion about how you

25  would enter into the room and what steps you would take

Sullivan-Direct/Lipez

1    to protect yourself, if any.

2    A.    Well, we had the room card that the female had

3    provided us and so there was three in the front and I

4    was to be in the back of the motel in case any

5    individuals that were in there tried to flee out the

6    one escape window in the bathroom, I believe, the

7    window.

8    Q.    So this was a first floor motel room?

9    A.    Yes.

10   Q.    And you're standing at the window that you

11   believed comes out of the back of the room --

12   A.    Yes --

13   Q.    -- that's why --

14   A.    -- a few rooms just shy of the window, yes.

15   Q.    What were you wearing at the time?

16   A.    I had my vest on, DEA insignia on the front, my

17   badge was out on a chain, had my tac belt on, my

18   firearm, handcuffs and other gear.

19   Q.    Did you unholster your weapon at any point while

20   you were at this motel?

21   A.    When I was out back, I had -- it was out, low

22   ready around -- which is just around my waist area,

23   just above my waist, just below my chest, not pointed

24   out at anyone, just straight down at the ground.

25   Q.    And how long would you say you were hanging out

Sullivan-Direct/Lipez

1   back of the motel?

2   A.    Um, approximately three minutes I would say.

3   Q.    And then what happened?

4   A.    Then Agent Wolf came around back and grabbed me

5   and we went back around the front and I entered the

6   room.

7   Q.    So at that point, the others made entry into the

8   room?

9   A.    Yeah.  That was all completed, yes.

10        THE COURT:  Agent, you have to lean a little

11  closer to the microphone, please, so we can pick it up.

12  There you go.

13        THE WITNESS:  Sorry.

14  A.    Yes.  So we walked back around front and I walked

15  right into the room because he had already made entry

16  in the room.

17  Q.    Where was your weapon at the time you made entry

18  into the room?

19  A.    Holstered.  As soon as Agent Wolf got me, I

20  holstered up and walked around front.

21  Q.    Did you unholster your weapon at any point while

22  you were in the room?

23  A.    No.

24  Q.    And what did you observe when you went in the

25  room?

Sullivan-Direct/Lipez

1   A.    The defendant was directly to the right on the

2   front of the room.  It's a very small motel room, so I

3   don't know how many people were right in the front of

4   the room, but I walked towards the back because it was

5   just crowded up front.  It was a very small hotel room

6   and just a bathroom in the back and then a basic motel

7   room with a fridge and a TV.

8   Q.    And by the defendant, you mean Mr. Rasberry?

9   A.    Yes.

10  Q.    And what was his position or situation when you

11  entered the room?

12  A.    He had hand restraints on and was just standing

13  there right by the front window, compliant.

14  Q.    And what did you do then after going into the

15  hotel room?

16  A.    I actually walked back to the bathroom and looked

17  around and just began searching the room.

18  Q.    And did you find anything in the course of your

19  search?

20  A.    I don't know if I was the initial person to find

21  it, but I saw a digital scale on the back of the toilet

22  and there were also -- I remember there were baggies in

23  the room.  I don't remember if it was in the room or

24  the bathroom and that's all I -- there was some

25  syringes actually as well underneath the dresser in the

Sullivan-Direct/Lipez

1    middle of the room.

2    Q.    And was anyone else assisting you with this

3    search of the motel room?

4    A.    At that point Thomas LaPierre was -- task force

5    officer, Andrew Flynn, Scarborough Police Department

6    was in the room.  I don't know if he was searching at

7    that moment, and obviously Paul Wolf, Agent Wolf.

8    Q.    And when you search a room like this, do you try

9    to do so methodically?

10   A.    Yes.  We try to do two to a room and we check

11   each other's side when we're done, so it's pretty

12   methodic.  Start in the back, work forward or forward,

13   work back.

14   Q.    And when you actually discover what you believe

15   is a piece of evidence and you're going to seize it, do

16   you have particular procedures that you have to follow

17   in terms of how you seize it and bag it and things like

18   that?

19   A.    Yeah.  We have a bag and I usually -- someone

20   will take a photo or bag the evidence and then just

21   write notes on who found it, where it was found and

22   it's taken to our non-drug evidence custodian if it's

23   non-drugs once we process it back at the office.

24   Q.    These are all policies and procedures --

25   A.    Yes.

Sullivan-Direct/Lipez

1    Q.    -- you've been trained on.  While you were

2    conducting the search of the room, did you observe

3    whether Agent Wolf had any interaction with Mr.

