1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF MAINE

3    _____

4    UNITED STATES OF AMERICA,          CRIMINAL ACTION

5              Plaintiff          Docket No:  2:15-127-JDL

6

7         -versus-

8

9    TODD RASBERRY,

10              Defendant
     _____
11                 Transcript of Proceedings

12

13   Pursuant to notice, the above-entitled matter came on
     for **Sentencing** held before **THE HONORABLE JON D. LEVY,**
14   United States District Court Judge, in the United
     States District Court, Edward T. Gignoux Courthouse,
15   156 Federal Street, Portland, Maine, on the 2nd day of
     December 2016 at 10:12 a.m. as follows:

16

17   Appearances:

18   For the Government:  Jamie R. Guerrette, Esquire
                          Assistant United States Attorney
19
     For the Defendant:  William Maselli, Esquire
20
     Also Present:  Dee Mosley, U.S. Probation
21

22              Lori D. Dunbar, RMR, CRR
                Official Court Reporter
23
                (Prepared from manual stenography and
24                 computer aided transcription)

25

```
 1              (Open court.  Defendant present.)

 2         THE COURT:  Good morning.

 3         MR. GUERRETTE:  Good morning, Your Honor.

 4         MR. MASELLI:  Good morning, Your Honor.

 5         THE COURT:  We proceed now in the case of

 6    United States versus Todd Rasberry.  This is Docket

 7    15-CR-127.  Counsel, please identify yourselves for the

 8    record.

 9         MR. GUERRETTE:  Jamie Guerrette for the United

10    States, Your Honor.

11         MR. MASELLI:  William Maselli for

12    Mr. Rasberry, Your Honor.

13         THE COURT:  Thank you.  Mr. Guerrette, has the

14    Government provided notice to any individuals entitled

15    to notice as victims under federal law?

16         MR. GUERRETTE:  No individuals in this case,

17    Your Honor, thank you.

18         THE COURT:  Thank you.

19         All right, Mr. Rasberry, I'd ask that you stand,

20    please; and Mr. Maselli, if you could move that

21    microphone toward him, get it right -- closer, please,

22    even closer, there we go.  That will pick up his voice

23    now, thank you.

24         You're Todd Rasberry, correct?

25         THE DEFENDANT:  Yes, Your Honor.
```

1        THE COURT:  Mr. Rasberry, the overall purpose

2   of this hearing is for me to sentence you based upon

3   your conviction.  I'm going to hear from the attorneys,

4   and I'll hear from you if you choose to speak, and I'll

5   hear from anyone else that is presented to speak this

6   morning.

7        I'm going to be asking you and Mr. Maselli certain

8   questions.  I want to be certain that you have first

9   received and read and understand the revised

10   presentence investigation report in this case.  I also

11   want to be certain that there's nothing that interferes

12   with your ability to understand and hear what's taking

13   place in court today.  And I also want to be certain

14   ultimately that you understand the sentence that I

15   impose and the reasons for it.

16        If you don't understand any of the questions that

17   I ask, let me know, I'll rephrase the question.  And if

18   you'd like to speak to Mr. Maselli before responding to

19   a question, that's fine.  Just let me know and I'll

20   give you a chance to speak to him.  Do you understand?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Mr. Rasberry, have you used any

23   drugs or alcohol in the past 48 hours?

24             THE DEFENDANT:  No, Your Honor.

25             THE COURT:  Are you currently taking any

1    medications?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  What medications are you taking?

4              THE DEFENDANT:  Remeron.

5              THE COURT:  What is it?

6              THE DEFENDANT:  Remeron.

7              THE COURT:  And what is that for?

8              THE DEFENDANT:  Depression.

9              THE COURT:  And do you have a prescription for

10   that?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  And what is the dosage and

13   frequency with which you take it?

14             THE DEFENDANT:  Every day, 30 milligrams.

15             THE COURT:  You take it once a day?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Are you taking any other

18   medications?

19             THE DEFENDANT:  No, Your Honor.

20             THE COURT:  That one medication that you are

21   taking, does it in any way affect your ability to think

22   clearly and to understand what's occurring in court

23   today?

24             THE DEFENDANT:  No, Your Honor.

25             THE COURT:  Mr. Rasberry, is there anything

1    else which might in any way interfere with your ability

2    to understand what is being said in court today?

3              THE DEFENDANT:  No, Your Honor.

4              THE COURT:  You have your GED; is that

5    correct?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  And so you can read and write; is

8    that right?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  And what do you understand the

11   purpose of today's hearing to be?

12             THE DEFENDANT:  Sentencing.

13             THE COURT:  Do you authorize Mr. Maselli to

14   speak and act on your behalf throughout this hearing?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  Mr. Maselli, you have received and

17   reviewed the revised presentence report with your

18   client; is that correct?

19             MR. MASELLI:  Yes, I have, Your Honor.

20             THE COURT:  And I take it you've had

21   sufficient time to do that?

22             MR. MASELLI:  Yes, I have.

23             THE COURT:  Mr. Rasberry, you have read the

24   entire report; is that right?

25             THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And you feel that you understand

2     it?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  And you've had sufficient time to

5     discuss that with Mr. Maselli as well; is that right?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Mr. Maselli, at this point in time

8     is there any -- does the defendant make any objections

9     to the revised presentence investigation report in this

10    case?

11         MR. MASELLI:  In the context of the agreements

12    that we've reached with the Government, the only

13    objection is relating to a criminal history point which

14    was addressed in the memorandum submitted to the Court.

15         THE COURT:  Right.

16         MR. MASELLI:  And Mr. Rasberry does not agree

17    with all factual recitations in the case, but they're

18    not necessary for resolution of sentence in this

19    matter.

20         THE COURT:  All right.  So for purposes of

21    this hearing, let's be clear about what was agreed to,

22    as I understand, between the Government and

23    Mr. Rasberry, which was presented to me earlier this

24    morning.

25         First, that for purposes of Paragraphs 13, 14, and

1    19 of the revised -- it's actually the second revised

2    presentence investigation report, so let me be clear

3    about that.  When I've been referring to the report,

4    we're referring to what is the second revised

5    presentence investigation report.  For purposes of

6    those paragraphs, the defendant and the Government have

7    stipulated that the drug quantity in this case is one

8    to three kilograms; is that correct?

9              MR. GUERRETTE:  Yes, Your Honor.

10             MR. MASELLI:  Yes, it is, Your Honor.

11             THE COURT:  As a consequence of that -- well,

12   before we get to that, for purposes of Paragraph 22,

13   which is the adjustment for Mr. Rasberry's role in this

14   offense, it is stipulated, as I understand, between the

15   Government and the defendant that he should receive two

16   additional points, not four; is that correct?

17             MR. GUERRETTE:  Yes, sir.

18             MR. MASELLI:  Yes, Your Honor.

19             THE COURT:  And so Paragraph 19, which is the

20   base level offense, is adjusted to what number?

21             MR. GUERRETTE:  30, Your Honor.

22             THE COURT:  Thank you.  Is that correct,

23   Mr. Maselli?

24             MR. MASELLI:  Yes, it is, Your Honor.

25             THE COURT:  Paragraph 24, which is the

1    adjusted offense level subtotal, would be adjusted to

2    32; is that correct?

3            MR. GUERRETTE:  Yes, Your Honor.

4            MR. MASELLI:  Yes, Your Honor.

5            THE COURT:  And finally Paragraph 28, which is

6    the total offense level, is adjusted to 29.

7            MR. GUERRETTE:  Yes, sir.

8            MR. MASELLI:  Yes, Your Honor.

9            THE COURT:  All right.  And so I have

10   accurately summarized, then, or stated the -- what the

11   Government and Mr. Rasberry have stipulated to this

12   morning; is that correct?