4    Rasberry?

5    A.    Yes.

6    Q.    What did you observe?

7    A.    So after I came out of the bathroom, they were

8    still looking around the room, I -- Agent Wolf was

9    speaking with Mr. Rasberry.  I don't know what he was

10   saying, but he began to conduct a pat down of Mr.

11   Rasberry and I noticed that he stopped in the groin

12   area and I don't know what he said to Mr. Rasberry at

13   that point, I was just watching his back from the

14   bathroom, that he had found something that was not

15   supposed to be there or part of his anatomy, I guess

16   you could say, and placed him under arrest at that

17   point.

18   Q.    Had you observed -- did you know whether anyone

19   had patted Mr. Rasberry down before that?

20   A.    No.  I was the last one in the room -- I was the

21   last one in the motel room.  I mean it's after, so no.

22   Q.    And then you spent most of your time searching

23   after that; is that right?

24   A.    Yes.

25   Q.    And did you hear whether -- when Agent Wolf was

Sullivan-Direct/Lipez

1    patting Mr. Rasberry down, did you -- were you able to

2    hear whether they were having any conversation or not?

3    A.    I don't know what was being said.  They were

4    speaking.  I don't know exactly what.

5    Q.    So you weren't able to hear or focused on what

6    they were saying; is that fair to say?

7    A.    Yeah.

8    Q.    So what happened then after Agent Wolf said he

9    found something that wasn't part of his anatomy?

10   A.    He placed him under arrest and began actually a

11   full body search.

12   Q.    And what did you observe at that point?

13   A.    He had started out in the waistband and

14   initially, it took Agent Wolf a while to actually

15   locate -- get his hands down in there and move the

16   pants and at that point, Rasberry actually instructed

17   Agent Wolf to just go in through the front to get it.

18   Q.    So he was helpful in the search at that point?

19   A.    Yeah.

20   Q.    And what did you observe Agent Wolf pull out of

21   the defendant's pants?

22   A.    It was one large baggie with four individually

23   wrapped packages inside of that bag.

24   Q.    What did it appear to you to be?

25   A.    Three -- three were like a brown powdery

Sullivan-Cross/Levine

1    substance, which was consistent with heroin, and the

2    fourth was white powder consistent with cocaine.

3    Q.    At any time while you were in the motel room, did

4    you see any of the other agents unholster their

5    weapons?

6    A.    No.

7            MS. LIPEZ:   I have no further questions.

8            THE COURT:   Thank you.   Attorney Levine.

9            MR. LEVINE:   Thank you, Your Honor.

10                    CROSS-EXAMINATION

11   BY MR. LEVINE:

12   Q.    Good afternoon.

13   A.    Good afternoon.

14   Q.    So you were the guy who was around back to

15   prevent escape through the back window?

16   A.    Yes.

17   Q.    And so you didn't witness the entry to the room?

18   A.    No.

19   Q.    And if agents had drawn weapons at that point in

20   time, you wouldn't have been there?

21   A.    Nope.

22   Q.    So even around back without actually entering the

23   room, you had drawn your weapon just in case?

24   A.    Yeah.   That's how I'm trained, yes, at that

25   point.

Sullivan-Cross/Levine

1    Q.    Just in case somebody tries to escape out the

2    window?

3    A.    Yeah.   Out the window, run out the back, you

4    know.

5    Q.    Because if they are dangerous enough -- desperate

6    enough to escape out the window, they may be dangerous

7    enough to draw a weapon?

8    A.    Yes.

9    Q.    And when you came into the room within minutes

10   after the initial entry, you were accompanied by Agent

11   Wolf?

12   A.    Yes.

13   Q.    And Agent LaPierre was already in the room?

14   A.    Yes.   Task force officer.

15   Q.    Task force officer and Scarborough police officer

16   Andrew Flynn was already in the room?

17   A.    Yes.

18   Q.    So now there's about four of you in the room,

19   plus the suspect, Mr. Rasberry, correct?

20   A.    Yes.

21   Q.    And he's in handcuffs at that point?

22   A.    Yes.

23   Q.    He's not resisting?

24   A.    No.

25   Q.    He's not trying to flee?

Sullivan-Cross/Levine

1    A.    Nope.

2    Q.    And your focus at that point in time is

3    conducting a search of the room?