13           MR. GUERRETTE:  Yes, Your Honor.

14           MR. MASELLI:  That's right, Your Honor.

15           THE COURT:  Mr. Rasberry, you understand this?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  I take it that you've had

18   sufficient time this morning to discuss all this with

19   Mr. Maselli?

20           THE DEFENDANT:  Yes, sir.

21           THE COURT:  And he's explained to you these

22   changes that were agreed to by you and by the

23   Government?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  And, Mr. Maselli, you're satisfied

1    that Mr. Rasberry understands them as well?

2              MR. MASELLI:  Yes, I am, Your Honor.

3              THE COURT:  Now, as I understand, Mr. Maselli,

4    you will be arguing as part of your sentence

5    presentation that the Court should either disregard or

6    provide a departure with respect to one of Mr. -- a

7    point that's associated with one of Mr. Rasberry's

8    convictions; is that right?

9              MR. MASELLI:  That is correct, Your Honor.

10             THE COURT:  And so you'd be seeking a

11   departure under Section 4A1.3?

12             MR. MASELLI:  Yes, Your Honor.

13             THE COURT:  All right.  And you'll have the

14   opportunity to argue that point as part of your

15   sentencing presentation.

16        Is there anything else at this time that you wish

17   to argue or put on the record with respect to any

18   objections to the second revised presentence

19   investigation report?

20             MR. MASELLI:  No, Your Honor.

21             THE COURT:  All right, thank you.  You can be

22   seated, Mr. Rasberry.

23        And with that, Mr. Guerrette, I'll hear from the

24   Government on the matter of sentence.

25             MR. GUERRETTE:  Thank you, Your Honor.

1      As the Court has pointed out, Your Honor, in light

2  of the agreements that were reached by the parties in

3  this case, the base offense level is 30, there's a two

4  role adjustment for Mr. Rasberry being an organizer,

5  leader, manager, or supervisor of criminal activity,

6  results in an adjusted offense level of 32, and three

7  points off, Your Honor, a total offense level of 29.

8      The Government is submitting, Your Honor, that

9  Mr. Rasberry is comfortably within a Criminal History

10  Category V in this case.  His criminal history category

11  points in the second revised presentence report equal

12  10.  That puts him in the Category V.  Therefore, the

13  guidelines in the matter should be in the range of 140

14  to 175 months pursuant to the guidelines, Your Honor.

15  We're recommending in this case a sentence in the

16  middle toward the high end of that guideline range,

17  with three years of supervised release to follow.

18      Before I get to the argument, Your Honor,

19  discussing the 3553 factors, just a couple points I

20  want to make on the criminal history category point

21  that the defendant is raising in Paragraph 33 of the

22  presentence report.  There was an entry, according to

23  the certificate of disposition of indictment, and

24  that's Government Exhibit No. 17, there was an entry of

25  a plea of guilty on 7/21/05, which was after the actual

1    offense that Mr. Rasberry was convicted of or -- within

2    the 10-year range, it was shortly before, but it was

3    within the 10-year range.

4         There was some mention that there was a

5    diversionary type of disposition, but if you look at

6    the certificate that was produced by the court in New

7    York, Your Honor, there was a plea of guilty.  And

8    there were penalties that were initially imposed on Mr.

9    Rasberry, including a conditional discharge, community

10   service, and a six-month license suspension.  And

11   according to that same document, Your Honor, it appears

12   that Mr. Rasberry came back a year later or about 10

13   months later in 2006 and he was resentenced to time

14   served.  And that was comfortably within the 10-year

15   range, so it's the Government's position that that one

16   point should count, which would be 10 points.

17        The other issue, Your Honor, that the Government's

18   raised in its sentencing memorandum is that

19   Mr. Rasberry was not afforded or assigned any criminal

20   history category points for the aggravated forgery

21   felony conviction that he suffered in the Cumberland

22   County Unified Criminal Court in early 2015.  And that

23   related to conduct dating back to November 2014, where

24   Mr. Rasberry was in a hotel room, there was some cash

25   found on his person, and when he was identified or they

1    attempted to identify him he lied about his name,

2    indicated he was James Bald, and subsequently signed a

3    fingerprint card and a USAC, a uniform summons and

4    complaint, under the false name.  He was subsequently

5    convicted of that aggravated forgery in February.

6         In the initial presentence report that came out in

7    this case, he was assigned a point for that, and that

8    was with the conduct of him possessing the cash and

9    admitting to a criminal forfeiture in that case being

10   calculated as part of the drug quantity.  It was

11   treated as relevant conduct, but he was still assigned

12   a point.  In the revised presentence report that point

13   went away, and nothing really was changed about the

14   offense conduct, it was still considered relevant

15   conduct, but only about 32 grams.

16        So this really goes, Your Honor, if the Court is

17   unwilling at this point to assign that point, which the

18   Government maintains should be assigned, I think it

19   goes to the equity argument that counsel will make

20   that, instead of being in a Criminal History Category V

21   he should be in a Criminal History Category IV, which

22   is significant.  If he were assigned that criminal

23   history category point, he would be comfortably within

24   the Criminal History Category V range, in the range of

25   140 to 175 months, where we feel, Your Honor, based on

1    the seriousness of the offense, the defendant's

2    criminal history and characteristics, the need to

3    protect the public from further crimes of the

4    defendant, and need to provide just punishment and

5    adequate sentence in this case, that's where a sentence

6    that the Court imposes should reasonably fall this

7    morning.

8         When you look at the nature and seriousness of the

9    offense, Your Honor, it's an extremely serious offense.

10   The defendant was involved in the distribution of a

11   highly addictive controlled substance.  He was involved

12   not on a discrete occasion but over a substantial

13   period of time.  We know that at least from November

14   2014, based on his admission to the criminal forfeiture

15   count, he was involved in the distribution of

16   controlled substances.

17        The relevant conduct lookback that the Government

18   proposed in its sentencing memo is a lot more discrete

19   than that and really looks back to a finite 90-day

20   period when you're calculating the drug quantity, but

21   he was involved at least for a period of six months in

22   the distribution of heroin.

23        Additionally, Your Honor, he was a -- by his own

24   admission a leader, organizer, supervisor, or manager

25   in the activity.  The conduct occurred over the period

1    of six months, it involved a number of different

2    actors, involved a number of different locations, and

3    the defendant had some leadership role in the ongoing

4    activity.

5        I don't have to tell the Court, Judge, that Maine,

6    as well as states across the nation, are in the middle

7    of what's being referred to as an opiate crisis.

8    People are losing jobs, can't maintain jobs, families

9    are being ravaged, and people are dying left and right

10   of overdose from opiates.  Unquestionably the

11   defendant's role in the distribution of heroin in the

12   greater Portland community for that period of time

13   played a role in that.  He poured gasoline on the fire,

14   arguably, to the opiate crisis in Maine.  And by his

15   own stipulation and the evidence that we submitted in

16   the sentencing exhibits, one to three kilograms of

17   heroin is not a nominal amount.  It's a pretty

18   substantial amount.  And defendant was at it for a

19   considerably long period of time.

20       Just to give the Court some perspective, Your

21   Honor, one of the Government's sentencing exhibits,

22   No. 4, is a photograph of evidence that was seized from

23   the defendant and a cooperator on July 15th, 2015.

24   Just to remind the Court of those basic facts, and

25   those are the facts contained in the prosecution

1    version, DEA agents learned that the individuals were

2    going to be making the delivery to a certain location,

3    they interdicted her, she was in possession of six

4    baggies of heroin that were intended for distribution.

5    She was immediately cooperative, indicated her source.

6    Champagne, Mr. Rasberry, was located in a specific

7    hotel room with additional drugs.  Agents went to the

8    hotel room and found Mr. Rasberry in possession of

9    about 51 grams of a substance that was later tested to

10   be positive for heroin, caffeine, and quinine.  That's

11   the chemical composition that were in the six bags that

12   were possessed by the cooperator moments before.