4    A.    For me, yes, at that point.

5    Q.    There's no urgency on anyone's part to frisk Mr.

6    Rasberry, right?

7    A.    I don't believe so. I --

8    Q.    You didn't see anyone frisk Mr. Rasberry?

9    A.    I did as soon as -- after I walked in, I had -- I

10   saw Mr. Wolf conduct a pat down, yes.

11   Q.    How long after you were in the room?

12   A.    I can't give an exact time.  I don't know.

13   Q.    Was it 20 minutes after you walked in?

14   A.    No.

15   Q.    Was it after you had conducted a search of the

16   room?

17   A.    Not the whole room.  I did just the bathroom and

18   then I was -- I don't know if the front room had been

19   searched at that point, I don't know, because as I

20   said, I was the last one in.  So I did the bathroom,

21   but I think that had already been searched.  I don't

22   know.

23   Q.    Had you make a written report?

24   A.    I did not.

25   Q.    So you're just testifying from independent

Sullivan-Cross/Levine

1    recollection?

2    A.    Yes.

3    Q.    Something that took place months ago?

4    A.    Yes.

5    Q.    And your job at the point in time that you enter

6    the room is to search the room for drugs, correct?

7    A.    For -- yeah, weapons, drugs.

8    Q.    Because the search for other people in the room

9    had already been conducted by Wolf and LaPierre before

10   you entered?

11   A.    I didn't -- yeah.  There was no other individuals

12   in the room.

13   Q.    Right.  That had already been ruled out?

14   A.    Yes.

15   Q.    So at this point you guys are tossing the room,

16   looking high and low, trying to find drugs, drug

17   paraphernalia, weapons, contraband, digital scales,

18   anything you can find?

19   A.    Yeah.  We had consent, so yeah.

20   Q.    And that's your focus at that point in time?

21   A.    My focus, yes.

22   Q.    Not getting Mr. Rasberry out of handcuffs as soon

23   as possible?

24   A.    No.  I walked to the back of the hotel room

25   because there was -- it's so small, I had to go to the

Sullivan-Cross/Levine

1    back and started searching the bathroom.

2    Q.    Did you hear anyone say to Mr. Rasberry that he

3    was not under arrest?

4    A.    I did not.

5    Q.    Did you hear anyone say to Mr. Rasberry he was

6    being detained?

7    A.    I did not, no.

8    Q.    What was your understanding as to how long he was

9    going to be detained?

10   A.    I had no -- I don't know.

11   Q.    Did you know that a drug dog was called?

12   A.    I don't recall that.

13   Q.    Do you know that a drug dog wasn't called?

14   A.    Well, I don't know.

15   Q.    Would it have been standard operating procedure

16   to call a drug dog?

17   A.    Um, not standard operating procedure.  I don't --

18   no.

19   Q.    You didn't hear anyone call for a K9?

20   A.    No.  I don't recall, no.

21   Q.    And do you have any idea how long it takes for a

22   K9 to arrive?

23   A.    Well, if you were to call Scarborough PD and they

24   are very close typically because it's right there in

25   Scarborough, so it could have been two minutes, it

Sullivan-Redirect/Lipez

1    could have been ten minutes.  I don't know.

2    Q.    Did you see what precipitated the pat down search

3    of my client by Agent Wolf?

4    A.    Precipitated as in?

5    Q.    Why did he do it at the point in time he did it

6    as opposed to earlier or later.

7    A.    I don't know.  I can't speak for Agent Wolf.

8             MR. LEVINE:  That's all I have.

9             THE COURT:  Attorney Lipez?

10            MS. LIPEZ:  Briefly, Your Honor.

11                     REDIRECT EXAMINATION

12   BY MS. LIPEZ:

13   Q.    Agent Sullivan, you started searching fairly

14   quickly after entering the room; isn't that right?

15   A.    Yes.

16   Q.    You were not waiting for a drug dog; is that

17   right?

18   A.    No.

19   Q.    No one instructed you to wait for a dog?

20   A.    No.

21   Q.    You began your search?

22   A.    Yes.

23            MS. LIPEZ:  I have no further questions.

24            THE COURT:  Attorney Levine, anything else?

25            MR. LEVINE:  No.

1          THE COURT:  Agent, you may step down.  Thank

2    you very much.

3          MS. LIPEZ:  I have no further witnesses, Your

4    Honor, and the Government rests.

5          THE COURT:  Attorney Levine, would you like a

6    recess at this point?