13        The other thing that Mr. Rasberry had on his

14   person, Your Honor, is a baggie containing about 23 or

15   24 grams of quinine, basically a cutting agent that was

16   used with the heroin.  Extrapolating what the

17   cooperator had on her person, so it was about -- there

18   were six baggies of heroin, the total net weight was

19   about 2 grams.  You use that and apply it to the

20   substantial quantity that Mr. Rasberry had on his

21   person, the heroin possessed by Mr. Rasberry on that

22   one discrete day was capable of producing about 150

23   dosage units or bags of heroin for distribution in this

24   community.  And we're looking at one discrete day, Your

25   Honor.  And it's not just this day, but the guidelines

1    requires the Court to consider all of his relevant

2    conduct, and by agreement and also the evidence would

3    establish here we're dealing with one to three

4    kilograms.  And the photograph, Your Honor, in

5    Exhibit 4 really demonstrates the substantial amount of

6    heroin that Mr. Rasberry was in possession of on that

7    date.

8         Another factor, Your Honor, that I think is

9    significant, Mr. Rasberry wasn't just a base player in

10   a distribution scheme.  By agreement we've agreed to a

11   two-point role enhancement for him being a leader,

12   organizer, supervisor, or manager of the criminal

13   activity.  Over the period of time where the Court

14   could reasonably look back at relevant conduct, there

15   were a number of actors that came in and came out.

16   There were a number of different trap locations used,

17   according to the testimony of the cooperator, which is

18   Exhibit No. 5.  There were also individuals that had

19   limited roles.

20        You're not dealing with someone in Mr. Rasberry

21   that was doing this, like some of the cooperators that

22   we have in this case, because they were strung out on

23   heroin and only engaging in the conduct because of

24   their severe addictions and engaging in the conduct to

25   get enough heroin just to feel normal.  I would submit,

1    I know there's some discrepancy in the revised

2    presentence report, that the defendant wasn't doing it

3    because he was addicted.  It was more of a

4    profit-motivated activity for him.  There's some

5    indication from the presentence report, I think he

6    indicated to probation that he had used controlled

7    substances, marijuana, there was frequent use of

8    alcohol, and he also told probation during the

9    presentence investigation that he was also using

10   Percocet and I believe it was cocaine was the other

11   substance.

12       You contrast that with his bail interview, where

13   he says only that he was using marijuana and alcohol,

14   didn't mention anything about the other substances, and

15   I think Cumberland County Jail records talk about

16   marijuana, alcohol, and ecstasy, not heroin -- not

17   Percocet and not cocaine.

18       So unlike the individuals noted in the

19   Government's sentencing memo SOI-1, 2, and 3, who all

20   had extremely severe addictions to this stuff,

21   defendant was not a heroin user.  He's never claimed to

22   be a heroin user.  He's never suffered from those

23   extreme addictions, yet he was involved in the

24   distribution of substantial quantities of the substance

25   in our community for an extended period of time.

1        So in light of that, Your Honor, I think when you

2   look at his history and characteristics, another factor

3   in this analysis, when you weigh those, on balance I

4   would submit that they're aggravating.   I recognize

5   that Mr. Rasberry had a troubled childhood.   He

6   obviously has individuals in the courtroom that care

7   very deeply about him, that have written letters to the

8   Court that he was a very caring father.   But that needs

9   to be contrasted with all the other factors, including

10  his criminal history.

11       When you look at his criminal record, Your Honor,

12  it's significant, and a Criminal History Category V

13  adequately provides for that.   He's had multiple stints

14  in prison for felony offenses.   He's routinely used

15  fake names and aliases, not just when interviewed but

16  when arrested and when prosecuted.   His offenses

17  include possession of a sawed-off shotgun in 2002, a

18  felony assault in 2002, possession of crack cocaine in

19  2005, the attempted possession of greater than an ounce

20  of cocaine in 2008, where he was convicted under James

21  Bald and served time under James Bald.   There was an

22  arrest in Rhode Island under the fake name of Rahiim

23  Etheridge in 2012, where he was charged with a couple

24  of different offenses, and that's summarized in

25  Paragraph 38, where he failed to appear.   And according

1    to that report a warrant of arrest is still

2    outstanding.  So I think that's another factor, when

3    you're looking at the equities of whether he should

4    fall within a V or a IV.  If he had resolved that case

5    and then convicted of any of those offenses, which he's

6    pled from, the category would likely be again

7    comfortably within the Criminal History Category V.

8           And then lastly, Your Honor, the aggravated

9    forgery conviction in January-February 2015, there

10   again he was I think -- at the time there was -- the

11   Court's familiar with it, he was on the hook for

12   potentially possession of marijuana, a large amount of

13   cash in his pockets.  He's asked what his name is,

14   doesn't provide any ID but identifies himself as James

15   Bald.  Eventually gets brought over to the jail, signs

16   a fingerprint card James Bald, signs the uniform

17   summons and complaint James Bald, and only when he's

18   confronted with the results of the FBI fingerprint

19   query where it identifies him as Todd Rasberry does he

20   say, yeah, all those names are me.  I think he rattled

21   off four or five different names, according to the

22   presentence report and sentencing Exhibit No. 7,

23   including Rahiim Etheridge, James Bald, I think there

24   was Jorge Pride, a number of others that he's used.

25          I'd submit, Your Honor, that his record is

1   evidence that the defendant has led a criminal

2   lifestyle, only interrupted by his arrests and brief

3   stints in prison, and that's a factor that should weigh

4   heavily in what the Court imposes for a sentence this

5   morning as well.

6       Lastly, Your Honor, the remaining factors in 3553

7   similarly the Government would contend call for a

8   lengthy sentence, one that will promote respect for the

9   law and provide just punishment for the offense.  I'd

10  submit that there's both a need to provide specific

11  deterrence to the defendant in this case, and there are

12  also a number of individuals that were allegedly

13  involved in this course of conduct that have not been

14  prosecuted and that will likely find out what

15  Mr. Rasberry receives for a sentence today.  So there's

16  both the need for general deterrence for those

17  individuals and specific deterrence for the defendant.

18      Lastly, Your Honor, given the history and conduct

19  that was involved here, in light of the crisis that

20  this state is facing, there is a need to protect the

21  public.

22      So we would recommend that the Court impose a

23  sentence within the 140 to 175 guideline range.  We

24  recommend something at the middle or the higher end of

25  it.

1            THE COURT:  Thank you, Mr. Guerrette.

2            MR. GUERRETTE:  Thank you, Your Honor.

3            THE COURT:  Mr. Maselli.

4            MR. MASELLI:  Your Honor, could we briefly

5     approach the bench?

6            THE COURT:  You may.

7                       (Sidebar)

8            MR. MASELLI:  Judge, I just wanted to alert

9     you to a situation and get your reaction to this,

10    because Mr. Rasberry's fiancée has brought their son

11    here, which frankly I recommended that they do not

12    bring him here.  They both would like when she comes

13    up -- what I would suggest is that he can come with her

14    and say what he wants to do, but I don't want to do

15    this if this is offensive to the Court or if it's going

16    to have a negative reaction, but it's what they want.

17           THE COURT:  How old is the son?

18           MR. MASELLI:  I think he's six.  And I asked

19    him what he was going to say, he was coherent and just

20    some basic comments to make.  But, again, I don't want

21    to offend the Court by that and --

22           THE COURT:  Jamie, do you want to be heard on

23    this?

24           MR. GUERRETTE:  No, Your Honor.

25           THE COURT:  You're reasonably comfortable that

1    it will go okay?

2              MR. MASELLI:  Yes, I am.

3              THE COURT:  That's fine.

4              MR. MASELLI:  Thank you very much.

5              THE COURT:  Thank you.

6                        (Open court)

7              THE COURT:  Mr. Maselli.

8              MR. MASELLI:  Thank you, Your Honor.  Before

9    making a sentencing argument, I would ask a few

10   individuals that are present to address the Court, and

11   first is Aidalina Costoso, if she could bring Messiah

12   with her.