7          MR. LEVINE:  Um, I talked to my client during

8    the last recess, Your Honor.  Could I have just one

9    moment?

10         THE COURT:  Yes, go ahead.

11         (Discussion off the record between the

12   defendant and counsel)

13         MR. LEVINE:  Judge, we have no witnesses.

14         THE COURT:  All right.  So the evidence is

15   closed and with that, I will now entertain argument by

16   counsel.  Attorney Lipez.

17         MS. LIPEZ:  Thank you, Your Honor.  May I have

18   a moment?

19         THE COURT:  You may.  Would either side like a

20   brief recess before we have argument?

21         MR. LEVINE:  I'm all set.

22         MS. LIPEZ:  I just need to get my notes.

23         THE COURT:  All right.

24         MS. LIPEZ:  Your Honor, as I understand

25   defense's argument, and I'm sure I'll be corrected if

1    I'm wrong, but it's not challenging the entry into the

2    room, but simply they've raised two issues.  One,

3    whether this *Terry* stop had, in fact, turned into an

4    unlawful de facto arrest; and two, whether Agent Wolf's

5    frisk at the time he did it was permissible.  As we lay

6    out in our briefs, we think both actions were entirely

7    reasonable.

8         Looking first at the actions taken in the

9    detention of this defendant, it really boils down to

10   whether the handcuffs and the weapons in this situation

11   were reasonable.  Courts, as we cited in our brief,

12   have repeatedly blessed the use of such measures when

13   there's reason articulable suspicion to believe that

14   someone may be a danger.

15        That's a fairly low standard.  It's not even

16   rising to the level of probable cause and it's

17   premised, as the courts have said over and over, on the

18   idea that officers need to reasonably be able to

19   protect themselves.

20        Here, there are multiple factors that warranted

21   the handcuffs and the drawn weapon.  First, the Court

22   has heard that this defendant had a significant

23   criminal history which included not only drugs, but

24   violence and violence involving weapons.

25        The Court also heard that this defendant had used

1    multiple aliases, which I would suggest is someone who

2    is an enhanced risk because it's someone who is not

3    particularly cooperative with law enforcement.

4         Perhaps most importantly, six months prior this

5    actual defendant had been found in another hotel room

6    in the Portland area with drugs and a gun.  I would

7    suggest that that is a red flag and, in fact, it would

8    be very reckless for police officers who are going to

9    encounter him in a hotel room like this not to take

10   note of that and not to take sufficient measures to

11   restrain him in light of that.

12        This also is a drug trafficking investigation.  We

13   know that there's often significant links between drug

14   trafficking and violence.  I'm not saying that's the

15   only reason as the defendant has suggested in his reply

16   brief, but it's certainly one of the factors if you

17   look at the totality of the circumstances, and here in

18   particular, they are investigating a serious federal

19   drug crime, which is always going to heighten tensions

20   and create more risk to the officers.

21        In addition, this is a motel room.  As you've

22   heard, it was unknown to the officers who was inside,

23   what they might find in there and that's inherently

24   more dangerous than a *Terry* stop in some sort of public

25   place.

1          We pointed the Court in our brief to the Chaney

2     case in the 1st Circuit which talked a bit about the

3     dangers inherent in a hotel room and I think that's a

4     valuable case for us.  And, in fact, the Court has also

5     heard about the steps the officers took even leading up

6     to the entry into the room; making sure not to stand

7     directly in front of the door, making sure not to stand

8     in front of the window, which I would suggest is

9     further indication of their concerns about their

10    safety.

11         The defendant argued in his initial and reply

12    brief, and there were some questions here today, about

13    how this was really indistinguishable from an arrest,

14    what's the difference, and I'd like to point to several

15    factors that I think do distinguish this, Your Honor.

16         First, you did hear testimony from Special Agent

17    Wolf that he specifically told the defendant more than

18    once that he was not under arrest.  That's something

19    that the 1st Circuit has noted in other cases cited as

20    an important factor and, in fact, this defendant, as we

21    heard, asked at some point if he could have his

22    handcuffs removed.  I would suggest that that is

23    indicative of somebody who understands he's not under

24    arrest.  He wouldn't ask that if he believed he were

25    arrested.

Second, there was no effort to relocate this defendant to an interrogation room or police station. That's something that the 1st Circuit has cited sometimes as being problematic.  That did not happen here.  This all occurred within his hotel room.

They didn't read him Miranda rights, there was no effort to interrogate him.  These again are all factors the Court could point to as being indicative of an arrest.  This was a detention.