13             THE COURT:  Please if you would step forward

14   and approach the podium with the microphone.  And if

15   you would please state your first and last name and

16   spell both for us.

17             MS. COSTOSO:  Aidalina Costoso, my first name

18   is spelled A-I-D-A-L-I-N-A.  My last name is

19   C-O-S-T-O-S-O.

20             THE COURT:  Thank you, please go ahead.

21   Please speak.

22             MS. COSTOSO:  I don't know where to start.  I

23   have a six-year-old with Todd Rasberry.  He's a very

24   good dad.  I ask the Court for leniency for my son.  I

25   don't really know what to say.  He's a good dad.  My

1    son is very attached to him.  I've worked a lot so

2    there's times that he's taken care of him, you know,

3    with ABCs and teaching him how versus saying yeah, yes.

4    Messiah is a very great kid.

5        I have other kids, not with Mr. Rasberry, and they

6    have experienced the good things with him.  He has

7    taught them right from wrong.  I have a 14-year-old

8    daughter that he's helped a lot with like school.  I

9    have an almost 20-year-old son who -- who now lives on

10   his own, but they all have different experiences with

11   him.  I have an 18-year-old son, who's not here today

12   because he's signing up for college.  Of all my kids

13   that one is the one who like I had to like talk to

14   more, messing up in school a little bit, and Mr.

15   Rasberry was able to help him focus.

16       I've been in Maine since my daughter was four

17   months old and she's 14.  I had Messiah here.  And like

18   I said, he's a great dad.  And I know people go through

19   things and make mistakes, but my son really needs him.

20   I don't really know what else to say.

21            THE COURT:  Thank you, Ms. Costoso.

22            MR. MASELLI:  Ismael Baez, Your Honor.

23            THE COURT:  Sir, please step up to the

24   microphone.  If you'd state your name and then spell

25   your first and last name.

1          MR. BAEZ:  Ismael Baez.  Ismael is spelled

2     I-S-M-A-E-L, and last name is B-A-E-Z.

3          THE COURT:  Thank you, please go ahead.

4          MR. BAEZ:  So I'm Ismael, I'm going to be 20

5     next week.  You know, start from the beginning.  I

6     moved to Maine when I was about eight years old, you

7     know, right in South Portland.  I grew up here.  My

8     parents lived with us, me, Julian, and Idalis.  You

9     know, relationships only work out sometimes, and they

10    ended up getting divorced.  And my father was stubborn,

11    didn't want to move out, so we moved to Portland.

12         When we got to Portland, I think maybe a year or

13    so later, you know, my mom had told me, I was maybe,

14    what, 12 at the time, she was working 9:00 to 9:00

15    every day, and she told me, I have a boyfriend.  I

16    said, okay, that's fine.  I said, what's his name?  She

17    said Todd.  I said, oh, are we going to meet him before

18    he comes in?  And she said, yeah, of course.  So he

19    came over one day, we met him, you know, he -- short

20    guy to me, I'm a tall dude, so he was nice, genuine,

21    and he cared, could tell he just cared right from the

22    get-go.

23         Todd ended up moving in and, you know, as a

24    12-year-old kid, 13 years old, you just find yourself

25    in a situation where you kind of get defensive because,

you know, you see yourself as the man of the house,
your mom's working all day, 12 hours a day, day and
night.  You walk from one side of town to the other to
get to school, no matter the weather, take care of your
little siblings, take them to school, make sure they do
their homework, make sure they're bathed, they're fed,
take care of yourself.  And, you know, I saw myself as
a father figure to my younger siblings.  So when he
came in I was kind of, you know, taken back by it and,
you know, we kind of butted heads but I got over it.
He was a good man and eventually I let him in, my
siblings let him in.  He was a father figure to us.

Todd, you know, he's a good dude.  He went in --
he came into custody maybe a week before my daughter
was born, 16-month-old daughter now, Ivy.  And the
first time she met him she touched his hand through
glass in a prison and waved and called him grandpa.
Not the first time -- you know, that wasn't the
experience I wanted her to have, but I knew she needed
to see him because, you know, it's -- it's -- he's
family, that's my dad.

Kind of off topic, back to what I was saying, you
know, Todd came in the home and my mom worked too, too
much, almost.  That's how she grew up, without parents,
basically.  Her father died when she was younger, and

1    her mother had other things going on and my mom was on

2    her own since she was 14, house to house, family to

3    family.  So I kind of just like stopped like, you know,

4    I got a gift to have a mother.  My father and my mother

5    separated, but to have another man in the house would

6    be kind of cool.  So when Todd came in it was more

7    like, you know, he was a brother to me.  He taught me

8    things I didn't even know.  He can do a lot more things

9    than what some people think he does.  He's very

10   talented, very smart.  And he definitely, definitely

11   sees, you know, he sees the good in people always, at

12   all times.

13          I don't know if anybody in here knows but, you

14   know, he -- he means so much to my family, as much

15   as -- you know, he was in New York one time and walking

16   home and someone actually tried to rob him and he got

17   shot twice, almost died.  My mother -- I think I was

18   maybe 15 or 16, she had no choice, she got on a plane,

19   stood by his side, he was basically dead on the table,

20   and he lived.  I took care of my siblings for three

21   weeks, three younger kids, all by myself.  You know, it

22   was tough, it was tough, but she had to go and it was a

23   time of need for him, and I respected that so I did

24   that favor for her.  And it made me a better person and

25   it gave me a -- you know, a taste of what fatherhood

1   might be like when I have kids someday, and two years

2   later I had the joy of becoming a father at 18, 19.

3       Todd Rasberry is my father.  I don't care what

4   anybody says, what blood tests say, what they say, he

5   says, you know, that's my dad, and, you know, is -- you

6   know, as the prosecutor just said, you know, even

7   though he's a good father that shouldn't take away from

8   what he's done.  But I'm guessing a lot of people in

9   here are parents.  No one would ever like to be told

10  that, you know, just because you're a dad shouldn't

11  take away from mistakes he's made in his life because

12  he's a good -- he's a good man.  He came in, he did

13  what he had to do, he -- he took care of me, took care

14  of my siblings.  He -- you know, when we needed

15  something, needed someone to talk to, you know, need to

16  go out, he would just be like, come here, man, give you

17  a hug, let you cry, cook you some food.

18      Basically when I was raised it was a single-family

19  home technically because my father worked a lot, but

20  when they divorced, you know, my mom, she not just

21  worked a lot, she did a lot.  She would come home and

22  be up until 2:00, 3:00, 4:00 in the morning, we were

23  just kids, make messes all the time and stuff, just

24  cleaning, cleaning, cleaning.  When Todd came in the

25  house, she'd come home, she got to sleep because stuff

1    was done, food was made.  She got to just be her, and

2    honestly since he's gone in she's been broken.  She

3    closed down her restaurant right in the Portland Public

4    Market.  She -- she's taken on a full-time job in

5    Biddeford hospital, I believe, in the kitchen.  She,

6    you know, she closed down the market just to be more of

7    a parent to my other three siblings, and it's hard to

8    even do that when, you know, you've got to make ends

9    meet.

10        So having Todd home was great for us, and although

11    I've moved out now, you know, every day just seems

12    like, you know, what if -- what if he was sitting right

13    here next to me, you know, hanging out in my apartment

14    with my family, coming over for dinner.  It's just --

15    it's hard to imagine life without him.

16        And although, you know, you're sentencing him

17    today, I just -- I hope you know that he's an honest

18    individual and he -- he means well.  He's had plenty of

19    mistakes, as you know, but that doesn't take away from

20    the person he is, the person he will always be, which

21    is my father.  Thank you.