And then I would suggest that the officer's actions, for example, with their weapons were very limited, very reasonable.  You heard that Officer Flynn holstered his weapon as soon as he entered the room. Never pointed it at the defendant.  He said he had it in what he called the low ready position; that Agents Wolf and LaPierre never pointed their weapons at the defendant, but moved passed him to just make sure that there was no one in the room who might harm them and then immediately holstered their weapons.

Agent Sullivan, the only time he had his weapon unholstered was when he had no contact with the defendant whatsoever and testified when he got back into the room, he never saw a weapon unholstered.

So the use of weapons here was very limited in scope, I would suggest, very proportional to the threat

1    that the officers faced and then they put them away.

2         In terms of the handcuffs, there were a lot of

3    questions about why wasn't he frisked immediately so

4    the handcuffs could be removed.  Your Honor, I suggest

5    a slightly different question.  I think the case law is

6    very clear actually that it would be appropriate in a

7    circumstance like this to have the defendant, who

8    presents a risk for all the reasons that I raised here,

9    to keep him handcuffed for the duration of the *Terry*

10   stop as long as that *Terry* stop doesn't take too long.

11        Here we've heard evidence that the agents were

12   rather quick.  I think the total time estimates we've

13   heard have been between 25 and 35 minutes.

14   Government's Exhibit 1, which is the dispatch log, I

15   think bears out about the 35-minute estimate.

16        That is well within the realm of reasonableness

17   that courts have blessed in terms of conducting a *Terry*

18   stop, a further investigation, and it sounds here,

19   based on the testimony, we would argue, that the agents

20   were all working diligently toward either confirming or

21   dispelling their suspicions that there might be drugs

22   in this room; in other words, someone had to stay with

23   the defendant for purposes of safety and the others

24   were doing what they needed to do to search that room,

25   to get evidence bags.  There was some conversation with

1    the cab driver outside, which all goes towards again

2    trying to investigate what was happening here.

3        So this time period was well within the limits of

4    what was reasonable and there's really no requirement

5    that I'm aware of that someone be frisked and

6    un-handcuffed immediately.  Again, the courts have

7    blessed someone being handcuffed for 60, 90 minutes

8    while the investigation continues.

9        I will move to the frisk itself, unless the Court

10   has questions about the detention.

11           THE COURT:  Please move on.

12           MS. LIPEZ:  And then the second question is

13   whether -- I suppose first the Court has to find that a

14   frisk at all was permissible for all the reasons that

15   we've just talked about.  Him being handcuffed, I would

16   argue that a quick frisk of this particular defendant

17   was permissible.

18       We cited the Osbourne case to the Court which

19   fairly clearly applies the same reasonableness standard

20   you see in the Fourth Amendment context to frisks and

21   multiple frisks and says that if the second officer is

22   reasonable in believing that the threat hasn't been

23   neutralized, then a second frisk can occur.

24       The testimony we heard here was that Officer Flynn

25   did a very cursory pat down of this defendant and was

just the back of his shorts.  He testified he did not

check his entire shorts, he did not check the groin or

the crotch area, and I suggest that's consistent with

the evidence because he said he was familiar with drugs

being hidden there.  I suggest that if he had patted

down that area, he probably would have, you know, found

the drugs himself and that clearly did not happen.

You heard testimony from Agent Wolf that he

believed that the defendant had not been fully frisked

at the time he did it.  He did it so that he could

remove the defendant from handcuffs.  I suggest that's

an appropriate thing to do.

Agent LaPierre testified that he heard Officer

Flynn and the defendant have a bit of a colloquy about

whether he had been fully patted down.  Officer Flynn

testified that I told the defendant specifically I had

not done it thoroughly.

And so we suggest that in light of all those

circumstances, in light of all the things that we've

mentioned that make this defendant a particular risk,

that it was appropriate for Agent Wolf to do a thorough

exterior frisk for weapons at that point.  It's what he

did.  He then found the drugs and the arrest and the

incident -- search incident to arrest followed from

there.

1          THE COURT:  Is it the Government's position

2     that the agent -- agents and officers did not have a

3     reasonable articulable suspicion that drugs were on Mr.

4     Rasberry and that that does not provide a basis for a

5     search of his -- a pat down search?

6          MS. LIPEZ:  Your Honor, I think as part of --

7     as part of the search of the motel room, I do think

8     they could have patted down the defendant as well.