22        THE COURT:  Thank you, Mr. Baez.

23        MR. MASELLI:  May it please the Court, just in

24    terms of the guideline issue, Your Honor, the criminal

25    history point, as I mentioned in the memorandum, I

1     would principally like to just rest on the argument

2     that was made in the memorandum and not go into length

3     about it right now.  I just think that under all the

4     circumstances in the case, especially since it was a

5     six days -- counted within a six-day period and that it

6     was his understanding that the case was being

7     discharged without a conviction, taking everything into

8     account that was listed in the memorandum, we would ask

9     the Court to sentence him under Category IV.  So I'd

10    like to move on from that, if I could.

11              THE COURT:  Please.

12              MR. MASELLI:  We've reached the point in the

13    proceeding that I've always considered to be the most

14    difficult and challenging aspect of a judge's duty,

15    sentencing another human being.  And a human being is

16    what I am focusing on, because that is truly what we're

17    dealing with.

18        Certainly it is easy to get lost in certain

19    directions when looking at the past and current crimes

20    and crunching numbers, but in the end it's a human

21    being that we're dealing with and all the other human

22    beings that this gentleman has had contact with and is

23    involved with.

24        The Government made its points concerning

25    Mr. Rasberry's criminal activities, and we certainly

1   agree that he's been convicted of a very serious

2   offense.  And we also understand that there's a social

3   problem here that Mr. Rasberry is not just the cause

4   of, he's part of the whole situation that goes way back

5   before Maine had supposedly a -- or has a crisis of

6   opiates in its society.

7       The Todd Rasberry that the Government has referred

8   to is not the Todd that is known by his family.  And

9   you can see that in the letters that were sent that

10   were all from the heart, very moving, and I'd suggest

11   to the Court that they're the kind of letters that

12   people write only when they're profoundly attached to

13   and affected by the individual that they're writing

14   about.

15       Todd has a lot of sides to him, but I think that

16   the main point here is that he's not a throwaway

17   person.  He's not just the sum of his prior activities,

18   which all stemmed from his childhood and upbringing.

19   He's a good man, as his stepson eloquently just stated

20   to the Court.  He's a loved person.  He's highly

21   intelligent.  He could have had a lot of other

22   possibilities in his life had he had a different

23   upbringing.

24       Todd has accepted responsibility for the conduct

25   he was involved with in this case.  He came in and pled

1    guilty before Your Honor, and he accepted that he was

2    involved in this activity and has taken responsibility

3    for it.

4        The paragraph at the end of the presentence report

5    talking about the possible reasons for variance below

6    the guidelines is I suggest to the Court extremely

7    powerful, Paragraph 75.  When you just put all of these

8    things together, his upbringing, his mental illness

9    properties, his lack of guidance, you put all these

10   things together and it's -- it's a powerful statement.

11       I mean, Todd -- Todd's father left basically just

12   after he was born.  He never had a father.  He was

13   sexually abused by an uncle when he was young.  So if

14   you can imagine a young kid looking for a father figure

15   from his -- from his own family, he was abused there.

16   His mom did the best that she could.  She worked for

17   some time but she became a drug addict.  Todd was

18   encouraged just to go out onto the streets as a young

19   boy, just get out of the house, go outside.

20       So what are you going to find outside on the

21   streets when you're seven years old, eight years old?

22   You're going to find a lot of crime, gangs, criminal

23   activity.  You're also going to find a lot of

24   charismatic and powerful people that would have a big

25   influence on him, but unfortunately absolutely the

1    wrong kind of influence.

2         So Todd was looking up to people that were

3    involved in crime.  He was involved in serious criminal

4    activity by the age of 11.  He was in and out of

5    juvenile custody, and this is the life that he was

6    destined to by his circumstances.  So when you think

7    about it, Todd Rasberry could have turned out a lot

8    worse and on a lot more destructive path than he

9    actually has been on, despite the serious nature of the

10   crimes that he's been convicted of.

11        There's an assault in his record for which he

12   received a substantial sentence.  It's really quite

13   some time ago now.  And that was a situation in 2001

14   where there was a large fight, a brawl, basically 16 --

15   approximately 16 individuals were involved, and a few

16   of them were prosecuted as a result of that.

17        Since that time in 2001, and that's 15 years ago

18   now, there's been no allegations of any violent

19   conduct.  And I think that's critical for the Court to

20   take into consideration, because we're asking the Court

21   to give a substantial break to Todd Rasberry.  He's

22   done time before as a young man.  He's had a couple of

23   sentences that were two years, three and a half years

24   in, but it was a time of his life that he was unable to

25   make the changes necessary to change his life.

1      When he got out of prison in 2004 he had an
2  absolute commitment to try.  He took a job in
3  construction.  He lived with his mother.  And within a
4  few months he had a serious injury at work.  He was
5  unable to work.  He had no money; he had nowhere to
6  turn.  He went back into the only way of life that he
7  knew.

8      Todd also has serious mental health issues.  He's
9  been diagnosed with depression.  He's had substance
10  abuse issues.  It's interesting that while he's been in
11  the Cumberland County Jail he's been addressing these.
12  You have noticed that he hasn't been wasting his time,
13  that he's done domestic violence courses, that he's
14  seeing his counselor, Paul Bartlett.  I've spoken with
15  him a few times.  I spoke with him first six to nine
16  months ago, and again we had communications in the last
17  couple of days.  And Mr. Bartlett is impressed with the
18  efforts that Mr. Rasberry has made.  He's been
19  regularly taking medication to keep on the right track.
20  He's been participating in counseling sessions, and
21  he's been no problem in the jail for the last one and a
22  half years.

23      So while we recognize that there are a number of
24  factors on the other side of the equation, Mr. Rasberry
25  is a man that absolutely can change his life around.

1    And I think that what the Court does today really can

2    make a substantial difference as to whether he has a

3    real chance to change his life around with the family

4    that surrounds him now or whether he's going to come

5    out of jail after even his young son is an adult or

6    nearly an adult.  He's got -- he's got a new

7    granddaughter.  He has a six-year-old son who loves his

8    father very much.  I spoke with him today, and he just

9    wanted to emphasize how much he loves him, how much he

10   loves spending time with him and whether he can come

11   home at some time soon.

12       A sentence substantially under 10 years in this

13   case would be absolutely within the statutory

14   guidelines of not being more than necessary to achieve

15   the purpose of the statute.  And it makes all the

16   difference in the world whether Todd Rasberry has

17   something to live for over the next years, whether he

18   can get out and have a real relationship with his son

19   when he's still a teenager, when he can integrate back

20   into the family with his stepsons and daughter, his

21   son, his other family members that have written from

22   New York that the Court has the letters from.

23       He also has a son who's 17 years old, Unique, that

24   he's had a good relationship with at various times.

25   But this is one of the things that really strikes me

1    about Todd's real desire to change his life now because

2    he recognizes that he could have done more with his

3    son.  And he was determined to do more with Messiah,

4    but he was trapped in this world where he was doing

5    what he knew how to do and was not able to make a

6    change because he didn't have the upbringing or the

7    education to go into a real profession.

8            I think that the time that Todd has right now,

9    because he's going to have a substantial sentence from

10   this Court, is going to give him the opportunity to

11   really think through what he wants to do.  He has plans

12   already of what he wants to do with his life, which he

13   may address with you, but that can change, of course,

14   over the next years.  But what he knows is that he

15   wants to move out of this realm of criminal activity.

16           I think that the Court really has an opportunity

17   here, Your Honor, to give a sentence that recognizes

18   the seriousness of the conduct while also giving him a

19   chance to survive in the future and to be a productive

20   member of society.  When he gets out of prison he's

21   going to be on supervised release.  If he doesn't

22   straighten himself out, the Court's going to see him

23   again very soon.  So I don't consider that to be a huge

24   risk factor.