9          For example, there are instances where the courts

10    have said if the defendant wants to leave, you know --

11    if they're searching a room for weapons or something

12    like that and the defendant wants to leave, they could

13    make sure that they've searched that person ahead of

14    time, so I do think that they had some information that

15    he had drugs on him as well.

16         THE COURT:  Now, of course, their source,

17    and -- I'm sorry, the woman that they had apprehended

18    told them that she believed there were drugs to be

19    found in a room or on the defendant's person.  She gave

20    consent to the search of the room.  It doesn't seem to

21    me she can give consent to the search of the person.

22         MS. LIPEZ:  I would agree with that.

23         THE COURT:  So my question then is whether as

24    a matter of fact -- well, just Fourth Amendment law --

25    the agents would be justified in patting down Mr.

1    Rasberry because they had a reasonable articulable

2    suspicion, not having found drugs in the room, that

3    there might be drugs on his person?

4              MS. LIPEZ:  Your Honor, I don't think so, but

5    I may request the opportunity to research that further

6    and do supplemental briefing if the Court would allow

7    it and is interested in that.

8         As I understand it, the *Terry* stop, when you have

9    reasonable articulable suspicion, certainly allows you

10   to investigate further, although a frisk of the

11   exterior I believe has to be based on the concern that

12   a person is armed or dangerous, but I would like the

13   opportunity to research that further.

14             THE COURT:  All right. Well, let's move on

15   from that point then.

16        The public's interest in having police officers

17   safe and therefore have the right to frisk people for

18   those people that they have reason to suspect might be

19   armed is obviously quite established in law.  Of

20   course, the law requires that I look at the totality of

21   the circumstances.

22        How -- why should I conclude that it was

23   reasonable for them to defer and postpone and complete

24   an actual frisk of Mr. Rasberry -- how long was it,

25   according to your view of the evidence?

1          MS. LIPEZ:  I think the testimony, it was

2     somewhere between 15 and 20 minutes.

3          THE COURT:  Why is it that they can keep

4     someone handcuffed, an individual whom they do not have

5     probable cause to arrest, for that period of time?  Why

6     do they have the right to defer it, postpone it and

7     sort of get to it at the end of the process?

8          That's an awfully big seizure, isn't it?  I mean

9     for purposes of his personal integrity, having been in

10    handcuffs for that period of time, why should I

11    conclude that that aspect of this scenario is

12    reasonable?

13         MS. LIPEZ:  Your Honor, I would suggest

14    that -- first of all, I don't think it's an awfully

15    long amount of time in terms of when you look at the

16    contents of the case law where the courts have blessed

17    much longer periods of detention.  I think there are

18    1st Circuit cases for up to 90 minutes, and there's a

19    difference between fully frisking someone to make sure

20    they're not armed and keeping them in handcuffs and I

21    don't suggest -- I don't think that determining that

22    someone doesn't have any weapons on them then requires

23    the police to un-handcuff that person.

24         In fact, I think the case law is quite clear that

25    if they believe someone is generally dangerous, and

1    it's a heightened situation, they can keep someone in

2    handcuffs for the duration of the *Terry* stop and that's

3    true whether or not they've been fully frisked and have

4    weapons on them.

5        I'm not aware of any requirement in the law that

6    suggests that as soon as they determine they have no

7    weapons on them, they have to un-handcuff them, and I

8    don't think that's consistent with the law.

9        I think there are lots of reasons to believe that

10   this particular defendant could be a risk to them even

11   if he didn't have a gun on them, and I've gone through

12   them again, but -- in the past, but, you know, the use

13   of aliases, the cooperating person had said that he

14   would be a flight risk, there are all sorts of things

15   that could have gone on here that presented a risk to

16   them, even in the absence of weapons, and they are

17   entitled to detain someone, to keep someone with them

18   while they can firmly dispel their suspicions.

19       I think sometimes there's confusion about I wasn't

20   free to leave, therefore I was under arrest and that's

21   clearly not the test, and so I would suggest to the

22   Court that they are independent questions and that they

23   were entitled to keep him in handcuffs for the duration

24   of this stop as long as reasonable, regardless of

25   whether they had frisked him in the beginning and found

1    weapons on him.  I think under these circumstances,

2    they could have kept him in handcuffs and that would

3    have been reasonable.