25           And again I would point to the lack of -- of

```
 1    violent conduct, which is important, because where he
 2    grew up violence surrounded him on a daily basis, and
 3    as you just heard from his stepson, in 2014 he was
 4    actually shot in an attempted robbery.  So he's been
 5    surrounded by violence.  And based -- and despite that,
 6    he's made himself a family man and moved into a family
 7    that had no father at home and took upon the role of
 8    friend and brother and father to the children that were
 9    there.  It's not what we normally consider of someone
10    that is not beyond redemption.
11         I would just state for the record that he was
12    originally charged with conspiracy, he pled to
13    possession.  The co-conspirator in that case,
14    Ms. Wilson, who was before this Court and of course her
15    case is unique unto itself, but just in terms of giving
16    somebody a break and talking about disparity purposes,
17    Ms. Wilson was sentenced to a time-served sentence.
18    And I'm sure that she was deserving of that.
19         But I just bring that up to the Court because I
20    think Todd is somebody that's worth taking a chance on.
21    People I'm sure have taken chances on him before when
22    he was younger, but I think that the Court has seen
23    from the relationships that he's forged that -- that he
24    is capable of forming sincere and lasting human
25    relationships and that he's determined to have a
```

1    relationship with his family and with his young son,

2    and I think it's to everybody's benefit in this society

3    if he's able to do so.

4         So we're asking the Court to vary substantially

5    from the guidelines.  I think the Government has made

6    points concerning the epidemic in this culture of

7    opiates.  It goes far beyond Todd Rasberry.  He's in

8    the process there, but it's -- I think it's been

9    recognized all around this country over the last four

10   or five years that the -- the Draconian sentences for

11   nonviolent drug offenders has gone too far in one

12   extreme and it's been coming back for quite some time.

13   And I think that it's more the rule than the exception

14   that the Court issues a variant sentence below the

15   guidelines.

16        And we suggest that a sentence substantially under

17   10 years, under all the circumstances of this case and

18   all the circumstances of Todd and what he still has to

19   offer human beings, would be the appropriate sentence

20   in this case.  Thank you very much.

21        THE COURT:  Thank you, Mr. Maselli.

22        Mr. Rasberry, as a defendant before the Court for

23   sentencing you have a right to speak on your own

24   behalf, it's called the right of allocution, if you

25   wish to do so, but you're not required to.  It's only

1    if you wish to speak.  Do you wish to speak at this

2    time?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  All right, please stand.  Go

5    ahead.

6              THE DEFENDANT:  My name is Todd Rasberry.  I

7    just want to let you know that I was a very active

8    member in my family life and that, you know, I plan on

9    being a productive member and hopefully you can have

10   leniency on my sentence.  Thank you.

11             THE COURT:  Thank you.

12        Mr. Maselli, anything else on behalf of

13   Mr. Rasberry?

14             MR. MASELLI:  Not at this time, Your Honor.

15   We would be recommending that the Court makes a

16   recommendation for the 500-hour drug program in prison

17   and for a designation -- recommended designation that's

18   nearby, Fort Devens or Berlin, so that his family can

19   continue to visit him.

20             THE COURT:  I didn't hear everything you just

21   said, you said Devens and what else?

22             MR. MASELLI:  And Berlin, New Hampshire.  I

23   believe those are the closest prisons to the state of

24   Maine.  Thank you very much, Your Honor.

25             THE COURT:  All right, and I just want to now

1     review the exhibits that I've received on behalf of

2     Mr. Rasberry.  I have two letters that were received

3     today.  One is from Julian, Mr. Rasberry's stepson.

4     The other is from Idalis Baez.  We'll mark those as

5     defendant's exhibits -- actually along with the letters

6     that were previously submitted which I have read, we'll

7     mark all these collectively as Defendant's Exhibit 1.

8     Is there any objection to the Court's receipt of them?

9              MR. GUERRETTE:  No, Your Honor.

10             THE COURT:  All right.  So the record's clear,

11     this includes the certificate from the Cumberland

12     County Sheriff's Office, the letter of Ms. Campbell,

13     the letter previously submitted by Aidalina, Mr. Ismael

14     Baez's letter, Sophia Smith's letter, Rahiim

15     Etheridge's letter, a letter from an individual,

16     doesn't contain a name, it's regarding Uncle Todd and

17     so obviously a niece or nephew or someone who views him

18     in that light.  It's I would have to guess to be

19     written by a child.  Rahiim Etheridge's letter and

20     Briana's letter.  Oh, in addition Yvonne's letter,

21     Renell's letter.  These will all be marked collectively

22     as Defendant's 1 and are received in evidence.

23          In addition, the Government has submitted exhibits

24     under seal, and is there any objection by the defendant

25     as to the Court's receipt of these exhibits?

1          MR. MASELLI:  No, Your Honor, thank you.

2          THE COURT:  Okay.  All are admitted

3    collectively as the Government's 1 -- actually, they

4    were individually marked, and so they're admitted as

5    marked and they are received and will remain under

6    seal.

7          Counsel, it's my intention now to recess so that I

8    can reflect upon the arguments that have been made and

9    the information I have received.  Is there anything

10   that we need to address before we recess?

11         MR. GUERRETTE:  No, Your Honor, thank you.

12         THE COURT:  I anticipate the recess will be

13   approximately 15 to 20 minutes.  Court will be in

14   recess.

15     (A recess was taken from 11:08 a.m. to 11:34 a.m.)

16         THE COURT:  All right, returning to the case

17   now of United States versus Todd Rasberry, this is

18   15-CR-127.

19         In arriving at a sentence in this case, I've given

20   thought to the arguments that Mr. Guerrette made, as

21   well as Mr. Maselli.  And I certainly listened

22   carefully to the individuals that spoke in support of

23   Mr. Rasberry, as well as Mr. Rasberry himself, of

24   course.  I've also reviewed all the exhibits which have

25   been marked and have been received as part of the

1  record of the sentencing.  And I have studied the

2  second revised presentence investigation report

3  carefully.  I adopt the report in its entirety as my

4  findings as part of the sentencing.

5      Mr. Rasberry, in arriving at a sentence the law

6  obligates me to consider many things.  Of course, the

7  sentencing guidelines which have been discussed, which

8  I have considered.  In addition, all other relevant

9  factors, and this includes the nature and circumstances

10  of the crime that you committed, your personal history

11  and characteristics, the need for the sentence to

12  reflect the seriousness of your crime, to be just

13  punishment, to provide adequate deterrence, not only to

14  you but to others, to protect the public from further

15  crimes by you, and to provide you with needed

16  educational or vocational training, medical care, or

17  other correctional treatment in the most effective way.

18  In addition, I have been mindful of the need to avoid

19  unwarranted sentencing disparities in considering the

20  sentence in this case.

21      You pled guilty to Count 2 of the indictment in

22  this case, possession with intent to distribute heroin,

23  which is a Class C felony, and I have found you guilty

24  of that offense.

25      Now, turning first to the guidelines calculation

1    in this case, the total offense level for purposes of

2    this offense is 29.  Mr. Rasberry's criminal history

3    category is a V.  This produces a sentencing range of

4    140 to 175 months, a period of supervised release of

5    three years, a fine range of 15,000 to $150,000, and he

6    is ineligible for probation.

7         I will turn in a moment to discuss the request for

8    departure in this case, but before I get to that,

9    counsel, is there any objection to the summary I've

10   provided regarding the applicable guidelines provisions

11   here?

12             MR. GUERRETTE:  No, Your Honor.

13             THE COURT:  Mr. Maselli?

14             MR. MASELLI:  No, Your Honor, other than our

15   objection to counting that single point.

16             THE COURT:  Right, Ms. Mosley?

17             PROBATION OFFICER:  Your Honor, I believe the

18   fine range, the maximum is $1 million.

19             THE COURT:  Thank you.  The maximum fine is a

20   million dollars.  The nonbinding guidelines range

21   however, would be 15,000 to 150,000 dollars, correct,

22   Ms. Mosley?  No?

23             PROBATION OFFICER:  No, Your Honor, 15,000 to

24   1 million.