4                THE COURT:  Thank you.

5                MS. LIPEZ:  Thank you.  And I do just want to

6    point out that we did make an inevitable discovery

7    argument in our brief, and I would argue that upon

8    finding the scales and the baggies in the room, in

9    light of everything else they had heard, they did have

10   probable cause to arrest and a search certainly would

11   have happened at that point.

12               THE COURT:  It certainly seems however from

13   the testimony to be that the officers, at least, did

14   not view themselves as having probable cause to arrest

15   at that point; isn't that the case?

16               MS. LIPEZ:  I don't know if they were

17   specifically asked.  I know Agent Wolf testified that

18   he didn't believe he had probable cause to arrest when

19   he entered the room.  I don't know if there was a

20   specific question about once the baggies and scales

21   were found.

22           It is an objective standard, although I understand

23   with inevitable discovery there does have to be some

24   step in that direction and I agree there was not a lot

25   of testimony about that.

1           THE COURT:   Thank you.

2           MS. LIPEZ:   Thank you.

3           THE COURT:   Attorney Levine.

4           MR. LEVINE:   Thank you, Your Honor.  Judge, I

5    think that what was going on here was really two things

6    at once; there's the *Terry* stop of my client, but

7    there's also the execution of the consent search.

8         So when the prosecutor talks about he can be

9    detained to the extent of the *Terry* stop, that may be

10   true, but this isn't just a *Terry* stop.  I mean they're

11   not searching the room for weapons per se.  They're

12   searching the room for drugs and drug-related

13   paraphernalia.

14        And they're doing that because they had a consent

15   to search that was given to them by somebody other than

16   the defendant, not because they had a search warrant,

17   but it amounts to the same thing and it takes the same

18   amount of time and in this case, it took about

19   20 minutes and explaining their focus, by everyone's

20   testimony, was searching for drugs.  They are looking

21   high and low trying to find drugs in the room.

22        There's no urgency to, you know, take care of the

23   defendant and his bodily integrity and, you know, take

24   off the handcuffs.  In fact, that's really

25   counter-productive to them because if they take off the

1    handcuffs, if they search him or pat him down and

2    discover that he doesn't have any weapons, he's just

3    free to leave, right?  I mean because they're executing

4    a consent warrant.

5         THE COURT:  Let me ask you this.  Do you agree

6    that at the moment that the police entered the hotel

7    room, they had a reasonable articulable suspicion that

8    Mr. Rasberry might be in possession of narcotics?

9         MR. LEVINE:  Yes.

10        THE COURT:  And so under that, they would

11   certainly have the right to pat him down at that point

12   in time, correct?

13        MR. LEVINE:  Well, pat him down for weapons.

14   I agree with that.

15        THE COURT:  All right.  But not otherwise?

16        MR. LEVINE:  No, because a pat down -- listen,

17   *Terry* is about weapons, right?  It's about armed and

18   dangerous.  Okay, the suspicion of drugs gives rise to

19   the inference that there may be weapons, but it's about

20   weapons.  It's not about a search for drugs at that

21   point in time.  Otherwise, you know, we have a search

22   incident to arrest and that's supposed to clean up

23   everything you have on your person.

24        THE COURT:  Did you think when they entered

25   the hotel room they also held a reasonable articulable

1    suspicion that Mr. Rasberry might have secreted drugs

2    in the motel room?

3            MR. LEVINE:  Yes.

4            THE COURT:  And so don't they have the right

5    to investigate that suspicion further before

6    determining -- first of all, before releasing Mr.

7    Rasberry -- yes, before releasing Mr. Rasberry.  Why

8    don't they get to take reasonable steps to see if their

9    suspicion is, in fact, bourne out by the facts?

10           MR. LEVINE:  I guess it comes down to

11   reasonable steps, and keep in mind *Terry* started out as

12   a search, a pat down, simple pat down to determine if

13   someone was armed and dangerous.  It's been expanded

14   and clearly it has -- and now it looks more and more

15   like an arrest every single day, but here's what I

16   don't get, Judge, in terms of what's reasonable and

17   what's not reasonable.

18       If I'm a police officer and I'm going into that

19   room with guns drawn because I believe that there's a

20   dangerous person inside and we have weapons and I spend

21   20 minutes searching the room high and low for drugs

22   without doing a full pat down, despite the fact that

23   he's in handcuffs, I mean if the guy has a weapon, my

24   God, he's going to be desperate enough to use it and I

25   want to make sure that I'm safe, that I go home to my

1    wife and kids at the end of the day.