25             THE COURT:  To 1 million, under the guidelines

1    as well.

2              PROBATION OFFICER:  Yes, Your Honor.

3              THE COURT:  All right, I accept that

4    clarification and I adopt it.

5         Now, with respect to the objection that the

6    defendant has made regarding Paragraph 33 of the second

7    revised presentence investigation report, this is the

8    conviction in 2005 for criminal possession of a

9    controlled substance for which one criminal history

10   point is assigned.

11        First of all, I find that that conviction does

12   qualify under the guidelines for inclusion, and it

13   appropriately results in one point.  The -- so I see no

14   reason to disregard that conviction in determining his

15   criminal history category, at least as it's presented.

16        I think the second issue, though, is whether I

17   should consider departing from the guidelines in

18   connection with that point on the basis that, as argued

19   by the defendant, it overstates his criminal history.

20   This would be Section 4A1.3 of the guidelines.

21        I have given careful consideration to that, and

22   although I think that actually it's a close call, I'm

23   satisfied in the end that it does not overstate the

24   seriousness of his criminal history.  Viewed in the

25   context of the entire history, which includes a

1   conviction for aggravated forgery in 2014 for which he

2   has received no points and the pending charge in Rhode

3   Island for which of course he received no points

4   because it's not a conviction but for which there is an

5   outstanding warrant for four years now, it seems to me

6   that, considered in the context of his entire history,

7   the resulting Criminal History Category V and the

8   inclusion of that point does not overstate the

9   seriousness of Mr. Rasberry's criminal history

10  category, and so I'm going to deny the objection on

11  that basis.

12       This is a case in which Mr. Rasberry has

13  specifically been found guilty of possession of heroin

14  with the intent to distribute.  From the events that

15  arose on July 15th of 2015, there is -- there was a

16  suppression hearing in this case, and so I'm quite

17  familiar with the events of that day.  And to

18  summarize, the law enforcement apprehended Ms. Wilson,

19  who was a runner working for Mr. Rasberry, and in turn

20  received permission to search her hotel room.  That led

21  to Mr. Rasberry himself, and he was in my view properly

22  searched and found to be in possession of a significant

23  quantity of heroin along with, as I recall, quinine and

24  caffeine.

25       As Mr. Guerrette pointed out, this was in total

1       enough heroin probably to result in as many as 150

2       retail sales that day, as many as 150 retail sales that

3       day, and so it certainly is indicative of Mr. Rasberry

4       being engaged in major league drug dealing.

5            As reflected in Paragraph 22 of the revised

6       presentence investigation report, this was by no means

7       an isolated incident but was, rather, part of

8       Mr. Rasberry's role as a leader or organizer of a drug

9       trafficking organization that operated in southern

10      Maine.  We had individuals who were traveling outside

11      of the state, bringing back heroin, sometimes hidden in

12      their bodies.  There were multiple houses involved,

13      known as trap houses, from which drug sales were

14      organized.  There were several people involved, at

15      least five or more, who had different roles.  And all

16      the information that I've received would suggest that

17      Mr. Rasberry was at the top of the pyramid and that

18      this activity went on for a period of months, at least.

19           And so the related relevant conduct in this case

20      really paints a portrait of a very serious, ongoing

21      criminal enterprise, which would have resulted in the

22      distribution of very large quantities of primarily

23      heroin on a daily basis, possibly, certainly weekly

24      basis, in this community.  And so as is really

25      acknowledged I think by all, there's no question,

1    Mr. Rasberry, the crime here is quite serious.  And any

2    sentence that is imposed has to reflect the seriousness

3    of the conduct that you engaged in.

4         This conduct, of course, is consistent with

5    Mr. Rasberry's history.  He has two -- he had two prior

6    drug convictions and has no legitimate employment

7    history to speak of.  And so the information contained

8    in the revised presentence investigation report in this

9    case does in fact paint the fact that Mr. Rasberry has

10   led a life of crime during his adult years.  And the

11   sentence in this case has to reflect the fact that the

12   public should be protected from any further crimes like

13   this by him.

14        Now, in considering Mr. Rasberry's personal

15   history and characteristics, it's really fair to

16   describe his childhood as heartbreaking.  It was a

17   childhood marked by severe abuse and neglect, abandoned

18   by a father as an infant, sexually abused as a young

19   child, raised by a drug-addicted mother, who

20   essentially left him to raise himself, and being

21   introduced to the streets and drug use and alcohol at a

22   very early age.  Mr. Rasberry has gone through life

23   with an untreated mental health condition, and has

24   abused alcohol and Cannibis and possibly other drugs.

25   And I think one can logically conclude that it was at

least in part a matter of self-medication.  There were times he did make attempts at drug treatment, to his credit; none were successful.

     In addition, I think it's important that the sentence in this case reflect also that Mr. Rasberry has for a fairly extended period accepted the responsibility of a household.  The other drug offenders, leaders of drug operations who I've seen in court, largely don't have families for which they've accepted responsibility and have earned the love and trust of children.  That's not part of that mix.  But it happens to be in this case, which makes Mr. Rasberry's case in that respect unique.  I take as sincere what his fiancée and stepson say about him, as well as what is described in the letters about the role that he's played in that household.  It shows that he's capable of loving and being -- and receiving love and cares about people.

     And so although it's not ever possible for any judge to be able to forecast the degree to which any particular defendant truly is amenable to rehabilitation after a lengthy prison sentence, there are kernels of evidence here to suggest it's possible with Mr. Rasberry.

     And I would add to that his performance since he's

1    been incarcerated.  He has been incarcerated for a

2    fairly lengthy period already.  Every indication that I

3    have is that he has performed admirably and has taken

4    advantage of the services that were offered to him in

5    the jail.  And that bodes well for what he might do

6    while he's incarcerated in the Bureau of Prisons.

7         There was a co-defendant in this case whose name

8    has been mentioned, Julie Wilson, who received a

9    sentence of time served.  I think it's important to

10   note that Ms. Wilson's crime was significantly less

11   serious than Todd Rasberry's, with an offense category

12   number of 13 and a criminal history category of II.  In

13   the scheme of this crime Ms. Wilson was a runner.  She

14   was a drug addict who was delivering drugs at the

15   direction of others and specifically at the direction

16   of Mr. Rasberry.  And so at least for purposes of

17   giving thought to the possibility of the need to avoid

18   unwarranted differences in sentencing and disparities

19   in sentencing, that's not of concern here.  Ms. Wilson

20   was -- is quite a different offender than Mr. Rasberry

21   with quite a different history who played quite a

22   different role than he did in this offense.

23         And so I'm left to make sense of the need on the

24   one hand for this sentence to be sufficiently harsh to

25   reflect the seriousness of the conduct that's involved,

1    to deter Mr. Rasberry, who's already had prison
2    sentences under his belt and has come out and continued
3    to offend, to afford adequate deterrence to the
4    community of people that are aware of him and of this
5    case and are undoubtedly paying attention to see what
6    happens to him, and also to protect the public from
7    further crimes by Mr. Rasberry. I think that if he
8    were to simply go back into -- go back into public life
9    in a relatively short period of time there is I think a
10   very high risk of reoffense. But on the other hand, to
11   also account for what I see as indicators of the
12   possibility of rehabilitation, to receive treatment for
13   his mental health condition, to receive vocational
14   training so that he has a means of making a legitimate
15   living, of giving him a sentence which is not so long
16   as to disincentivize him from trying to heal himself so
17   that he can get back to his family.
18        Mr. Rasberry is in his 30s now, and it seems to me
19   it does matter what age he gets out of prison relative
20   to where his younger son will be in life for him to
21   still have a chance at playing a meaningful role as a
22   parent. And so I've tried to balance those
23   considerations primarily in arriving at a sentence in
24   this case. And with that as an explanation, I'd like
25   you to stand, Mr. Rasberry.