2         I'm telling you that the reason they didn't do

3    this is not because they, you know, were otherwise, you

4    know, trying to conduct a *Terry* type stop; they were

5    trying to search for drugs.  They didn't want to have

6    to release him sooner than they searched, and it just

7    seems to me that what's reasonable in terms of the

8    Fourth Amendment is do the pat down right away.

9         I'm not saying anything other than that.  I'm not

10   saying that, you know, if they had done what they

11   should have done because it's the most reasonable thing

12   to do they could have kept the evidence, but they

13   didn't do that and here's what the evidence is.

14        You know, what was done to him and -- you know,

15   look, I don't dispute the officer's testimony that

16   there was this preliminary search and maybe it wasn't

17   as, you know, narrowly focused as this subsequent

18   search that discovered the baggie because, you know,

19   how am I to make that argument because if there were,

20   you know, a less than cursory or more than cursory

21   search, presumably it would have disclosed the item.

22        What I'm saying to you, Judge, is their focus --

23   it's really about their focus.  They're looking for

24   drugs.  They're looking for a bandanna.  They had found

25   nothing in it, but it was folded in some way.  I mean

1     it didn't feel like a weapon, but now they're really

2     searching this guy because they think he has drugs.

3          And this police officer from Scarborough, he

4     wasn't the lead guy, he was called in at the last

5     minute.  He didn't want to step on anyone's toes.

6     Maybe he didn't want to conduct a more thorough search

7     of my client's person, but it's very clear that the

8     reason he was detained was so that they could find

9     drugs and it's really clear that after 20 minutes, the

10    reason they did this subsequent search under the

11    so-called pat down for weapons was about finding the

12    drugs that they didn't find in the room that they knew

13    was there somewhere.  That's it.

14              THE COURT:  Thank you, counsel.

15              MR. LEVINE:  Thank you.

16              THE COURT:  Anything further from the

17    Government?

18              MS. LIPEZ:  Very briefly, Your Honor, if I

19    may.

20              THE COURT:  You may.

21              MS. LIPEZ:  Your Honor had touched on this,

22    but *Terry* is not just about weapons.  There's two parts

23    to *Terry*.  The first is whether there's reasonable

24    articulable suspicion of criminal activity, and then a

25    person can be detained while the police take steps to

1    confirm or dispel that suspicion and so there's no

2    requirement that as soon as they determine someone's

3    not dangerous, they have to let him go.

4         In this case, as I said earlier, they were allowed

5    to keep the defendant with them until they finished

6    searching that room and determine whether drugs they

7    had hoped were there were there or not.

8         There's no requirement under *Terry* that someone be

9    patted down immediately.  All *Terry* says is if you're

10   going to pat someone down, that there also has to be

11   reasonable articulable suspicion that they are

12   dangerous, which I suggest there was here.

13        So they're really independent analyses and if you

14   take the pat down out of it, as I said before they

15   could never have patted him down, kept him in handcuffs

16   the entire time and I think that would have been

17   entirely reasonable.  They did the pat down, the

18   testimony was, so that they could remove him from the

19   handcuffs so that they could relieve him of that, but

20   there's no requirement that that need be done right

21   away.  I believe that, based on the fact they could

22   have kept him in the handcuffs the entire time, that's

23   consistent with *Terry*.

24        I don't think that the evidence is consistent with

25   the idea that the pat down was for the purpose of

1    finding drugs.  That's not what any of them testified

2    to and there's nothing, I think, to suggest that they

3    had any nefarious motives here, but instead were coming

4    to the end of their search and concluded that if they

5    were going to remove the defendant from handcuffs, they

6    had to make sure that they were all safe before doing

7    so.

8              THE COURT:  One moment please.  Anything else?

9              MS. LIPEZ:  No, Your Honor.

10             THE COURT:  Thank you.  All right, counsel, I

11   will take this under advisement and issue a written

12   order as promptly as we can.

13        Thank you both for very effective presentations

14   and I'll be issuing a decision.  Thank you, we will be

15   in recess.

16             MR. LEVINE:  Thank you.

17             MS. LIPEZ:  Thank you.

18             (End of proceeding).

19

20

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2     I, Dennis Ford, Official Court Reporter for the United

3     States District Court, District of Maine, certify that

4     the foregoing is a correct transcript from the record

5     of proceedings in the above-entitled matter.

6     Dated:  February 3, 2017

7               /s/ Dennis Ford

8               Official Court Reporter