1        I've concluded that a just and fair sentence in

2   this case, one that is sufficient but not greater than

3   that needed to accomplish the purposes that I have just

4   described, is as follows:

5        I'm ordering you committed to the custody of the

6   U.S. Bureau of Prisons for a total term of 138 months,

7   the equivalent of 11-1/2 years.  I am going to

8   recommend to the Bureau of Prisons that you be housed

9   in Devens or Berlin for purposes of being as close to

10  your family as possible and also that you be considered

11  for participation in the RDAP program.  You are

12  remanded to the custody of the U.S. Marshal in

13  furtherance of the sentence at the conclusion of this

14  hearing.

15       I'm imposing a term of supervised release of three

16  years.  You are to report to the district in which you

17  are released within 72 hours.  You're not to commit

18  another federal, state, or local crime.  You're not to

19  illegally possess a controlled substance.  You are to

20  cooperate in the collection of DNA, and you are not to

21  possess a firearm, ammunition, destructive device or

22  any other dangerous weapon at any time.  Do you

23  understand?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  I'm imposing this district 's

1    standard conditions of supervised release.  Attorney

2    Maselli, did you review those with your client?

3             MR. MASELLI:  Yes, I did, Your Honor.

4             THE COURT:  Are you satisfied that he

5    understands them?

6             MR. MASELLI:  Yes, Your Honor.

7             THE COURT:  And, Mr. Rasberry, is that

8    correct, you do understand the standard conditions of

9    release?

10            THE DEFENDANT:  Yes, Your Honor.

11            THE COURT:  I'm also imposing the following

12   special conditions of supervised release:

13        First, you are to participate in mental health

14   treatment as directed by your officer until released

15   from the program by the officer.  You are to pay or

16   copay for services during the treatment to the

17   officer's satisfaction.  Do you understand?

18            THE DEFENDANT:  Yes, Your Honor.

19            THE COURT:  Secondly, you are to participate

20   in work force development programs and services as

21   directed, and if not employed perform up to 20 hours of

22   community service per week.  Work force development

23   programming may include assessment, testing,

24   educational instruction, training classes, career

25   guidance, and job search and retention services.  Do

1    you understand?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  Third, I'm ordering that you not

4    use or possess any controlled substance, alcohol, or

5    other intoxicant, and you participate in a program of

6    drug and alcohol abuse therapy to the supervising

7    officer's satisfaction.  This will include testing, one

8    test within 15 days of release and at least two but not

9    more than 120 per year thereafter.  You are to pay or

10   copay for services.  You're not to obstruct or tamper

11   in any way with any tests.  Do you understand?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  Fourth, a U.S. Probation Officer

14   may conduct a search of you and of anything you own,

15   use, or possess if the officer reasonably suspects that

16   you have violated a condition of supervised release and

17   reasonably suspects that evidence of the violation will

18   be found in the areas to be searched.  Searches must be

19   conducted at a reasonable time and in a reasonable

20   manner.  Failure to submit to a search may be grounds

21   for revocation of release.  Do you understand,

22   Mr. Rasberry?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  Mr. Maselli, are there any

25   objections to any of the special conditions that I've

1    just announced?

2          MR. MASELLI:  No, Your Honor.

3          THE COURT:  I do find that these conditions

4    are essential, given Mr. Rasberry's history of having a

5    serious mental health diagnosis without treatment, his

6    need to develop a legitimate means to support himself

7    and his family, the fact that Mr. Rasberry has an

8    untreated substance abuse problem, and so all those

9    conditions will assist in addressing those issues.

10        I am imposing a special assessment of a hundred

11    dollars.  I find that Mr. Rasberry does not have the

12    means to pay a fine and so I am not ordering a fine.

13        Counsel, before I advise Mr. Rasberry of his

14    rights of appeal, are there any issues regarding

15    sentencing that I have not addressed?

16          MR. GUERRETTE:  Not from the Government, Your

17    Honor, no.

18          THE COURT:  Mr. Maselli?

19          MR. MASELLI:  No, Your Honor.

20          THE COURT:  Mr. Rasberry, you have the right

21    of appeal, and to exercise that right to appeal from

22    your conviction and/or the sentence you must file with

23    the clerk of court within 14 days of today a written

24    notice of appeal.  Do you understand?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  If you fail to timely file the

2    written notice of appeal, you will have given up your

3    right to appeal this sentence and conviction.  Do you

4    understand?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  If you cannot afford to file the

7    appeal, you can appeal without cost.  The clerk's

8    office will prepared and file it for you at your

9    request without cost; again, you have to request that

10   within 14 days.  Do you understand?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Mr. Rasberry, it's very possible

13   you will not agree with my characterization of the

14   sentence given just -- looking just at your criminal

15   conduct as relatively light.  But I believe it is.  I

16   have tried to sincerely take into consideration what I

17   see as the positive things that you might have going

18   for you, and I don't expect that you -- and you don't

19   need to agree with me, but I want you to know that that

20   was my assessment.

21       Now, you're here today with your family, who

22   speaks so highly of you, including in the courtroom

23   today your young son.  The way that you've lived your

24   life up until now will not be tolerated, cannot be

25   tolerated, by your family or by society.  And it will

1   take a significant period of time for you to turn

2   yourself around.  So I ask you, really implore you, to

3   do everything you can while you're incarcerated to

4   reform yourself.  You're still a relatively young

5   person, you'll come out in middle age, you'll still

6   have a life ahead of you, and you've got a family that

7   cares about you.  Don't waste your time.  Take

8   advantage of everything that is offered to you to bring

9   out the best in yourself.

10          Now, in my view the most important thing is that

11   your son today is six.  If you do well while you're in

12   prison you'll come out and he'll still be a kid, he'll

13   still be a teenager, at least.  He's here today.  Who

14   knows what he's making of this.  But it's a big part of

15   his life and it will always be a big part of his life,

16   this experience.  And really the question is what's he

17   going to take from this.  And I want to suggest to you

18   that you're the one that's now responsible for deciding

19   what he's going to take from this.

20          If you come out of prison after all this and don't

21   live a decent life, one can only imagine what that will

22   mean to him and what effect it might have on him when

23   he's a man your age.  And if you come out of prison and

24   you make something of yourself and you're law abiding,

25   and he sees that with all you went through you have

1    transformed yourself, that powerful message will be

2    with him the rest of his life.

3         So in my view your most important responsibility

4    going forward now is as a role model to him.  People

5    have the means to change themselves and to rehabilitate

6    themselves.  It is doable.  And you can do it if you

7    want, but I really encourage you to think about him.

8    This is your opportunity to do something very powerful

9    and good for him.  So I wish you success.

10        Counsel, anything further?

11            MR. GUERRETTE:  No, Your Honor.

12            MR. MASELLI:  No, Your Honor, thank you.

13            THE COURT:  Attorney Guerrette, there are two

14   other counts in the indictment.  They are to be

15   dismissed; is that correct?

16            MR. GUERRETTE:  Yes.

17            THE COURT:  And so the Government's moving to

18   that effect?

19            MR. GUERRETTE:  Yes, Your Honor.

20            THE COURT:  And I take it there's no

21   objection?

22            MR. MASELLI:  No objection, Your Honor.

23            THE COURT:  The two remaining counts are

24   ordered dismissed.  Thank you, Court will be in recess.

25                    (Time noted:  12:00 p.m.)

1

2                           **C E R T I F I C A T I O N**

3     I, Lori D. Dunbar, Registered Merit Reporter, Certified

4     Realtime Reporter, and Official Court Reporter for the

5     United States District Court, District of Maine,

6     certify that the foregoing is a correct transcript from

7     the record of proceedings in the above-entitled matter.

8     Dated:  February 24, 2017

9                    /s/ Lori D. Dunbar

10                   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25